**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**

|  |  |
|---|---|
| **JOHN DOE,**<br><br>           **Plaintiff,**<br><br>   **v.**<br><br>**BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA and MEDICAL COLLEGE OF GEORGIA AT AUGUSTA UNIVERSITY,**<br><br>           **Defendants.** | **Civil Action No.:**<br><br>**VERIFIED COMPLAINT**<br><br>**Jury Trial Demanded** |

PLAINTIFF JOHN DOE[1], by his attorneys Withers Law Firm, PC, and Offit Kurman, P.A., as and for his Verified Complaint against Defendants the BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA ("BOR") and MEDICAL COLLEGE OF GEORGIA AT AUGUSTA UNIVERSITY ("AU"), respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.     This Title IX discrimination lawsuit is brought on behalf of Plaintiff John Doe ("John" or "Plaintiff"), a former student improperly expelled from AU.

2.     John was a second-year medical student at AU when he was expelled over allegations that he sexually assaulted his friend and classmate Jane Roe.[2]

3.     In violation of Title IX of the Education Amendments of 1972, AU engaged in a faulty process improperly influenced by John's male gender to reach an erroneous outcome

---

[1] Plaintiff has filed, contemporaneously with this Complaint, a Motion for Leave to Proceed Under a Pseudonym.
[2] "Jane Roe" is a pseudonym. Plaintiff will identify non-party student witnesses by their initials to protect their confidentiality. AU knows the identity of Jane Roe and the non-party student witnesses.

regarding Jane's false claims.

4.     AU also improperly refused to accept and investigate John's report that Jane had sexually assaulted him.

5.     AU's decision to engage in selective enforcement in violation of Title IX was also improperly influenced by John's male gender.

6.     John has been greatly damaged by AU's actions, as his education and future career in medicine have been severely compromised, if not completely extinguished, due to his disciplinary record.

7.     Additionally, as a result of AU's actions and inactions, John has suffered reputational damages, economic injuries, and the loss of educational and career opportunities.

## THE PARTIES

8.     John Doe is a natural person residing in Georgia.

9.     The BOR is a state entity that oversees the University System of Georgia.

10.     AU is a public medical school organized and existing by virtue of the laws of the State of Georgia that conducts business in the State of Georgia.

## JURISDICTION AND VENUE

11.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the claims herein arise under federal law.

12.     This Court has personal jurisdiction over Defendants because Defendants are arms of the State of Georgia and conduct business within the State of Georgia.

13.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this

judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.    John And Jane's Interaction on March 29, 2025

14.    John and Jane, a fellow medical student, both attended a party at another student's home on March 29, 2025.

15.    Prior to March 29, 2025, John and Jane had been acquaintances, but they were not particularly close.

16.    Jane arrived at the party at 6:13PM.

17.    John arrived at the party at approximately 7PM.

18.    The party involved a cocktail making contest, and John served as one of the judges.

19.    As a result, John and the other judges were sequestered from the other party guests from approximately 7:20PM to 8:10PM while they sampled the cocktail contest submissions.

20.    After judging the cocktail competition, John went to the patio in the backyard and smoked a cigar with B.E.

21.    While they were smoking, K.L and Jane came outside and asked if they could join.

22.    While the group of four smoked, Jane made sexually suggestive comments towards John and imitated oral sex on a cigar while maintaining eye contact with John.

23.    When B.E. noted John's upcoming wedding, Jane asked John, "Are you sure you want to fuck one person for the rest of your life?"

24.    Jane asked John the same question several times throughout the evening, which was overheard by one witness, GR.

25.    John did not witness how much alcohol Jane drank at the party.

26.     John also did not observe Jane before she arrived at the party.

27.     During the party, John did not observe any signs indicating that Jane was incapacitated.

28.     John did not observe Jane slurring her words while speaking at the party.

29.     John did not observe Jane speaking incoherently at the party.

30.     John did not observe Jane unable to walk while at the party.

31.     John did not observe Jane vomit at the party.

32.     John did not observe Jane become unconscious at the party.

33.     While John consumed alcohol at the party, he did not become heavily intoxicated or incapacitated.

34.     When the party ended at approximately 10:20PM, several other partygoers asked Jane if she wanted to go out to a bar to continue drinking.

35.     Jane decided that she wanted to go home.

36.     John offered to give Jane a ride home instead of calling an Uber.

37.     Jane accepted John's offer and walked unassisted to John's car.

38.     Jane's exit from the home where the party was being held was captured by a doorbell camera.

39.     The doorbell camera footage shows Jane walking unassisted down the front steps of the home before walking unassisted to John's car on the sidewalk in front of the home.

40.     The doorbell camera footage shows that Jane did not stumble at any point walking down the steps or on the sidewalk in front of the home.

41.     The doorbell camera footage shows that Jane did not fall at any point walking down

the steps or on the sidewalk in front of the home.

42. The doorbell camera footage shows Jane walking fluidly down the steps and on the sidewalk in front of the home.

43. The doorbell camera footage shows that Jane was not incapacitated when she left the party.

44. Because John did not know where Jane lived, he asked her to provide directions to her home.

45. Jane was able to clearly provided turn-by-turn directions during the 20-minute drive from the party to her home.

46. Jane did not consume any alcohol during the 20-minute drive to her apartment.

47. After arriving at Jane's apartment complex, Jane directed John to park in any available spot.

48. After John parked, Jane leaned over the center console and kissed John.

49. After this kiss, Jane told John, "I wish you were upstairs railing me right now," indicating that she wanted to have sex with John.

50. John declined Jane's offer.

51. John and Jane then sat in the car and continued talking.

52. During the conversation, Jane once again told John that she wanted him to come to her apartment and have sex with her.

53. John responded by saying that he did not feel comfortable with that.

54. Jane did not drink any alcohol while she and John sat talking in his car.

55. Jane then invited John into her apartment.

56.     After they entered the apartment, Jane went into her bedroom, leaving John in the hallway.

57.     After several minutes, Jane emerged from her bedroom and told John she needed to put sheets on her bed.

58.     Jane then asked John, "Why are you just fucking standing there?"

59.     Jane then dropped to her knees, pulled down John's underwear, and began performing oral sex on John.

60.     Jane did not ask for John's consent before doing so.

61.     John did not give consent, verbal or otherwise, to Jane before she began performing oral sex on him.

62.     Jane briefly stopped performing oral sex to taunt John by stating, "I can't believe you'd cheat on your fiancée."

63.     Jane then continued performing oral sex on John without his consent.

64.     Jane's actions caused John to feel frozen and unsure of what to do.

65.     Jane then took John to her bedroom and asked John to perform sex acts on her.

66.     Jane performed sex acts on John with her hands and mouth as he sat passively and let them happen.

67.     Jane also asked John to have sex with her from behind.

68.     At one point during the encounter, Jane moved a wall mirror from one side of the room and placed it perpendicular to the bed before telling John, "I want you to fuck me in this mirror."

69.     John reluctantly had sex with Jane as she directed him to do so.

70.     John felt compelled to have sex with Jane because he feared she would retaliate against him if he rejected her based on how aggressive Jane was behaving.

71.     Throughout the sexual encounter, Jane made derogatory comments to John as a result of his behavior that clearly indicated he was being coerced to engage in intercourse.

72.     Jane told John, "Stop being a little bitch about it."

73.     She also told John, "You're such a fucking pussy."

74.     Jane further stated, "I love that I have you shaking like that," referring to John's trembling leg.

75.     Jane also directed John, "You can't tell anyone about this, or they're going to think I'm a horrible person."

76.     Jane refused to let John leave until he ejaculated.

77.     When John indicated he was about to finish, Jane directed him to ejaculate on her back or buttocks, at which time John ejaculated on her back.

78.     John then noticed that there was blood on his genitals caused by Jane's menstruation.

79.     John asked Jane if he could take a shower, and she agreed.

80.     John took a quick shower and then prepared to leave Jane's apartment.

81.     Before John left, Jane told him, "We are never telling anyone about this."

82.     Jane also asked John if he was able to drive home, to which John responded affirmatively.

83.     John then left Jane's apartment at 11:29PM.

84.     Jane did not drink any alcohol while John was in her apartment.

85.　Prior to their sexual encounter, John did not observe any signs indicating that Jane was incapacitated.

86.　Jane was not slurring her words prior to their sexual encounter.

87.　Jane was not speaking incoherently prior to their sexual encounter.

88.　Jane was able to walk unassisted prior to their sexual encounter.

89.　Jane did not vomit prior to their sexual encounter.

90.　Jane did not become incontinent prior to their sexual encounter.

91.　Jane did not become nonresponsive prior to their sexual encounter.

92.　Jane did not become confused about her situation or surroundings prior to their sexual encounter.

93.　Jane did not become unconscious prior to their sexual encounter.

94.　Prior to their sexual encounter, Jane was capable of making rational, reasonable decisions.

95.　Prior to their sexual encounter, Jane was capable of appreciating the situation and addressing it consciously.

96.　John did not observe any signs indicating Jane was incapacitated during their sexual encounter.

97.　Jane was not slurring her words during their sexual encounter.

98.　Jane was not speaking incoherently during their sexual encounter.

99.　Jane was able to move on her own, engage in active sexual behavior, walk, and reposition herself during their sexual encounter.

100.　Jane did not vomit during their sexual encounter.

101. Jane did not become incontinent during their sexual encounter.

102. Jane did not become nonresponsive during their sexual encounter.

103. Jane did not become confused about her situation or surroundings during their sexual encounter.

104. Jane did not lose consciousness during their sexual encounter.

105. During their sexual encounter, Jane was capable of making rational, reasonable decisions.

106. During their sexual encounter, Jane was capable of appreciating the situation and addressing it consciously.

107. John did not observe any signs indicating that Jane was incapacitated after their sexual encounter.

108. Jane was not slurring her words after their sexual encounter.

109. Jane was not speaking incoherently after their sexual encounter.

110. Jane was able to walk unassisted after their sexual encounter.

111. Jane did not vomit after their sexual encounter.

112. Jane did not become incontinent after their sexual encounter.

113. Jane did not become nonresponsive after their sexual encounter.

114. Jane did not become confused about her situation or surroundings after their sexual encounter

115. Jane did not lose consciousness after their sexual encounter.

116. After their sexual encounter, Jane was capable of making rational, reasonable decisions.

117. After their sexual encounter, Jane was capable of appreciating the situation and addressing it consciously.

**B. Jane's Inconsistent Statements And False Accusations Following Her Encounter With John**

118. On April 4, 2025, Jane called John's fiancée multiple times, one of which John answered.

119. Jane asked to speak to John's fiancée, but John's fiancée told John to hang up, which he did.

120. Jane then left John's fiancée a voicemail at 5:17PM asserting that John raped her and that John's fiancée should leave him.

121. At 6:16PM, Jane sent John's fiancée a direct message on Instagram stating that John had cheated and did not assert that any rape occurred.

122. In the aftermath of the encounter, Jane also inconsistently characterized her rendezvous with John as "sex" and "rape" to multiple medical school classmates, at one point telling a witness, KL, that John had been "unfaithful."

123. Despite showing clear signs that she had the capacity to consent immediately prior to, during, and after her sexual encounter with John, Jane told multiple medical school classmates that she was incapacitated when she had sex with John.

124. Despite the fact that Jane was the aggressor who repeatedly told John that she wanted to have sex and directed John to perform specific acts during intercourse, Jane falsely told multiple medical school classmates that John raped her.

**C. Jane Taints The Witness Pool**

125. On April 11, 2025, Jane sent a mass text to all of the female classmates in her and

John's cohort accusing John of sexually assaulting her and advised them to be cautious.

126. Jane also requested that all of these women state that she was very drunk that night if they were ever asked.

**D.    Relevant Title IX Policies**

127. At all times relevant to this matter, AU had a Sexual Misconduct Policy in place.

128. The Sexual Misconduct Policy defines "Consent" as "Words or actions that show a knowing and voluntary willingness to engage in mutually agreed upon sexual activity. Consent cannot be gained by force, intimidation or coercion; by ignoring or acting in spite of objections of another; or by taking advantage of the incapacitation of another where the respondent knows or reasonably should have known of such incapacitation."

129. The Sexual Misconduct Policy defines "Incapacitation" as "The physical and/or mental inability to make informed, rational judgments. It can result from mental disability, sleep or any state of unconsciousness, involuntary physical restraint, status as a minor under the age of 16, or from intentional or unintentional taking of alcohol and/or other drugs. Whether someone is incapacitated is to be judged from the perspective of an objectively reasonable person."

130. The Sexual Misconduct Policy defines "Nonconsensual Sexual Contact" as "Any physical contact with another person of a sexual nature without the person's consent. It includes but is not limited to the touching of a person's intimate parts (for example, genitalia, groin, breasts, or buttocks); touching a person with one's own intimate parts; or forcing a person to touch his or her own or another person's intimate parts. This provision also includes 'Fondling' as defined by the Clery Act."

131. The Sexual Misconduct Policy defines "Nonconsensual Sexual Penetration" as

"Any penetration of the vagina, anus, or mouth by a penis, object, tongue, finger, or other body part; or contact between the mouth of one person and the genitals or anus of another person. This provision also includes 'Rape, Incest, and Statutory Rape' as defined by the Clery Act."

132.    The Sexual Misconduct Policy defines "Stalking" as "Engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for their safety or the safety of others or suffer substantial emotional distress."

133.    A defined by the Sexual Misconduct Policy, "Course of conduct means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with person's property," and "Substantial emotional distress means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling," for the purposes of determining whether an individual has engaged in "Stalking."

134.    "Sexual Misconduct," as defined by the Policy, "Includes, but is not limited to, such unwanted behavior as dating violence, domestic violence, nonconsensual sexual contact, nonconsensual sexual penetration, sexual exploitation, sexual harassment, and stalking."

135.    The Sexual Misconduct Policy requires that AU's Title IX Coordinator take the following steps upon receiving notice of any alleged Sexual Misconduct:

> Upon notice of the alleged Sexual Misconduct, the institution's Title IX Coordinator ("Coordinator") will assess whether a formal investigation, informal resolution, or dismissal would be appropriate. In making this determination, the Coordinator will assess whether the allegation(s), if true, would rise to the level of prohibited conduct, whether a Formal Complaint must be filed, whether an investigation is appropriate in light of the circumstances, whether the parties prefer an informal resolution, and whether any safety concerns exist for the campus community. The need to issue a broader warning to the community in compliance

with the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act") shall be assessed incompliance with federal law.

136.    In other words, no formal report is required to trigger the Title IX Coordinator's initial evaluation of allegations of Sexual Misconduct.

137.    Rather, once the Title IX Coordinator has mere notice that Sexual Misconduct may have occurred, the Title IX Coordinator is required to determine to undertake an initial evaluation of the allegations.

138.    The Sexual Misconduct Policy further states, "Once the Title IX Coordinator has received information regarding an allegation of Sexual Misconduct, the parties will be provided written information about support services. Support services are non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, a without charge that are made available to the Complainant and Respondent before or after the filing of a complaint or where no complaint has been filed. Support services include counseling, advocacy, housing assistance, academic support, disability services, health and mental services, and other services, available at the student's institution. Available support services should also be listed on the institution's Title IX website."

139.    According to the Sexual Misconduct Policy, "Anyone who has made a report or complaint, provided information, assisted, participated or refused to participate in any manner in the Sexual Misconduct Process, shall not be subjected to retaliation. Anyone who believes that they have been subjected to retaliation should immediately contact the Coordinator or their designee. Any person found to have engaged in retaliation in violation of this Policy shall be subject to disciplinary action.

140.    The Sexual Misconduct Policy states, "Until a final determination of responsibility,

the Respondent is presumed to have not violated the Sexual Misconduct Policy."

141. The Sexual Misconduct Policy further notes that "the standard of review throughout the Sexual Misconduct process is a preponderance of the evidence."

### E. Relevant Code of Conduct Provisions

142. At all times relevant to this matter, AU had a Student Code of Conduct in place.

143. The Code of Conduct states, "Until a final determination of responsibility, the Respondent is presumed to have not violated the Sexual Misconduct Policy."

144. The Code of Conduct also states, "Prior to the finalization of the investigation report, timely and equal access to information directly related to the allegations that has been gathered during the investigation and may be used at the hearing will be provided to the Complaint, the Respondent, and a party's advisor (where applicable)."

145. According to the Code of Conduct, "The initial investigation report . . . should fairly summarize the relevant evidence gathered during the investigation and clearly indicate any resulting charges or alternatively, a determination of no charges."

146. The Code of Conduct states, "Should it be reasonably believed that the individual presented tainted testimony, the hearing panel will disregard or discount the testimony."

147. The Code of Conduct lists the following bases for appeal following a disciplinary hearing:

- whether prescribed University disciplinary procedures were not followed such that the fairness of the hearing was impacted, including but not limited to, whether the alleged misconduct falls within the jurisdiction of the University conduct system, whether any hearing questions were improperly excluded, or whether the decision was tainted by a conflict of interest or bias by the Title IX Coordinator, Conduct Officer, investigator(s), or hearing decision maker;

- whether the decisions made or sanction(s) imposed by the hearing body were

consistent with the weight of the information available; and

- whether new evidence exists sufficient to alter the original decision that was not considered at the original hearing and was not known or knowable by the accused student or organization at the time of the hearing.

**F.**     <u>**Jane Files A False Title IX Complaint Against John**</u>

148.    On April 2, 2025, Jane reported her false allegations of sexual assault to Dr. Nina Paletta, an AU employee.

149.    Upon learning of these allegations, Dr. Paletta immediately reached out to Dr. Elizabeth Gray, AU's Savannah Campus Dean, to obtain further reporting instructions.

150.    On April 10, 2025, Jane filed a report with Julie Kneuker, AU's Title IX Coordinator, falsely asserting that John sexually assaulted her.

151.    In her complaint, Jane falsely asserted that John had sex with her while she was heavily intoxicated and unable to consent.

152.    AU also fabricated a claim that Jane woke up at the end of the sexual encounter confused to John ejaculating on her back.

153.    Based on Jane's false report, John was charged with Nonconsensual Sexual Penetration.

154.    An investigation of Jane's false Title IX complaint began on April 16, 2025.

**G.**     <u>**John Attempts To File Title IX Report Against Jane But AU Refuses To Investigate His Claims Or Reprimand Jane For Witness Tampering**</u>

155.    On April 2, 2025, John informed Dr. Folami Powell, an AU employee, that Jane had sexually assaulted him.

156.    John also asked Dr. Powell for information about making a report to the Title IX Coordinator.

157. Dr. Powell informed John that his report of Jane's misconduct had been forwarded to the Title IX Coordinator, who would be reaching out to him to discuss the matter.

158. However, Kneuker never reached out to John to discuss his allegations of sexual assault against Jane.

159. Rather, Kneuker contacted John on April 14, 2025 to inform him that AU would be initiating a formal investigation process based on Jane's false claims of sexual assault.

160. On April 14, 2025 and April 15, 2025, John asked Kneuker about the status of his complaint against Jane.

161. John explained that Jane had forcibly exposed his genitals and performed oral sex on him without his consent.

162. This conduct constituted Nonconsensual Sexual Contact as defined by the Sexual Misconduct Policy.

163. John further explained that Jane coerced him into having intercourse.

164. This conduct also constituted Nonconsensual Sexual Contact as defined by the Sexual Misconduct Policy.

165. In response to his complaint, Kneuker told John, "If you were having sex from behind, you were in control of the situation."

166. Kneuker's comment completely ignored the fact that John's complaint against Jane was also based on Jane's nonconsensual removal of John's underpants and forceable oral sex that she performed on him.

167. Moreover, Kneuker's comment shows that she believes that a penetrative sexual partner – who can only possibly be a man – cannot possibly be a victim of sexual assault.

168. In other words, Kneuker's comment shows that she does not believe that men can be victims of sexual assault in the context of an encounter with a woman.

169. In response to Kneuker's comment, John once again explained that Jane was being aggressive and coercive, which made him feel pressured into having sex with her.

170. John also informed Kneuker that Jane was directing his movements, so he really was not in control of the situation.

171. Kneuker informed John that filing a countercomplaint against Jane would be seen as retaliatory.

172. Despite receiving a report that Jane exposed John's genitals and performed oral sex on him without consent before coercing him to engage in intercourse, Kneuker refused to accept John's Title IX complaint against Jane.

173. Kneuker's comment also improperly assumed that John sexually assaulted Jane despite the fact that no final determination of responsibility had been reached.

174. During his intake meeting, John also informed Kneuker of Jane's witness tampering *via* her mass text to the female members of the cohort accusing John of sexual assault and directing her female classmates to emphasis her drunkenness on the night in question if they were asked about it.

175. Kneuker took no action in response to Jane's blatant witness tampering.

**H.**    **AU Refuses To Enforce No Contact Order Against Jane**

176. On April 16, 2025, the Title IX office issued a mutual no-contact order ("NCO") to John and Jane.

177. The NCO prohibited, among other things, "face-to-face contact," and required that

"reasonable distance" be maintained.

178.    On May 6, 2025, while sitting in the Armstrong Center auditorium, Jane approached the area John was sitting in and sat immediately in front of him, two chairs to the side despite the availability of dozens of empty chairs further away.

179.    By sitting close enough to John to have face-to-face contact, Jane violated the terms of the NCO.

180.    However, when John reported Jane's violation of the NCO on May 7, Kneuker refused to enforce the clear and unambiguous terms of the NCO.

181.    Instead of disciplining Jane for committing an undisputed violation of the NCO, Kneuker revised the NCO to prohibit the exact behavior that Jane had already engaged in.

**I.    The Faulty Title IX Investigation and Further Failure to Investigate Jane's Conduct Violations**

182.    AU assigned Kymyetta E. Turner to investigate Jane's false claims.

183.    During his interview with Turner on May 15, 2025, John explained to Turner that Jane was the sexual aggressor who made repeated verbal statements expressing her desire that John have sex with her, as noted extensively above.

184.    John also told Turner that Jane pulled down his underwear and performed oral sex on him without his consent.

185.    John also told Turner that Jane coerced him into performing various sex acts with her, including intercourse.

186.    Thus, John had once again informed an AU employee that Jane engaged in conduct that constituted Nonconsensual Sexual Conduct.

187.    Neither Turner nor AU took any action in response to John's report of Jane's

misconduct.

188.    John also informed Turner that Jane had called his fiancée several times on April 4, 2025 before leaving a voicemail asserting that John had raped her.

189.    John also informed Turner that Jane sent his fiancée an Instagram direct message on April 4, 2025 asserting that John had cheated.

190.    John provided documentary evidence of the voicemail and the direct message.

191.    This behavior by Jane constituted Stalking as defined by the Sexual Misconduct Policy.

192.    However, neither Turner nor AU took any action in response to Jane's behavior.

193.    The Final Investigation Report was issued on June 30, 2025.

194.    The Final Investigation Report included multiple evidentiary attachments.

195.    Once of these attachments was a surreptitious audio recording of a conversation that occurred between John and two non-party witnesses on April 14, 2025.

196.    This recording was provided to Turner on May 6, 2025.

197.    Turner did not inform John of the existence of this recording during his initial interview on May 15, 2025, nor did she do so during his follow up interview on May 30, 2025.

198.    In fact, John only became aware of the existence of this recording when the Final Investigation Report was issued on June 30, 2025, nearly two months after AU first became aware of the existence of the recording.

199.    AU's improper withholding of this recording until after the Final Investigation Report was issued prevented John from properly and adequately challenging the witness statements offered in support of Jane's false narrative during the investigation process.

**J.** **The Title IX Hearing And Decision**

200.    A Title IX hearing was held before a three-person panel (the "Hearing Panel") on July 18, 2025.

201.    The Hearing Panel issued its decision on July 25, 2025 (the "Hearing Decision").

202.    The Hearing Decision found John responsible for Nonconsensual Sexual Penetration and expelled him from AU.

203.    In reaching this determination, the Hearing Panel misread the record evidence and expert testimony in a manner that only favored Jane.

204.    No member of the Hearing Panel had any medical training or expertise in alcohol metabolism.

205.    Undeterred by their ignorance, the Hearing Panel engaged in a "scientific" analysis of Jane's incapacitation based on her status as a female and her uncorroborated and self-reported alcohol consumption prior to John's arrival at the party.

206.    The Hearing Panel improperly relied on this unsupported analysis to reach its incorrect conclusion that Jane was incapacitated during her sexual encounter with John and that Jane's ingestion of Zoloft on the night in question exacerbated the effects of her alcohol consumption.

207.    In making this determination, the Hearing Panel also ignored testimony provided by witness called by AU, Dr. Jasmine Shell, who testified that mixing alcohol and Zoloft would not lead to incapacitation.

208.    The Hearing Decision also relied heavily on testimony provided by three witnesses – LTB, RN, and ZRC – to support its findings that Jane was incapacitated, John knew Jane was

incapacitated, and John was not a credible witness.

209.  All three of these witnesses stated that they had a bias towards believing any woman who makes a claim that she was sexually assaulted.

210.  Thus, the testimony provided by LTB, RN, and ZRC was improperly tainted and should have been disregarded pursuant to the Code of Conduct.

211.  The Hearing Panel ignored this clear bias and violated AU's Code of Conduct when it relied upon this tainted testimony.

212.  Most galling, the Hearing Panel credited LTB's testimony claiming that John knew Jane was extremely intoxicated even though LTB's testimony was contradicted by an audio recording of a conversation between John and LTB that was part of the evidence record the Hearing Panel was tasked with evaluating.

213.  Astonishingly, the Hearing Panel stated that LTB's testimony regarding John's supposed admission of Jane's incapacitation – which, once again, was flatly contradicted by an audio recording in the evidence record – was "perhaps the most damaging to the Respondent's credibility."

214.  In determining that John was not a credible witness, the Hearing Panel ignored evidence proving that John relayed a consistent narrative of the night in question to numerous witnesses over a period of time.

215.  Instead, the Hearing Panel found that John was not credible because he first testified that he had two drinks at the party and later said it was three drinks despite the fact that John at all times indicated he was estimating his alcohol consumption and the difference between consuming two or three drinks had no material outcome on the case.

216.   By contrast, the Hearing Panel improperly assumed that Jane's testimony was factual and did not address multiple inconsistencies in her ever-evolving description of the events giving rise to the Title IX process.

217.   The Hearing Decision does not address the fact that Jane told varying stories as to whether she had "sex" or was "raped" or whether John was "unfaithful."

218.   The Hearing Decision includes multiple untrue statements regarding Jane's supposed consistency in reporting the events in question.

219.   The Hearing Decision asserts that Jane told a consistent story to numerous outcry witnesses over time despite the fact that the Title IX evidentiary record shows this to be obviously false.

220.   The Hearing Decision goes to great lengths to offer patently irrational explanations for Jane's unsupported and inconsistent claims.

221.   Notably, the Hearing Panel offered a strained interpretation completely at odds with objective video evidence of Jane leaving the party.

222.   The video shows Jane descending two flights of stairs in high heels without assistance and without stumbling.

223.   When she reaches the bottom of the stairs in the video, Jane quickens her steps to catch up to John as she follows him to his truck to be driven home.

224.   The video evidence shows that Jane was not showing any outward, objective signs of incapacitation less than 20 minutes prior to the sexual encounter.

225.   However, when faced with this incontrovertible evidence that Jane was not incapacitated, the Hearing Panel inserted its own biased and subjective perspective to reach a

conclusion that completely contradicts the objective video evidence.

226.    The Hearing Panel determined that Jane was incapacitated despite a dearth of evidence indicating how much alcohol she had actually consumed on the night in question.

227.    In fact, multiple witnesses at the party who claimed Jane was incapacitated stated that they did not know how much Jane had to drink.

228.    Multiple witnesses also testified that Jane was incapacitated even though they had left the party early and could not provide any explanation as to why they believed Jane was incapacitated.

229.    Additionally, 9 of the 11 witnesses from the party had received the text message from Jane directing them to testify the Jane was very drunk at the party.

230.    The Hearing Panel also ignored the following uncontested evidence proving that Jane had decision-making capacity – and was therefore not incapacitated – immediately prior to the sexual encounter:

- At the end of the party, Jane was invited by her friends to continue drinking downtown.

- When presented with the option to continue drinking with her friends, Jane chose to go home and said she was going to order an Uber.

- When John offered to drive Jane home instead, Jane accepted.

- On the way from the party to Jane's apartment, Jane provided John with turn-by-turn directions, as John had never been to Jane's apartment before.

231.    One witness stated that Jane told her that she did not want to go downtown due to her alleged level of intoxication, demonstrating that Jane was aware of her circumstances and made a deliberate and rational decision to go home.

232.    Another witness testified that Jane had no problems communicating with her at the

end of the evening.

233. The Hearing Decision indicates that the Hearing Panel improperly shifted the burden of proof to John.

234. While the Hearing Decision explains away Jane's behavior and testimony when it conflicts with her allegations, it creates problematic issues for John where none exist.

235. The Hearing Panel imputed a higher standard of knowledge with regard to Jane's supposed incapacitation based on a misperception that John possessed military experience, his purported undergraduate degree in human physiology, and his one year of medical school.

236. John has a degree in biology, not human physiology as the Hearing Panel incorrectly stated.

237. John's relationship with the military was purely contractual, as he is a participant in the Health Professions Scholarship Program.

238. John had not received any formal military training or served in any capacity.

239. Jane also had a year of medical school experience at that time, but her testimony and conduct were not held to a heightened standard based on that fact.

240. The Hearing Panel's misleading misrepresentation of John's background and imputation of constructive knowledge of Jane's alleged incapacitation based on that fabricated background held John to an impermissibly high standard in violation of the preponderance of the evidence standard.

241. The Hearing Panel also cited the "timing and nature" of John's attempt to report Jane's violations of the Sexual Misconduct Policy as evidence of retaliatory intent and used it to undermine John's credibility.

**K.** **John's Appeal of the Hearing Decision**

242. John appealed the Hearing Decision on August 8, 2025, asserting procedural error and findings inconsistent with the weight of the information.

243. AU denied John's appeal in a decision dated August 22, 2025 (the "Appeal Decision").

244. The Appeal Decision blatantly ignored substantial portions of John's appeal, improperly overlooked significant procedural defects in the Title IX process, and incorrectly disregarded the Hearing Panel's failure to properly assess the relevant evidence.

245. John made a further appeal to AU's President (the "Presidential Appeal") on August 28, 2025.

246. The Presidential Appeal was denied on September 23, 2025.

**L.** **AU's Gender Bias Against Males**

247. In 2017, Kneuker embossed her Facebook profile picture with the message "Believe Survivors":



248.     In 2018, Kneuker embossed her Facebook profile picture with #IbelieveSurvivors:



249.     Both of these endorsements occurred prior to Kneuker's receipt of Jane's Title IX complaint against John.

250.     Based on the anti-male statement Kneuker made to John noted above, it is clear that Kneuker equates "survivor" with women who make accusations of sexual assault against men.

251.     The fact that Kneuker publicly asserted on multiple occasions that "survivors" should be believed unconditionally shows that the Title IX process against John was biased from the very beginning.

252. AU's Title IX Prevention and Education website prominently features the following photograph:



253. The photograph features two female students standing in front of a large sign that states, "Believe & Support Survivors."

254. The two female students are accompanied by two police officers.

255. The use of this photograph on AU's Title IX Education and Prevention website indicates that AU endorses the position that women who claim they have been sexually assaulted

should be believed without question.

256.    The ominous inclusion of multiple law enforcement members indicates that AU will enact strict punishment based a mere accusation by a female student.

257.    AU's Title IX Prevention and Education website provides a link labeled "Financial Help for Women in Abusive Relationships."

258.    There is no corresponding link for men.

259.    AU's Title IX Prevention and Education website provides a link to a Stalking Fact Sheet.

260.    The Stalking Fact Sheet contains a section titled "Stalking and Intimate Partner Femicide."

261.    There is no corresponding section of the Stalking Fact Sheet that references violence committed by female stalkers against men.

262.    AU's decision to link to the Stalking Fact Sheet, which explicitly and exclusively refences femicide (with no mention of androcide), shows that AU believes that only women can be victims of sexual violence.

263.    AU's Title IX Prevention and Education website also provides a link to materials prepared by the Know Your IX organization.

264.    The Know Your IX materials use repeated examples of sexual assault depicting a female victim and male perpetrator.

265.    The Know Your IX materials linked by AU also state, "We recognize that gender violence is both a cause of inequity and a consequence of it, and we believe that women, transgender, and gender non-conforming students will not have equality in education or

opportunity until the violence ends."

266.	There is no reference to how men are impacted by sexual assault.

267.	The Know Your IX materials state, "Violence, including gender violence, asserts and reinforces hierarchies of dominance, power, and privilege. Historically, rape (and the threat of rape) has been used by white men to establish and maintain slavery, colonialism, and war and to subordinate women and other marginalized peoples."

268.	Augusta University's adoption and endorsement of the positions taken in the Know Your IX materials indicates an institutional anti-male bias.

269.	Mark Myers, a member of the Hearing Panel, is a self-described activist who has been publicly engaged in sexual assault advocacy since the 2015-2016 academic year.

270.	Myers formed a student organization at Allegheny College called Why Not Us, which, among other activities, emphasized the relationship between the Title IX office and Women's Services.

271.	Why Not Us was identified by Allegheny College's newspaper as an organization that seeks to empower women on campus in meaningful ways.

272.	Why Not Us harshly criticized of the Trump Administration's Title IX changes that provided increased due process protections for accused students and instead advocated for the Title IX regulations in place at the time of the Obama Administration's 2011 Dear Colleague Letter, which had a profound negative impact on men attending colleges and universities.

273.	Myers also advocated for the creation of a Title IX Advisory Committee within the Allegheny Student Government as part of his ongoing activism, citing the need to address "rape culture" through educational efforts.

274. Morgan Davis, another member of the Hearing Panel, is affiliated with the Sexual Assault Response Center ("SARC"), an organization that frames sexual misconduct as a female-specific issue.

275. Davis has taught "Fierce & Fearless: Self-Defense for Empowerment," a women-only self-defense class hosted by SARC.

276. This women-only class is offered explicitly as part of Sexual Assault Awareness Month.

277. Neither Davis nor SARC offer parallel programing for men.

278. SARC exclusively employes female administrators and nurses.

279. SARC routinely produces educational material exclusively depicting female patients and victims.

280. SARC employees attended the International Conference on Sexual Assault, Domestic Violence, and Forging New Pathways, which was hosted by End Violence Against Women International (EVAWI).

281. SARC's newsletter regarding Black History Month frames rape as a female-centric issue.

282. SARC's Facebook posts often include the hashtag #believesurvivors.

283. Kneuker was employed by SARC prior to becoming Title IX Coordinator at AU.

284. Since 2017, AU has had a culture that conformed to the notion of "believe all women" in the midst of the #MeToo era that is evident in the events hosted on campus and from explicit statements from AU's administration.

285. In 2017, AU created a Domestic Violence Awareness Month Committee which

paired with SafeHomes of Augusta Domestic Violence Center to coordinate events in an effort to "raise awareness and unite those working to end abuse."

286. Annual events held at AU since 2017 have included the SafeHomes Survivors' Walk, which "features testimonies from domestic violence survivors, a balloon release and a candlelight walk to honor victims" and panel discussions where survivor stories are shared to raise awareness.

287. Other events have included an annual interactive play entitled "Why Do They Stay? Understanding the Victim's Perspective," as well as a Title IX case studies workshop where employees can "gain important knowledge about victim-centered response."

288. The events noted above overwhelmingly focused on portraying women as victims of sexual assault.

289. AU has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female students.

290. AU ignored evidence that was favorable to John in making its disciplinary determinations.

291. AU repeatedly violated its own policies.

292. AU failed to act in accordance with its own policies that were designed to protect accused students.

293. AU applied university policies in a manner that resulted in harsher penalties for males accused of sexual misconduct as compared to females.

294. Indeed, John was expelled based on Jane's allegations of sexual assault, yet AU

refused to investigate John's allegations that Jane sexually assaulted him.

295.    In other Title IX matters, AU has also applied university policies in a manner that resulted in harsher penalties for males accused of sexual misconduct as compared to females.

296.    In fact, males accused of sexual assault at AU are historically and systematically and invariably found guilty, regardless of the evidence, or lack thereof.

297.    AU reached conclusions that were incorrect and contrary to the weight of the evidence.

298.    AU found John responsible despite a lack of evidence proving by a preponderance of the evidence that Jane was incapacitated at the time of the sexual encounter.

299.    John also identified multiple inconsistencies in Jane's story regarding the alleged incident that AU ignored in reaching its disciplinary determination.

300.    In addition to the inconsistencies that John identified for AU, the evidentiary record contained discrepancies in Jane's story that AU ignored.

301.    Despite clear evidence to the contrary, AU found that Jane's descriptions regarding her level of lucidity and recollection of the alleged incident were consistently reported.

302.    Whenever inconsistencies in Jane's story came up, AU made a tremendous effort to reconcile these discrepancies.

303.    To the contrary, AU created inconsistencies in John's explanation of the events in question where none existed.

304.    Based on the foregoing, AU failed to properly apply the preponderance of the evidence standard by failing to assess the entirety of the evidentiary record, ignoring exculpatory evidence in John's favor, ignoring evidence that contradicted Jane's account of the event in

question, and rendering inconsistent and skewed credibility determinations.

305. Based on the foregoing, AU improperly shifted the burden of proof to John when it conducted the Title IX hearing in a manner that failed to assume he was not responsible at the outset of the hearing.

**M. Damages**

306. As a direct and proximate result of AU's actions, John sustained damages, including, without limitation, reputational damages, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

307. John's career in medicine has been jeopardized by AU's actions.

**FIRST CAUSE OF ACTION**
**(VIOLATION OF TITLE IX OF THE EDUCATION**
**AMENDMENTS OF 1972 – ERRONEOUS OUTCOME)**

308. John repeats and realleges each and every allegation hereinabove as if fully set forth herein.

309. Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

310. Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

311. AU federal funding, including in the form of student loans.

312. Numerous evidentiary and procedural errors throughout AU's Title IX process resulted in an erroneous outcome.

313. Under Title IX, an educational institution must develop, implement and execute a

hearing procedure which is substantially fair in nature.

314. Challenges to university disciplinary proceedings on the basis of "erroneous outcome" assert that the plaintiff was innocent and was wrongly found to have committed an offense and that gender bias was a motivating factor behind the erroneous findings.

315. An erroneous outcome occurred in this case because John was innocent and wrongly found responsible for Nonconsensual Sexual Penetration, and gender bias was a motivating factor.

316. Evidentiary weakness and procedural flaws support a claim of an erroneous outcome.

317. As detailed above, AU misapplied its own policies and procedures when it found John responsible for Nonconsensual Sexual Penetration.

318. AU's finding that John was responsible for Nonconsensual Sexual Penetration in contravention of its own policies and without sufficient evidence to support such a finding constituted an erroneous outcome.

319. Allegations of a flawed proceeding support a claim of an erroneous outcome.

320. AU engaged in a flawed proceeding when it failed to presume that John had not violated the Sexual Misconduct Policy.

321. AU engaged in a flawed proceeding when it withheld highly relevant evidence from John in violation of the Code of Conduct.

322. AU engaged in a flawed proceeding when it ignored clear inconsistencies in Jane's story regarding the alleged incident.

323. AU engaged in a flawed proceeding when it ignored evidence that was favorable to

John in reaching its disciplinary determinations.

324. AU engaged in a flawed proceeding when it created inconsistencies in John's recounting of the events in question where none existed.

325. AU engaged in a flawed proceeding when it created excuses for questionable actions and testimony by Jane that reflected poorly on her credibility and otherwise undermined her allegations against John.

326. AU engaged in a flawed proceeding when it found John responsible for Nonconsensual Sexual Penetration despite clear video evidence establishing that Jane was not incapacitated prior to the sexual encounter in question.

327. AU engaged in a flawed proceeding when it violated the Code of Conduct by considering and relying upon clearly tainted testimony from three witnesses who admitted that they had a pro-female bias that led them to instinctively believe any woman who claimed she was sexually assaulted.

328. AU's website prominently features photographs and links that show a pro-female, anti-male bias.

329. Statements made by the Title IX Coordinator to John indicate that there is an atmosphere of anti-male bias at AU.

330. Facebook posts made by the Title IX Coordinator indicate that she harbors a pro-female, anti-male bias.

331. At least two members of the Hearing Panel also harbor pro-female, anti-male bias, as exhibited by their prior words and deeds.

332. This anti-male bias at multiple levels of the Title IX proceeding led to an erroneous

outcome.

333.   The behavior detailed above constitutes illegal sex discrimination.

334.   As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SECOND CAUSE OF ACTION
## (VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972 – SELECTIVE ENFORCEMENT)

335.   John repeats and realleges each and every allegation hereinabove as if fully set forth herein.

336.   A university engages in selective enforcement in violation of Title IX when it treats a similarly-situated member of the opposite sex more favorably than the plaintiff asserting the claim.

337.   John and Jane were similarly situated.

338.   John and Jane were both students enrolled at AU during the relevant time period.

339.   John and Jane both alleged that they had been subjected to sexual assault.

340.   AU treated Jane, a female, more favorably than John, a male.

341.   Specifically, AU accepted and investigated Jane's allegations of sexual assault against John.

342.   However, when John reported that Jane had sexually assaulted him, AU refused to accept and investigate John's allegations.

343.   As detailed above, AU's decision to accept Jane's complaint but reject John's was based on improper, anti-male bias.

344.   The behavior detailed above constitutes illegal sex discrimination.

345. As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against BOR and AU as follows:

(i) on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii) on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(iii) awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

Dated: Savannah, Georgia
      October 1, 2025

WITHERS LAW FIRM PC
*Attorneys for Plaintiff*

By: /s/ Thomas A. Withers
Thomas A. Withers
8 East Liberty Street
Savannah, GA 31401
912-447-8400
twithers@witherslawfirmpc.com

-and-

OFFIT KURMAN, P.A.
*Attorneys for Plaintiff*

By: /s/ Kimberly C. Lau
Kimberly C. Lau (*pro hac vice* pending)
James E. Figliozzi (*pro hac vice* pending)
590 Madison Avenue, 6th Floor
New York, New York 10022
(212) 545-1900
kimberly.lau@offitkurman.com
james.figliozzi@offitkurman.com

## **VERIFICATION**

████████████████ aka JOHN DOE, declares the following under penalty of perjury:

1.      I am a Plaintiff in the within proceeding. I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to my own knowledge.

2.      The grounds of my belief as to all matters not stated upon my personal knowledge are based upon my records.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 30, 2025.

 aka JOHN DOE

4933-4692-4396, v. 10