Exhibit C



**AUGUSTA**
UNIVERSITY

June 26, 2025 Personal and Confidential

### Alleged Student Sexual Misconduct Final Investigation Report

**Reported By:** Dr. Elizabeth Gray
**Complainant:** Jane Roe
**Respondent:** John Doe
**Investigator:** Kymyetta E. Turner
**Date of Incident:** March 29, 2025
**Start of Investigation:** April 16, 2025
**Interim Measures:** No Contact Directive

## I. Summary of the Allegations/Executive Summary:

On Wednesday, April 2, 2025, Dr. Elizabeth Gray, MCG Savannah Campus Dean notified Julie Kneuker, Title IX Coordinator that an alleged sexual assault involving two students had been reported to her office. On Thursday, April 10, 2025, the Title IX Coordinator received a signed formal complaint from Jane Roe (Complainant), who alleged that on Saturday, March 29, 2025, she was sexually assaulted by John Doe (Respondent). The Complainant alleged that after the Respondent drove her home from an off-campus cocktail party, the Respondent had sex with her, despite her being heavily intoxicated and unable to consent. The Complainant stated that she recalls waking up confused to the Respondent ejaculating on her back.

The investigation into this complaint began on April 16, 2025, and was completed in a manner appropriate in light of the circumstances of the case. The investigation included interviews with the Complainant, the Respondent, and 15 witnesses. These interviews were supplemented by the gathering of evidence as appropriate and available.

## II. Relevant Charges/Portions of the University System of Georgia Board of Regents Sexual Misconduct Policy[1]

**Nonconsensual Sexual Penetration:** Any penetration of the vagina, anus or mouth by a penis, object, tongue, finger or other body part; or contact between the mouth of one person and the genitals or anus of another person. This provision also includes "Rape, Incest, and Statutory Rape" as defined by the Clery Act.

## III. Relevant Definitions:

---

[1] See USG Board of Regents Policy Manual, Section 6.7.1 *Definitions and Prohibited Conduct*



**Consent:** Words or actions that show a knowing and voluntary willingness to engage in mutually agreed-upon sexual activity. Consent cannot be gained by force, intimidation or coercion; by ignoring or acting in spite of objections of another; or by taking advantage of the incapacitation of another where the respondent knows or reasonably should have known of such incapacitation. Minors under the age of 16 cannot legally consent under Georgia law.

Consent is also absent when the activity in question exceeds the scope of consent previously given. Past consent does not imply present or future consent. Silence or an absence of resistance does not imply consent.

Consent can be withdrawn at any time by either party by using clear words or actions.

### IV. Summary of Information Obtained from the Complainant's Interview on Tuesday, April 22, 2025

Jane Roe is a first-year medical student, at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. She is President of the General Surgery Club and is expected to graduate in 2028.

1. The Complainant stated that she and the Respondent met at the beginning of the school year, in July 2024. She stated that the medical school class is a close-knit group of 41 students, and that while she and the Respondent are friendly and have had friendly conversations, she only considers them to be acquaintances. She further stated that she and the Respondent have hung out together, outside of school, but in group settings only. The Complainant stated that she and the Respondent have never dated or expressed romantic interest in one another.

2. The Complainant stated that on Saturday, Saturday, March 29, 2025, she and KL (Witness A) made plans to attend a cocktail party together, at the home of one of their classmates, LH (Witness J), at 128 E. 48th Street, Savannah, GA 31405. She stated that prior to leaving home, she had consumed at least 2 shots of vodka, as well as some of the cocktail drink that she had prepared to take to the party, causing her to feel intoxicated. She stated that prior to leaving her apartment, as well as upon getting into the Uber to go to the party, she struggled and spilled some of the cocktails that she had made to take to the party. The Complainant stated that she began drinking at approximately 4pm and that she continued to drink throughout the party, until the time that she left.

3. The Complainant stated that according to the Uber App on her phone, she and Ms. KL arrived at the party at 6:13pm. She stated that upon arrival, she attempted to place her


prepared drinks on a table, but tumbled over, spilling some of the drinks. She stated that she believes this was due to her being drunk. The Investigator was able to obtain door camera footage of the Complainant's arrival to the party, at 6:14pm (Attachment #1).

4. She stated that while at the party, she continued to drink and had consumed more of the cocktails that she had prepared, along with some of the cocktails prepared by other party guests, some moonshine, a martini, a limoncello shot and a partial beer.

5. The Complainant stated that after being at the party for approximately one hour, she and the Respondent, along with ███ ████ Witness F) was in the backyard smoking cigars and talking and that is the only time that she recalls speaking with the Respondent during the party. She stated that she does not recall what they were talking about.

6. The Complainant stated that at approximately 10 or 11pm, the Respondent offered her a ride home, to which she accepted. She stated that while she does not recall walking to the Respondent's truck, she does recall him opening the passenger side door so that she could get in. She further stated that she does not recall needing assistance walking to his truck. When asked what she and the Respondent were talking about, in a door camera recording (Attachment #2) of she and the Respondent leaving the party and walking to his truck, the Complainant stated that she does not recall.

7. When asked by the Investigator what time she and the Respondent left the party, the Complainant stated that she is not sure, but she assumed that she got home at either 10:41or 11:29 pm, as those are the times of the last notifications on her doorbell camera (Attachment # 3). She stated that the camera was not recording the night of the party. The Investigator was able to obtain a doorbell camera footage of the Complainant and Respondent leaving the party at 10:23pm (Attachment #2) and was able to determine that the Complainant and Respondent arrived at the Complainant's apartment at 10:41pm.

8. The Complainant stated that due to the effects of the alcohol that she drank, she does not recall much about the ride to her home, but assumes she gave the Respondent her address at some point during the ride, as he had no reason to know it prior to that night. When asked by the Investigator what happened when she and Respondent entered her apartment, the Complainant stated that she could not recall.

9. The Complainant alleged that the only thing that she recalls after getting into the Respondent's truck is her bent over in her bedroom, with the Respondent having sex with her from behind and then ejaculating on her back. She stated that she recalls feeling confused at the time. When asked by the Investigator if she recalls discussing sexual positions with the Respondent during the alleged sexual encounter, the Complainant stated not that she knows of. When asked by the Investigator what happened after the Respondent allegedly ejaculated on her back, the Complainant stated that she does not recall. She stated that prior to him leaving her apartment, the Respondent stated to her "Don't tell anyone about this."



10. The Complainant stated that when she woke up the next day, she was naked and had dry blood on her legs, from her menstruation. She stated that she had bruises on her inner left thigh and right hip (Attachment #4) and that her clothes from the night before were scattered on the floor in the hallway of her apartment. She stated that she is unsure as to how she got the bruises on her body, and that they could have been caused by a number of things, from rough sex with the Respondent, to her falling and stumbling from intoxication the night before. She stated that upon checking her phone, she realized that she had made phone calls (Attachment # 5) the night before that she had no recollection of making. When asked by the Investigator if she was aware that her menstruation had started prior to attending the party, the Complainant stated that she was aware.

11. The Complainant stated that 1 or 2 days after the party that she told Ms. ▉▉KL▉▉ that the Respondent had sex with her and that she barely remembered it. She stated that she did not provide Ms. ▉▉KL▉▉ with any further details but told her to keep it to herself, because she was not yet sure how she wanted to handle it.

12. The Complainant stated that in the days following the party she had been approached by several other party attendees who had provided her with additional information about what had occurred at the party, as well as her level of intoxication. She stated that she has no recollection of much of what she was told happening.

13. The Complainant stated that she was informed by ▉▉ZC▉▉ (Witness E) that she had been slurring her words and not making much sense during a conversation that the two of them had at the party. She stated that Ms. ▉▉ZC▉▉ further informed her that Ms. ▉KL▉ had mentioned to her (Ms. ▉▉ZC▉▉ that she noticed the Respondent hovering around the Complainant at the party.

14. The Complainant stated that she was informed by Mr. ▉BE▉ hat she almost burned herself with a cigar, due to the way that she was holding it, while smoking cigars in the backyard at the party. She stated that Mr. ▉BE▉ further told her that at that same time, he had advised the Respondent to "back off" of her, because he (Mr. ▉BE▉ did not feel comfortable with the eye contact that the Respondent was making with her, or that he was physically getting close to her. Mr. ▉BE▉ told her that the Respondent replied to Mr. ▉BE▉ by saying "No. She's having fun." The Complainant stated that she does not recall that happening.

15. The Complainant stated that she was informed by ▉RM▉ (Witness D) that at one point during the party, she (the Complainant) told Ms. ▉RM▉ that the Respondent had tried to have sex with her and that when she mentioned him having a fiancé, he replied "I'm a single man for two weeks." The Complainant stated that she does not recall the conversation with Ms. ▉RM▉ nor the conversation with the Respondent.

16. The Complainant stated that she was informed by ▉ED▉ (Witness B) that she (Ms. ▉ED▉ ) saw her (the Complainant) and the Respondent together, prior to

4



her (Ms. ██ED██), leaving the party, and that when she (Ms. ██ED██) later checked the Respondent's location on her phone, it showed him as being on the south side of Savannah, rather than at his home or the party. She stated that she is not sure as what caused Ms. ██ED██ to check the Respondent's location the night of the party.

17. The Complainant stated that she believes the effects of the alcohol that she drank at home and during the party was amplified not only by the amount that she drank, but also by the fact that she only weighs 115lbs and had not eaten for over 2 hours before the party or during the party. She further stated that the dosage of the prescription medication Zoloft that she was on at the time, had been recently increased to 150mg.

**Summary of Information Obtained from the Complainant's Follow-Up Interview on Tuesday, May 20, 2025.**

1. When asked by the Investigator if she obtained her own drinks while at a cocktail party, on Saturday, March 29, 2025, the Complainant stated that she got some of the drinks herself and was also served drinks by others. She stated that she sampled several of the drinks that had been made by some of the other contestants in the cocktail competition. She stated that she is unsure as to how many drinks the Respondent had, but that he seemed either completely sober or only slightly "buzzed."

2. When asked by the Investigator if she recalls imitating oral sex using a cigar, while making eye contact with the Respondent at the party, the Complainant stated that she does not recall doing that. When asked by the Investigator if she recalls saying to the Respondent "are you sure you want to fuck one person for the rest of your life?" several times while at the party, the Complainant stated that she does not recall saying that to him. She stated that while at the party, she only recalls speaking with the Respondent in the backyard while smoking cigars and towards the end of the party, when he offered her a ride home.

3. When asked by the Investigator if she recalls providing directions to her apartment to the Respondent, the Complainant stated that she's not sure but guesses she did. When asked by the Investigator if she recalls leaning over in the Respondent's truck and kissing him on the mouth, in the parking lot outside of her apartment, the Complainant stated that she does not recall doing that. She stated that she does not recall any physical interaction between her and the Respondent in his truck, at any time.

4. When asked by the Investigator, if she recalls telling the Respondent "I wish you were upstairs railing me right now," and subsequently inviting him up to have sex, while in the parking lot outside of her apartment, the Complainant stated that she does not. She stated that she is unsure why the Respondent went up to the apartment with her.



5. When asked by the Investigator if once inside the apartment, she recalls telling the Respondent to excuse her messy apartment and then going into her bedroom to put sheets on her bed, the Complainant stated that she does not recall that. She stated that her apartment had been cleaned prior to her leaving for the party, as she was expecting Ms. KL to come over earlier in the day and that there were red sheets on her bed at that time.

6. When asked by the Investigator if she recalls leaving her bedroom, pulling down the Respondent's underwear and performing oral sex on him in the hallway of her apartment, the Complainant stated that she does not recall that. When asked by the Investigator if she recalls saying to the Respondent "I can't believe you'd cheat on your fiancé," while performing oral sex in him, the Complainant stated that she does not recall saying that.

7. When asked by the Investigator if during the alleged sexual encounter with the Respondent, she recalls saying to him "stop being a little bitch about it," and "you're such a fucking pussy," and "I love that I have you shaking like this," the Complainant stated that she does not recall saying that. When asked by the Investigator if during the alleged sexual encounter, she recalls moving a wall mirror from one side of the room to another and saying to the Respondent, "I want you to fuck me in the mirror," the Complainant stated that she does not recall that.

8. When asked by the Investigator what the Respondent's level of participation was during the alleged sexual encounter, the Complainant stated that she does not recall. When asked by the Investigator if during the alleged sexual encounter with the Respondent, she recalls saying to him "you're not leaving until you come," the Complainant stated that she does not recall that. When asked by the Investigator if she recalls instructing the Respondent to ejaculate on her butt or her back, she stated that she does not recall. She stated that she only knew that he ejaculated on her back. When asked by the Investigator what she did when the alleged sexual encounter was over, she stated that she does not recall. She stated that she only recalls being naked and feeling confused.

9. When asked by the Investigator if she recalls the Respondent taking a shower at her house prior to him leaving her apartment, the Complainant stated that she does not recall that. She stated that she did not notice any wet towels or anything out of place in her bathroom the next day, nor was she looking for anything to be out of place because she had no reason to.

10. When asked by the Investigator if she recalls saying to the Respondent, "don't tell anyone because people will think I'm a horrible person," as he was leaving her apartment, the Complainant stated that she does not recall saying that. She stated that as the Respondent was leaving, she was standing in the foyer area of the apartment naked, when he asked her why she was naked. She stated that she does not recall what her response was to him. She stated that the Respondent then said to her "don't tell anyone



about this" and then left. When asked if she recalls asking the Respondent if he was ok to drive as he was leaving the apartment, the Complainant stated that she does not recall.

11. When asked by the Investigator about an Instagram direct message that she sent to the Respondent's fiancé (now Wife), ████ (Potential Witness #2) on April 4, 2025 (Attachment#8), the Complainant stated that she sent the message out of concern for Ms. ████ who was scheduled to marry the Respondent on April 6, 2024. When asked by the Investigator why she used the word "cheating" in the message, the Complainant stated that she did not want to use the word "rape" in the message. She stated that later, that same day, she made a call to Ms. ████ which was answered by the Respondent, who hung up on her. The Complainant stated that she made a second call to Ms. ████ in which she left a voicemail (Attachment #9A), advising her that the Respondent was a rapist. She stated that she made the second call in anger at what the Respondent had allegedly done to her and because he had previously hung up on her.

12. The Complainant stated that in the days following the alleged sexual assault, she had become increasingly uncomfortable around the Respondent and did her best to make as little contact with him as possible. She stated that on Monday, March 31, 2025, while in an Anatomy Class that both she and the Respondent attended, she made a point of keeping an eye on the Respondent, in effort to stay away from him. She stated that at one point during the class, the Respondent walked over to the side of the table that she sits at, causing her to immediately walk to the opposite side of the table, away from him. She stated that because she and the Respondent work in different groups, he had no reason to be near her. She stated that later during that same class period, the Respondent walked up behind her, causing her to jump. She stated that both incidents caused her to become upset and cry after class and that it was then that she realized that she was having trouble coping with the situation.

13. The Complainant stated that she initially hesitated to report the alleged sexual assault because she did not want it to have a negative impact on her, nor on the medical class. She stated that she ultimately decided to report it because she is concerned about the Respondent possibly harming future patients in the same way, especially those who would be placed under anesthesia while in his care.

14. The Complainant stated that the alleged sexual assault has had a negative impact on her grades, causing her to fall within the lowest quartile of her class (Attachment # 6). She stated that due to her failing grades, she had been mandated to meet with a Learning Specialist, who presented her with an opportunity to take some time away from school, but that she declined because she feared it would cause further setbacks for her. She stated that she has been working hard to get her grades back up.


**V. Summary of Information Obtained from the Respondent on Thursday, May 15, 2025**

John Doe is a first-year medical student, at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. He is a participant in the U.S. Health Professions Scholarship Program and serves as Second Lieutenant in the Medical Services Corp for the U.S. Army. He is expected graduation in 2028.

1. The Respondent stated that he and the Complainant are both first year medical students, in the same class, who met at the beginning of the school year, in July 2024. He stated that he and the Complainant have never been friends and have only had casual interactions, as professional acquaintances. He stated that he and the Complainant have never dated or expressed romantic interest in one another and that they only hung out with one another in group settings.

2. The Respondent stated that on Saturday, Saturday, March 29, 2025, after spending the day shopping with his fiancé AM (Potential Witness #2), he attended an off-campus party, at the home of one of his classmates, LH (Witness J), at 128 E. 48th St., Savannah, Ga., 31405. He stated that because the party was to be a "black-tie" event, he decided to wear traditional Scottish black-tie attire, consisting of a kilt and jacket, rather than his tuxedo because he did not want to get his tuxedo dirty, as he had planned to wear it during his wedding the following week.

3. He stated that the party was scheduled to start at 5pm, with a cocktail competition taking place at 6pm, in which he was to serve as a judge. The Respondent stated that because he was going to arrive late to the party, he was not expecting to serve as a judge and therefore decided to drive himself to the party.

4. The Respondent stated that upon his arrival at the party, at approximately 7pm, he and the other competition judges were taken to a room separate from the other party guests for approximately an hour, to sample and deliberate on the 8-9 cocktails that had been submitted for the competition. When asked by the Investigator how much he had to drink at the party, the Respondent stated that he had completed two of the drinks and sampled the others to varying degrees of completion.

5. The Respondent stated that after the competition, he and BE (Witness F) were standing on the patio in the backyard smoking cigars, when KL (Witness A) and the Complainant joined them and asked to participate. He stated that while they were smoking the cigars, the Complainant began making sexually suggestive comments and imitating oral sex using the cigar, while making eye contact with him. He stated that when Mr. BE mentioned his (Respondent's) upcoming wedding, the Complainant asked him "are you sure you want to fuck one person for the rest of your life?" He stated the


Complainant repeated the question several times throughout the evening, whenever his upcoming wedding was mentioned in her presence.

6. When asked by the Investigator if he witnessed how much alcohol the Complainant drank at the party, the Respondent stated that he had not, because he and the other cocktail competition judges had been isolated from other party guests to deliberate on the competition submissions. He stated that during the party, he noticed no signs of the Complainant being heavily intoxicated and that she was able to clearly communicate throughout the evening. When asked by the Investigator about his level of intoxication at the party, the Respondent stated that he is unsure, but that he was capable of driving.

7. The Respondent stated that as the party began winding down, some of the party guests began making plans to travel to Downtown Savannah and asked if he wanted to go, which he declined. He stated that when Ms. ███ asked the Complainant if she was going Downtown with them, she declined and stated that she would get an Uber home. The Respondent stated that he noticed the Complainant take her phone out to order an Uber and offered her a ride home, in effort to save her time and money. He stated that when the Complainant responded by asking if he was sure, he asked her how long it would take to get to her home, and she told him approximately 20 minutes. He stated that they told everyone that they were leaving and walked to his truck, with the Complainant needing no help or support.

8. When shown a video of him and the Complainant leaving the party, the Respondent was asked by the Investigator what they talked about on the way to his truck, to which he stated that they were not speaking about anything significant and only having small talk. He stated that upon getting into his truck, he asked the Complainant where she lived and that she gave him turn-by-turn directions to her home. He stated that although he was intoxicated, he was in control of his senses and actions, and that the Complainant was able to speak plainly with him. When asked by the Investigator what he and the Complainant talked about during the ride to her home, the Respondent stated that they engaged in small talk.

9. When asked by the Investigator if at any time during the party, he tried to have sex with the Complainant, the Respondent stated that he had not. When asked if he recalls the Complainant saying to the Complainant "I'm a single man for 2 more weeks" at any time during the party, the Respondent stated that he does not recall that. He further stated that the comment would have been inaccurate, as he was scheduled to be married 1 week later.

10. The Respondent stated that upon arriving at the Complainant's apartment complex, she told him to park anywhere, and he did. He stated that after he parked, she leaned over the center console and kissed him, and that he responded by kissing her back. He stated that the Complainant then pulled back and asked if he was upset that she kissed him, to which he replied he was not. He stated that the kiss between them was mouth to mouth and prolonged. When asked by the Investigator if any other physical interaction occurred

9



between him and the Complainant in the truck, the Respondent stated that he does not recall.

11. The Respondent stated that the Complainant then made the statement "I wish you were upstairs railing me right now," to which he responded by saying something similar to "whoa, I don't know about that." He stated that he and the Complainant then continued to have small talk, and that at some point the Complainant told him that she wanted him to come up to her apartment to have sex with her, at which time he told her that he did not feel comfortable with that. He stated that the Complainant's statements were sudden and overt. When asked by the Investigator what the Complainant's response was to his reluctance, the Respondent stated that he was looking away from the Complainant and did not notice her reaction.

12. The Respondent stated that he followed the Complainant to her apartment and that upon entering, she told him that she was not expecting company and commented on the condition of her apartment. He stated that the Complainant then went into her bedroom, leaving him in the hallway of the apartment and that a few minutes later, she came out of her bedroom and stated that she needed to put sheets on her bed. He stated that the Complainant then asked him "why are you just fucking standing there?", dropped to her knees, pulled down his underwear and began performing oral sex on him. He stated that the Complainant then briefly stopped performing oral sex on him and said, "I can't believe you'd cheat on your fiancé," and then continued performing oral sex on him. He stated that her actions left him feeling frozen and unsure of what to do.

13. When asked what was going through his mind as he waited for the Complainant in the hallway of her apartment, the Respondent stated that he was wondering why he was there and trying to decide if he should leave. He stated that he was aware that he and the Complainant had different expectations of what was going to happen between them.

14. The Respondent stated that the Complainant then took him to her bedroom and asked him to perform sex acts with her, which he did despite his previous hesitation. He stated that sexual encounter consisted mostly of the Complainant touching herself and performing sexual acts on him with her hands and mouth, as he laid on the bed, passively letting it happen. He stated that the Complainant also asked him to have sex with her from behind.

15. The Respondent stated that at one point during the sexual encounter, the Complainant moved what appeared to be a wall mirror from one side of the room and placed it perpendicular to the bed and told him "I want you to fuck me in this mirror." He stated that throughout the sexual encounter, the Complainant made comments to him such as, "stop being a little bitch about it," "you're such a fucking pussy," and "I love that I have you shaking like that," referring to his trembling leg. He further stated that she told him, "You can't tell anyone about this or they're going to think I'm a horrible person."


16. When asked by the Investigator, what made him continue to engage in the sexual encounter with the Complainant despite his previous hesitation, the Respondent stated that he believed the only thing to do was to get through it. He further stated that he feared not having sex with the Complainant would cause her to retaliate against him for embarrassing her. He stated that the Complainant kept making references to and comments about his fiancé.

17. When asked by the Investigator what the references and comments were that the Complainant made about his fiancé, the Respondent was unable to recall exactly what those references and comments were.

18. When asked by the Investigator if the Complainant said or did anything specific to give him the impression that there would be consequences to him not having sex with her, the Respondent stated the Complainant did not overtly say or make threats against him, but that the aggressive nature of her words gave him the impression that there would be consequences to him not having sex with her.

19. The Respondent stated that toward the end of the sexual encounter, the Complainant was performing oral sex on him and that he became flaccid due to his discomfort. He stated that the Complainant told him "You're not leaving until you cum," and instructed him to have sex with her from behind. He stated that when he advised the Complainant that he was about to "finish," she instructed him to "cum" on either her back or buttocks (Respondent unsure of exact statement), at which time he ejaculated on her back.

20. The Respondent stated because there was blood on his genitals caused by the Complainant's menstruation, he asked her if he could take a shower, to which she agreed. He stated that after taking a quick shower, he got partially dressed and prepared to leave. He stated that as he was leaving, he noticed the Complainant in the kitchen and asked her why she was naked, to which she responded, "it's my house, why shouldn't I be." He stated that she then said "we are never telling anyone about this, to which he agreed. He stated that the Complainant asked him if he would be ok driving, to which he replied that he was. He stated that he then left the Complainant's apartment, got into his truck, put directions to his home into a GPS and drove off.

21. When asked by the Investigator if he had gone up to the Complainant's apartment for the purpose of having sex with her, the Respondent stated that he did not. He stated that he had made it clear to the Complainant that he was not interested in having sex with her, but that he was enjoying the kissing, the flirting and the attention that the Complainant was giving him and thought that perhaps something less than sex would occur between them.

22. The Respondent stated that the sexual encounter between him and the Complainant was consensual and initiated by the Complainant. He stated that at no time was the Complainant incapacitated and that her words were clear and direct and consistent with her actions.


23. When asked by the Investigator if he had spoken to anyone about the sexual encounter between him and Complainant in the immediate days after, the Respondent stated that he had not.

24. When asked by the Investigator how he learned of the allegations against him, the Respondent stated that he learned of the allegations on the evening of Wednesday, April 2, 2025, from his fiancé, Ms. ▓AM▓ He stated that Ms. ▓AM▓ had received a visit at her workplace from ▓VS▓ (Potential Witness #1), advising her that the Respondent had sexually assaulted one of his classmates and was considering filing a report against him. He stated that he then contacted Dr. ▓FP▓ alleging that he had been sexually assaulted and asked her for the Title IX Coordinator's contact information. He stated that he did not learn that a formal complaint had been filed against him until Monday, April 14, 2025.

25. The Respondent stated that on Friday, April 4, 2025, Ms. ▓AM▓ began receiving phone calls from blocked phone numbers (Attachment # 7). He stated that when he answered one of the calls, the Complainant asked to speak with Ms. ▓AM▓, at which time Ms. ▓AM▓ instructed him to disconnect the call, and he did. He stated that on that same day, at 5:17pm, Ms. ▓AM▓ received a voicemail from the Complainant (Attachment #9A & B ), advising her (Ms. ▓AM▓) that the Respondent had raped her (the Complainant) and that she (Ms.▓AM▓) should not stay with him and that at 6:16pm, Ms. ▓AM▓ received a direct message via Instagram from the Complainant (Attachment #8), advising her that the Respondent had cheated on her.

**Summary of Information Obtained from the Respondent's Follow-Up Interview on Friday, May 30, 2025.**

1. When asked by the Investigator, what other times and locations during the party, did he and the Complainant interact with one another, besides during the time that they were smoking cigars in the backyard and at the end of the night, when he offered her a ride home, the Respondent stated that at one point he, the Complainant and ▓DR▓ (Witness P) were near the stairs in the backyard talking about his upcoming wedding. He stated that it was one of the instances in which the Complainant asked him "Are you sure you want to fuck one person for the rest of your life?" When asked if Ms.▓DR▓had acknowledged the Complainant's question, the Respondent stated that he does not recall her acknowledging the question.

2. The Respondent stated that he, the Complainant and ▓KL▓ (Witness A) were having a conversation and that when the Complainant asked him whether he would be content with "only fucking one person" after marriage, Ms. ▓KL▓ who is married, stated to the Complainant, that marriage can expand one's sexual experiences.

12



3. When asked by the Investigator, what his response was to the Complainant asking him, "Are you sure you want to fuck one person for the rest of your life?", the Respondent stated that he did not respond to her question. He stated that it is a weird question, to which he had no quick rebuttal to.

4. When asked by the Investigator, who could have witnessed the Complainant making lewd comments and gestures, such as imitating oral sex using a cigar, the Respondent mentioned <span>BE</span> (Witness F), <span>KL</span> and <span>GR</span> (Witness I). When asked if any of the witnesses mentioned the Complainant's behavior at the time, the Respondent stated that they did not.

5. When asked by the Investigator what he and the Complainant talked about when they were engaged in "small talk," between the time that she kissed him and the time that she invited him up to her apartment to have sex, the Respondent stated that he does not recall what they talked about, as it was meaningless and not important.

6. When asked by the Investigator, what his response was to the Complainant performing oral sex on him in the hallway of her apartment, the Respondent stated that he froze up, unsure as to what to do. When asked if he attempted to stop the Complainant or push her away, he stated that he did not.

7. When asked by the Investigator, how he became undressed and where in the Complainant's apartment he became undressed at, the Respondent stated that he undressed himself, in the hallway. He stated that the Complainant undressed herself mostly in the hallway and then took him into the bedroom. He stated that after taking him into her bedroom, the Complainant briefly stepped back into the hallway, but that he does not know the reason why.

8. When asked by the Investigator, how he and the Complainant made their way from the hallway to her bedroom, the Respondent initially stated that the Complainant instructed him to go to her bedroom. He then stated that he is unsure if she grabbed him by the hand and led him into the bedroom or not. He stated that he decided to comply with the Complainant because he felt that it was the only way out of the situation.

9. When asked by the Investigator, if upon entering the Complainant's apartment, she told him that she needed to put sheets on her bed, the Respondent stated yes. He stated that the Complainant briefly went into her bedroom and that when she came out, he asked her what she was doing and that she told him that she needed to put sheets on her bed. When asked by the Investigator, what color the sheets were on the Complainant's bed when he entered her bedroom, he stated that they were either dark red or maroon.

10. When asked by the Investigator, what his response was to the comments that the Complainant made to him during the alleged sexual encounter, such as "Stop being a little bitch about it" and "You're such a fucking pussy," and "I love that I have you shaking like this," the Respondent stated that he did not respond to the Complainant's


comments. He stated that she took a dominating role during the alleged sexual encounter, and that he "just laid there" and let it happen.

11. When asked by the Investigator if, considering the Complainant was on her menstruation and he given that he stated previously that bouts of hand and oral sex, including the Complainant "touching herself," occurred during the alleged sexual encounter, he noticed a transfer of blood anywhere on the Complainant's body, such as her hands and/or mouth, the Respondent stated that he does not recall seeing blood on the Complainant's hands. He stated that it is not a detail that he would've noticed and that he only knows that there was blood on his pelvic area.

12. When asked by the Investigator, what his response was to the Complainant telling him, "You're not leaving here until you come," the Respondent stated that he told the Complainant that he was not sure if he would finish and that he's unsure of what her response was.

13. When asked by the Investigator, to describe how he came to take a shower in the Complainant's bathroom, prior to leaving, the Respondent stated he asked the Complainant if he could take a shower, at which time she told him yes and informed him that he could find a towel in the bathroom. He stated that in the shower, he used his hands to rub water on himself and a towel to dry off and that when he was finished with the towel, he hung it on a hook nearby.

14. When asked by the Investigator, if he recalls the Complainant jumping and screaming after noticing his proximity to her, during Anatomy Class, on Wednesday, April 2, 2025, the Respondent stated that he does not recall that happening.

## VI. Summary of Information Gathered from Witnesses

### A. Interview with ███KL███ on Thursday, April 24, 2025

███KL███ is a first-year medical student at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. Amongst the several clubs and organizations that she participates in, she serves as the Vice President of Curriculum in Student Government. She is expected to graduate in 2028.

1. Ms. █KL█ stated that she and the Complainant met in July 2024, on the first day of school during orientation and that they immediately hit it off and became close friends. She stated that she and the Respondent met during either the first or second week of school and have never been friends. Ms. █KL█ stated that she finds the Respondent to be a bit immature and polarizing with a needless need to stir up drama in class. She further stated that the Respondent seems to have a sort of "hot and cold" relationship with his own friend group.



2. Ms. ██ stated that neither the Complainant nor Respondent have ever expressed romantic interest in one another to her, but that the Complainant has told her that she (the Complainant) believes the Respondent had a crush on her because he would often hang around her. Ms. ██ stated that she believes the Respondent is drawn to the Complainant because she is one of the few people in class who is nice to him.

3. Ms. ██ stated that on the evening of Saturday, March 29, 2025, at approximately 4:30pm, she went to the Complainant's house to get dressed and prepared for a party that was taking place at the home of one of her classmates, at 128 48th Street, Savannah, Ga. 31405. She stated that when she arrived at the Complainant's house, the Complainant told her that she had already started drinking. She stated that the Complainant was more giggly than usual and struggled to carry some drinks to the Uber that they had ordered to take them to the party. When asked by the Investigator how intoxicated she believed the Complainant to be prior to the party, Ms. ██ stated that while the Complainant was not "sloshed," she was not sober enough to drive.

4. When asked by the Investigator, what the condition of the Complainant's apartment was, Ms. ██ stated that the apartment was clean and tidy. When asked by the Investigator if there were sheets on the Complainant's bed prior to them leaving for the party, Ms. ██ stated that there were red sheets on the Complainant's bed.

5. Ms. ██ stated that upon their arrival at the party, she and the Complainant separated, but that after being there for a couple of hours, she noticed the Complainant and the Respondent in the backyard smoking cigars together and found it to be strange. When asked by the Investigator if while in the backyard, she witnessed the Complainant making eye contact with the Respondent and imitating oral sex using a cigar, Ms. ██ stated that she did not witness that.

6. Ms. ██ stated that ██ZC██ (Witness E) who was nearby while the Complainant and Respondent were in the backyard smoking cigars made a comment to her about the Respondent being around the Complainant. Ms. ██ stated that when the Complainant walked away to come speak with her, the Respondent followed her.

7. When asked by the Investigator if based on her observations, the Respondent appeared to be intoxicated, Ms. ██ stated that despite him having a few drinks during the judging of the cocktail competition, he seemed more sober the night of the party, than he had in the past when she's seen him "out of sorts," after having a few beers.

8. Ms. ██ stated that anytime that she is unsure of how much the Complainant had to drink at the party, but that anytime she saw her during the party, she (the Complainant) had a drink in her hand. She stated that the Complainant became more intoxicated and looked wobbly when attempting to stand up from a bench that she was sitting on. She stated that at one point the Complainant was not making sense, and her words were jumbled when



trying to communicate, but after focusing she was able to speak correctly. She stated that she had never seen the Complainant that intoxicated before.

9. When asked by the Investigator if the Complainant was served drinks or obtained drinks on her own, Ms. <span style="background:black;color:white">KL</span> stated that everyone was serving one another as well as obtaining their own drinks.

10. Ms. <span style="background:black;color:white">KL</span> stated that she and the Complainant had initially planned on taking an Uber back to the Complainant's house after the party, but that when she (Ms. <span style="background:black;color:white">KL</span>) decided to go to Downtown Savannah with some of the other party guests, the Complainant told her that she would get an Uber home. She stated that the Complainant did not inform her that she would be getting a ride home from the Respondent.

11. When asked by the Investigator, if at any time during the party, she heard the Complainant ask the Respondent, "Are you sure you want to fuck one person for the rest of your life?", Ms. <span style="background:black;color:white">KL</span> stated that she did not hear the Complainant make that comment. When asked if she recalls having a conversation, with the Complainant and the Respondent, in which she commented to the Complainant something about "marriage expanding a person's sexual experience," Ms. <span style="background:black;color:white">KL</span> stated that she does recall having a conversation with the Complainant and the Respondent at one point, that she does recall having a feeling of wanting to defend marriage, but that she does not recall the context around the feeling.

12. Ms. <span style="background:black;color:white">KL</span> stated that on Monday, March 31, 2025, the Complainant called her upset and said that she had something to tell her and that she could not tell anyone. She stated that the Complainant told her that the Respondent had been unfaithful to his fiancé and had sex with her (the Complainant) when she was really drunk. She further stated that the Respondent told her (the Complainant) not to tell anyone. Ms. <span style="background:black;color:white">KL</span> stated that upon hearing what the Complainant had told her, she immediately thought to herself, that the Respondent had raped the Complainant. She stated that she did not say that to the Complainant at the time, because she did not want to upset her any further. Ms. <span style="background:black;color:white">KL</span> stated that the Complainant did not share any further details about the alleged sexual assault with her at that time.

13. Ms. <span style="background:black;color:white">KL</span> stated that on Wednesday, April 2, 2025, while in Anatomy Class, she noticed the Respondent weirdly hanging around the Complainant on two occasions, despite them being in different lab groups. She stated that it was if the Respondent was "testing the waters" with the Complainant, trying to determine how she was feeling.

14. Ms. <span style="background:black;color:white">KL</span> stated that on one of the occasions, when the Respondent spoke, the Complainant jumped and screamed after realizing how close the Respondent was to her. She stated that when she and the Complainant were alone after the class, the Complainant became upset and cried. Ms. <span style="background:black;color:white">KL</span> stated that it was a surprise because the Complainant is usually good at keeping her emotions in check.



15. Ms. ▮KL▮ stated that the Complainant told her that she was having a hard time focusing in class, and that she had gotten a bad grade on a quiz earlier that week.

**B. Interview with ▮ED▮ on Thursday, April 24, 2025**

▮ED▮ is a first-year medical student at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. She is the President of the Student Mentor Group and Co-President of the Ophthalmology Interest Group and participates in several other clubs and organizations. She is expected to graduate in 2028.

1. Ms. ▮ED▮ stated that she met both the Complainant and the Respondent in July 2024, at the beginning of the school year. She stated that she considers the Complainant to be an acquaintance of hers and they've never hung out together outside of a group setting. She stated that she previously considered the Respondent to be a friend but that incidents surrounding the alleged sexual assault has ended their friendship. Ms. ▮ED▮ stated that neither the Complainant nor the Respondent has ever indicated to her any romantic interest in one another and that prior to the day of the party she had never seen them interact with one another.

2. Ms. ▮ED▮ stated that on Saturday, March 29, 2025, she attended a cocktail party at the home of one of her classmates, at 128 E. 48th Street, Savannah, Ga. 31405. She stated that while at the party, she witnessed the Complainant stumbling and having a hard time standing. She further stated that the Complainant was slurring her words and not making much sense when communicating and it was the first time that she had ever seen the Complainant in that condition.

3. When asked by the Investigator if based on her observations, the Respondent appeared to be intoxicated, Ms. ▮ED▮ stated that the Respondent did not seem intoxicated at all the night of the party, compared to when she's seen him intoxicated in the past.

4. Ms. ▮ED▮ stated that as she was leaving the party, she noticed the Complainant and the Respondent in the backyard, standing next to one another and talking while smoking cigars. She stated that it's unknown to her as to what they were talking about, but that she thought it was strange because she had never seen them speaking with one another before then.

5. Ms. ▮ED▮ stated that after leaving the party she provided a ride home to a friend and that she and the friend sat in car from approximately 9:30-11:30pm. She stated that at one point, the friend who happened to have the Respondent's location on her phone was checking the location of another friend of theirs and noticed the Respondent's location as being on the South Side of Savannah, rather than at the party or his residence. She stated that she and the friend thought it was weird but did not think much of it at the time.

17



6. Ms. ██ stated that in the days following the party, she heard a rumor that the Respondent had offered the Complainant a ride home from the party and raped her. She stated that the following week, when she spoke with the Complainant, she confirmed what Ms. ██ had previously heard, but that she offered no specific details about the alleged sexual assault with her. Ms. ██ stated that she later sent the Complainant a text message ensuring her support and willingness to testify if needed.

7. Ms. ██ stated that on Monday, April 14, 2025, she, ██LTB██ (Witness K) and ██RN██ (Witness N) were unexpectedly approached by the Respondent, who insisted on telling them his side of the alleged sexual assault incident. She stated that the Respondent told them that as the cocktail party was winding down, he offered the Complainant a ride home, despite him being intoxicated. She stated that he told them that after arriving to the Complainant's apartment complex, she kissed him and asked if he wanted to come up to her apartment, to which he replied "no."

8. Ms. ██ stated that the Respondent told them that he is unsure as to how he got to the Complainant's apartment, and that upon entering she pulled his pants down and began "doing stuff" to him. She stated that the Respondent told them that he and the Complainant had sex and framed it in a way to show the Complainant as being the aggressor. She stated that the Respondent told them that he was afraid that if he did not have sex with the Complainant, she would tell his fiancé. Ms. ██ stated that she found the information that the Respondent was giving them to be confusing.

9. Ms. ██ stated that due to some of the details that she's heard about the alleged sexual assault, she, Ms. ██LTB██ and Ms. ██RN made the decision to distance themselves from the Respondent and that they have not spoken with the Respondent since April 14, 2025.

10. Ms. ██ stated that on Tuesday, April 15, 2025, she, Ms. ██LTB██ and Ms. ██RN received a text message from the Respondent, stating that the Title IX Coordinator did not believe that men could be raped (Attachment #10).

11. When asked by the Investigator if she had any added information, Ms. ██ stated that on Monday March 31, 2025, the Respondent expressed to her and other mutual friends that he was unsure about getting married. She stated that he had told them that his fiancé had been yelling at him and treating him badly and that if she did not fix herself, they would not be married for long.

12. When asked by the Investigator about her level of intoxication, if any, while at the party, Ms. ██ stated that she was sober, as she had only taken a couple of sips of one drink, shortly after arriving to the party.

**C. Interview with Dr. ██EG██ on Tuesday, April 29, 2025**



Dr. <span style="background:black">EG</span> is Dean of the Medical College of Georgia, Savannah Campus, in Savannah, Ga. She has been with Augusta University since 2020.

1. Dr. <span style="background:black">EG</span> stated that both the Complainant and the Respondent are first-year medical students at the MCG Savannah Campus and that she has known them both since July 2024.

2. Dr. <span style="background:black">EG</span> stated that she has never had an opportunity to witness one on one interactions between the Complainant and the Respondent. She stated that she has only been around them in large group settings.

3. Dr. <span style="background:black">EG</span> stated that she was made aware of allegations of sexual assault against the Respondent just before noon on Wednesday, April 2, 2025, by Dr. <span style="background:black">NP</span> (Witness H). She stated that Dr. <span style="background:black">NP</span> had received a report of alleged sexual assault and wanted to know the next step to take. Dr. <span style="background:black">EG</span> stated that she and Dr. <span style="background:black">NP</span> then reported the incident to the Augusta University Title IX Coordinator, <span style="background:black">JK</span>.

4. Dr. <span style="background:black">EG</span> stated that Dr. <span style="background:black">NP</span> informed her that some of the medical students were at an unsanctioned, off-campus party when one of the students had allegedly been sexually assaulted by another student. She stated that she was further informed that the intoxicated student had pulled her top down while at the party, and that other students at the party intervened on her behalf. Dr. <span style="background:black">EG</span> stated that she later received a report of the same incident from another student.

5. When asked by the Investigator if she had noticed any unusual behavior from the Complainant since learning of the alleged sexual assault, Dr. <span style="background:black">EG</span> stated that she had not seen the Complainant in the days after the alleged sexual assault was reported, but that when she did see the Complainant, she did not seem distressed in any way. However, she stated that at some point, she noticed that the Complainant, who had been previously attending lectures exclusively in person, began attending online only and that when she did attend mandated, in-person lectures, she sat separated from her classmates.

6. When asked by the Investigator if she noticed any unusual behavior from the Respondent since learning of the alleged sexual assault, Dr. <span style="background:black">EG</span> stated that while she had not seen the Respondent in the days after alleged sexual assault was reported, she was made aware that the Respondent had become emotionally distressed and upset while speaking with the Title IX Coordinator, prompting her to assign a faculty member to check on him. She stated that she noticed that the Respondent, who had previously attended lectures exclusively online began attending in-person.

7. Dr. <span style="background:black">EG</span> stated that on either Thursday, April 3, 2025, or Friday, April 4, 2025, she received a complaint from <span style="background:black">VS</span> Potential Witness #1) pertaining to the alleged sexual assault on the Complainant. She stated that Mr. <span style="background:black">VS</span> was asking why no actions had been taken against the Respondent. Dr. <span style="background:black">EG</span> stated that she advised Mr. <span style="background:black">VS</span> not to insert himself into the situation, as it was not his place.


8. Dr. <span style="background:black">EG</span> stated that on Friday, April 18, 2025, Dr. <span style="background:black">NP</span> received a complaint from two female students, advising that the Respondent had been making them feel uncomfortable and not respecting their boundaries, because they had decided to end their friendship with him.

**D. Interview with** <span style="background:black">RM</span> **on Tuesday, April 29, 2025**

<span style="background:black">RM</span> is a first-year medical student at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. She is a participant in several interest groups and play recreational soccer. She is expected to graduate in 2028.

1. Ms. <span style="background:black">RM</span> stated that she met both the Complainant and the Respondent on the first day of class, in July 2024. She stated that she and Complainant converse often but are not close friends and that she and the Respondent have only had friendly interactions. She stated that she has only hung out with both the Complainant and the Respondent in group settings.

2. Ms. <span style="background:black">RM</span> stated that neither the Complainant nor the Respondent have ever expressed to her any romantic interests in one another, and that prior to the day of the party, she had never seen them interact with one another.

3. Ms. <span style="background:black">RM</span> stated that on Saturday, March 29, 2025, she attended a cocktail party at the home of one of her classmates, at 128 E. 48th Street, Savannah, Ga. 31045. She stated that when the Complainant arrived at the party, she informed Ms. <span style="background:black">RM</span> that she was "already hammered," indicating that she was intoxicated. She stated that while at the party the Complainant continued to drink and that at one point, she noticed the Complainant knock over a drink, as she was attempting to stand up from a couch. She stated that the Complainant was not slurring words during communication but was less reserved than usual and obviously intoxicated.

4. When asked by the Investigator if she knows how many drinks the Complainant had at the party, Ms. <span style="background:black">RM</span> stated that she does not know. She stated that the Complainant was served drinks and obtained drinks on her own, as everyone at the party did.

5. When asked by the Investigator if based on her observations, the Respondent appeared to be intoxicated, Ms. <span style="background:black">RM</span> stated that she could not speak to the Respondent's level of intoxication, but that she noticed that he had completed 3 of the 11 cocktails submitted for the competition, as she and the Respondent both were judges of the competition.

6. Ms. <span style="background:black">RM</span> stated that at one point during the party she was in the backyard with the Complainant and the Respondent, expressing sentiments to the Respondent about his upcoming wedding and that when she walked away, the Complainant followed her into the house and said something like "it's funny that you're saying all of that because <span style="background:black">JOHN DOE</span> just tried to fuck me," while laughing. She stated the Complainant then told her that when she (the Complainant) mentioned the Respondent being in a relationship, he replied with



something like "not for another two weeks." She stated that the Complainant gave her no specific details about what the Respondent did or said to give her the indication that he wanted to have sex with her.

7. When asked by the Investigator, if at any time during the party, she heard the Complainant ask the Respondent the question, "Are you sure you want to fuck one person for the rest of your life?", Ms. <span>RM</span> stated that if the comment was made, she was not present for it.

8. Ms. <span>RM</span> stated that the Complainant then said something like "maybe it's because I told <span>BE</span> that I would suck his dick too," while laughing. Ms. <span>RM</span> stated that she was not sure as to what incident the Complainant was referring to, because she (the Complainant) had told Mr. <span>BE</span> (Witness F) that she would "suck his dick," in the beginning of the school year.

9. When asked by the Investigator, if at any time during the party, she witnessed the Complainant making eye contact with the Respondent, and/or imitating oral sex using a cigar, Ms. <span>RM</span> stated that if that incident occurred, she was not present for it.

10. Ms. <span>RM</span> stated that on Friday, April 11, 2025, she and several of her female classmates received a text message from the Complainant alleging that she had been sexually assaulted by the Respondent (Attachment #11) and advising them to be cautious around him. She stated that the Complainant shared no further details about the alleged sexual assault in the text message and that she did not speak with the Complainant about it.

11. Ms. <span>RM</span> stated that she had not notice any unusual behavior from either the Complainant or the Respondent since learning about the alleged sexual assault. She stated that after learning about the alleged sexual assault, she initially stopped speaking with the Respondent, but has since began speaking with him again, so as not to make him feel shunned. She stated that some of her other classmates continue to ignore the Respondent and move if he sits next to them.

12. When asked by the Investigator, about her level of intoxication, if any, while at the party, Ms. <span>RM</span> stated that she was intoxicated, but not to the point of being unable to remembering.

**E. Interview with <span>ZC</span> on Tuesday, April 29, 2025**

<span>ZC</span> is a first-year medical student, at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. She is President of the OB/GYN Interest Group, as well as President of the LGBTQ in Medicine Interest Group. She is expected to graduate in 2028.

1. Ms. <span>ZC</span> stated that she has known both the Complainant and the Respondent since the beginning of the school year, in July 2024. She stated that she and the Complainant


have since become good friends and have hung out one-on-one at least once. She stated that while she and the Respondent have spoken occasionally, she does not know him very well. She stated that he has rubbed her the wrong way, in the way that he has approached ethical topics of conversation in the past. She stated that she has seen the Complainant and the Respondent interact with one another at a couple of parties, and that it always seemed as though the Respondent was hanging around the Complainant.

2. Ms. ZC stated that on Saturday, March 29, 2025, she attended a cocktail party at the home of one of her classmates, at 128 E. 48th Street, Savannah, Ga. 31405. She stated that at the party, the Complainant was more intoxicated than she had ever seen her before. She stated that at one point, the Complainant snatched a drink out of her hand and drank it and that if she had seen her reach for another drink, she would've stopped her.

3. When asked by the Investigator if the Complainant was served drinks or obtained her own drinks, Ms. ZC stated that she is unsure, as she was not paying much attention.

4. Ms. ZC tated that during the judging of the cocktail competition, she was standing next to the Complainant and that the Complainant grabbed on to her a few times for stability. She further stated that the Complainant was slurring her words, talking in incomplete sentences and unable to follow conversations. She stated that as the night went on, the Complainant's stability seemed to have improved, though she was still very intoxicated.

5. When asked by the Investigator if based on her observations, the Respondent seemed to be intoxicated, Ms. ZC stated that he seemed sober compared to a Halloween party that she had seen him intoxicated at in October.

6. Ms. ZC stated that while in the backyard, she noticed the Respondent oddly hanging around the Complainant. She stated that it seemed everywhere that the Complainant went, the Respondent was within 5 feet of her. She stated that she (Ms. ZC ) made a comment to Ms. KL (Witness A), about how strange it was seeing the Complainant and the Respondent being in such proximity to one another. She stated that when the Complainant walked over to speak with her and Ms. ▓▓, the Respondent was standing nearby by as though he was waiting for something.

7. Ms. ZC stated that she saw the Complainant and the Respondent interact with one another on two occasions while at the party. She stated that on one occasion, the Complainant and the Respondent were in the backyard smoking cigars with GR GR (Witness I) and that it seemed like the Complainant was not actively engaged in the conversation but was just standing by laughing.

8. Ms. ZC stated that she later saw the Complainant and the Respondent sitting on a bench in the backyard, with BE (Witness F) and that the Respondent was leaning over Mr. BE, talking to the Complainant. She stated that at one point, she witnessed tension between Mr. BE and the Respondent, as though they were having a heated debate,

22


but she is unaware as to what they were debating about. She stated that she was later told by another classmate that Mr. ▮BE▮ had left the party because he was uncomfortable with something, but was not told what made him feel uncomfortable.

9. Ms. ▮ZC▮ stated that at the end of the night some of the party guests were making plans to go to a karaoke bar and that she was under the impression that the Complainant was going with them. She stated that when she asked another party guest about the whereabouts of the Complainant, she was told that the Complainant had taken an Uber home. She stated that she noticed the Respondent standing nearby, again, as though he was waiting for something, at which time she assumed that he was waiting for an Uber.

10. Ms. ▮ZC▮ stated that in the days after the party, the Complainant seemed to be withdrawn. She stated that the Complainant had not been as enthusiastic in planning the suture workshop that she and the Complainant were coordinating, as she previously had. She stated that when she asked the Complainant if she was ok, she stated that she was.

11. Ms. ▮ZC▮ stated that on Friday, April 11, 2025, she and several of her female classmates received a text message from the Complainant alleging that she had been sexually assaulted by the Respondent (Attachment #11) and advising them to be cautious around him. She stated that the Complainant shared no further details about the alleged sexual assault in the text message and that she did not speak with her about it.

12. Ms. ▮ZC▮ stated that she knows the Complainant very well and that she (the Complainant) has a very healthy stance pertaining to sex. She stated that she (Ms. ▮ZC▮) is an avid believer of women when it comes to sexual assault, but that even if she wasn't she would still support the Complainant, because she has no reason to lie. She stated that the medical class has participated in as many as 20 parties together and that everyone should feel safe with one another.

13. When asked by the Investigator, about her level of intoxication, if any, while at the party, Ms. ▮ZC▮ stated that she was sober most of the night.

**F.  Interview with ▮BE▮ on Wednesday, April 30, 2025**

▮BE▮ is a first-year medical student, at the Medical College of Georgia, Savannah Campus, in Savannah, Ga., of which he is a native. Mr. ▮BE▮ has plans to become a psychiatrist in the future and he is expected to graduate in 2028.

1. Mr. ▮BE▮ stated that he met the Complainant in July 2024, on the first day of school. He stated that she is one of the first people that he spoke to in the class and that he considers her to be a friend of his. He stated that he met the Respondent in July 2024, during the week of Orientation, and that although they talk often, they are not close friends.


2. Mr. <span>BE</span> stated that on Saturday, March 29, 2025, he attended a cocktail party at the home of one of his classmates, at 128 E. 48th Street, Savannah, Ga. 31405. He stated that when the Complainant arrived at the party, he could immediately tell that she was extremely intoxicated. He stated that she was giggly, stumbling and cursing a lot, which was unlike her. He further stated that the Complainant was rambling about random things and slurring words.

3. When asked by the Investigator if he witnessed how many drinks the Complainant drank at the party, Mr. <span>BE</span> stated that he is not sure how many drinks she had. He stated that he served her a couple of drinks and that it is likely that she sampled many of the other drinks on her own, as everyone at the party did.

4. When asked by the Investigator if based on his observations, the Respondent appeared to be intoxicated, Mr. <span>BE</span> stated that he is not sure as to how much the Respondent drank, but that he was one of the judges in the cocktail competition.

5. Mr. <span>BE</span> stated that after the cocktail competition, he and the Respondent were in the backyard smoking cigars when the Complainant approached them and asked to sample one of the cigars. He stated that as they were standing there, he noticed the Respondent making eye contact with the Complainant and slowly moving closer to her. He stated that although he thought the behavior to be odd, he didn't think much of it, because the Respondent is a quirky kind of person and thought the behavior was just a part of his personality.

6. Mr. <span>BE</span> stated that at one point, he, the Respondent and the Complainant were sitting on a picnic bench in the backyard, when he gave the Complainant his cigar to try. He stated that when she began holding the cigar with her fingers close to the burning end, he took the cigar away from her and made a comment like "that's enough, she's too far gone." He stated that the Respondent replied, saying "She's just having fun. It's ok." Mr. <span>BE</span> stated he became uncomfortable with the situation and decided to leave. He stated that he was one of the first guests to leave the party.

7. When asked by the Investigator if while smoking cigars, he noticed the Complainant making eye contact with the Respondent and/or making lewd gestures toward him (the Respondent), such as imitating oral sex using the cigar, Mr. <span>BE</span> stated that smoking a cigar requires "sucking in," so he could see how it could be viewed as imitating fellatio, but that he did not see it that way.

8. When asked by the Investigator, if at any time during the party, he heard the Complainant ask the Respondent the question, "are you sure you want to fuck one person for the rest of your life," Mr. <span>BE</span> stated that he did witness the Complainant and the Respondent talking at one point during the party, but does not know what they were talking about.

9. When asked by the Investigator if his discomfort was caused by the Respondent making eye contact and getting closer to the Complainant or the Complainant's level of intoxication, Mr. <span>BE</span> stated that his discomfort was more in relation to the Complainant's


level of intoxication. He stated that it was obvious that she needed to be cut off. He stated that the idea of the Respondent becoming inappropriate with the Complainant never crossed his mind.

10. When asked by the Investigator if at the party, the Complainant made a comment about performing oral sex on him, Mr. <span style="background:black">BE</span> stated that she did not. He stated that he and the Complainant have a "bro-ish" kind of relationship and that if she had made a comment about performing oral sex on him at the party or in the past, he would not have taken it seriously.

11. Mr. <span style="background:black">BE</span> stated that on Monday, March 31, 2025, he noticed the Complainant upset and crying at school. He stated that he was concerned because the Complainant is usually good at keeping her emotions covered up. He stated that on either that day or the next day, April 1, 2025, the Complainant alleged to him that she had been sexually assaulted by the Respondent. He stated that she told him that she blacked out and only had flashes of what happened. He stated that she told him that she vaguely remembers her and the Respondent being in bed together. He stated that she shared no other details with him and that he did not ask any questions, only listened.

12. Mr. <span style="background:black">BE</span> stated that after learning of the alleged sexual assault, he was not sure as to how to interact with the Respondent and distanced himself. He stated that he has since began speaking to the Respondent again, so as not to make him feel shunned.

13. When asked by the Investigator about his level of intoxication, if any, while at the party, Mr <span style="background:black">BE</span> stated that he took a sip of most of the drinks at the party, but was not intoxicated or close to being intoxicated, as he drove himself home from the party.

**G. Interview with Dr. <span style="background:black">FP</span> on Thursday, May 1, 2025**

Dr. <span style="background:black">FP</span> is the Assistant Dean of Pre-Clerkship Curriculum, at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. She began her career with Augusta University in 2008, as a Research Assistant.

1. Dr. <span style="background:black">FP</span> stated that she met both the Complainant and the Respondent in July 2024, at the beginning of the school year. She stated she knows the Complainant to be a good student, giving no cause for academic concerns. She stated that in her time at the Savannah Campus she has come to know the Respondent a little more personally, as he often comes to her for guidance and to voice concerns and issues. She stated that she is not aware of the relationship between the Complainant and the Respondent, as she has not had an opportunity to observe their interactions with one another.

2. Dr. <span style="background:black">FP</span> stated that on the morning of Wednesday, April 2, 2025, she learned that the Complainant had reported an alleged sexual assault to Dr. <span style="background:black">NP</span> Witness H). She


stated that Dr. <span>NP</span> had contacted her, asking if the Complainant and the Respondent were in any of the same working groups. She stated that on the evening Wednesday, April 2, 2025, at 5:52pm, she received a call from the Respondent (Attachment #16) requesting contact information for Augusta University Title IX Coordinator, Julie Kneuker. She stated that the Respondent told her that he believed that he had been sexually assaulted but provided her no further details.

3. Dr. <span>FP</span> stated that later that same evening, she received a call from <span>VS</span> (Potential Witness #1) voicing concerns about his own safety from the Respondent, because he had told the Respondent's fiancé about the alleged sexual assault.

4. Dr. <span>FP</span> stated that she has not noticed any unusual behavior from the Complainant since learning of the alleged sexual assault, but that her grades have been in the lowest scoring bracket, which had not happened in the past. She stated that the Respondent has seemed a little distressed but nothing unusual. She stated that she gave him the opportunity to take some time away from school if needed, but that he has not taken that opportunity.

5. Dr. <span>FP</span> stated that on Monday, April 14, 2025, she was asked by Dr. <span>EG</span> (Witness C), to check on the Respondent, because he had become extremely upset after speaking with the AU Title IX Coordinator and that she continues to check in with him often. She stated that she has concerns about him interacting with his peers and that the relationship with his friends has become strained.

6. Dr. <span>FP</span> stated that the Respondent shared with her that in the days after the report of the alleged sexual assault was made, his fiancé, <span>AM</span> (Potential Witness #2) had received strange calls from unknown phone numbers, as well as a direct message (DM) from the Complainant, advising her (Ms. <span>AM</span> that the Respondent had cheated on her. Dr. <span>FP</span> stated that she does not know the dates that the Respondent's fiancé received the calls and the direct message.

7. Dr. <span>FP</span> stated that on Monday, April 28, 2025, she and some students were walking in a hallway with the Respondent walking closely behind the Complainant. She stated that when the Complainant noticed the Respondent close to her, moved so that Dr. <span>FP</span> would be between her and the Respondent.

**H. Interview with Dr. <span>NP</span> on Friday, May 2, 2025**

Dr. <span>NP</span> is the Assistant Dean of Student Affairs, at the Medical College of Georgia, Savannah Campus, in Savannah, Ga., where she also serves as an Assistant Professor of Medicine. Dr. <span>NP</span> has been practicing Internal Medicine in the Savannah, Ga. area for 6 years. She began her career with Augusta University in July 2024.



1. Dr. NP stated that she has known both the Complainant and the Respondent since the beginning of school, in July 2024. She stated that she is not around the students often, and is unfamiliar with their interactions with one another, but that she does know that they have different friend groups.

2. Dr. NP stated that on the morning of Wednesday, April 2, 2025, the Complainant came to her office advising that she needed to have a conversation that may be triggering. She stated that the Complainant told her that she had gone to a cocktail party the Saturday before, drank too much and became extremely intoxicated, to the point where her dress kept coming up and that her friends were trying to keep her covered up.

3. Dr. NP stated that the Complainant told her that the Respondent, who had been sober offered her a ride home and that when they got to her house, they had an alleged sexual encounter, that she could not consent to because she had blacked out. She stated that the Complainant told her that she was urged by a friend to report it, and that she decided to because she wanted to tell her own story. She stated that the Complainant told her that she also decided to report it out of concern for others, especially the Respondent's future patients. Dr. NP stated that upon learning of the alleged sexual assault, she immediately sought out Dr. EG (Witness C) for further reporting instructions.

4. Dr. NP stated that in the days after the alleged sexual assault was reported she made it a point to keep a close eye on both the Complainant and the Respondent. She stated that initially the Complainant seemed to be doing well and holding things together, but that after a while her grades had slipped into the lowest quartile, which was unlike her, because she usually does well academically. She stated that though she has made it a point to keep them separated, and in different Anatomy groups, the Complainant has made complaints about the Respondent often getting too close to her, making her feel uncomfortable.

5. Dr. NP stated that in the days after the alleged sexual assault was reported, the Respondent began displaying concerning behavior, such as having emotional outbursts, with crying and vomiting and then suddenly stopping and heading to class as though nothing's happened. She stated that the Respondent's grades remained steady and that had begun attending all lectures in person, as opposed to exclusively online, as he had done in the past.

6. Dr. NP stated that since the beginning of the school year, the Respondent has displayed a pattern of concerning and sometimes manipulative behavior, such as providing different excuses to different professors for the same absence, and accusing her (Dr. NP ) of targeting him, when she has asked him questions in class and then attempting to convince her that he had witnesses to support him, which turned out to be false.

7. Dr. NP stated that she has gotten complaints from other students claiming that the Respondent has used his mental health to manipulate them if things were not going his way, saying that he would kill himself. She stated that those same students have


complained that the Respondent has not respected the boundaries that they've set with him, and that when they've tried to distance themselves from him, he has tracked their locations and attempted to make them talk to him. She stated that she has also received reports of the Respondent threatening litigation against students and telling them that Title IX is on his side.

**I. Interview with** ███ **GR** ███ **on Monday, April 5, 2025**

███ **GR** ███ is a first-year medical student at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. He serves as Co-President of the Ophthalmology Club and Research Assistant to Dr. Folami Powell. He is expected to graduate in 2028.

1. Mr. ██ **GR** ██ stated that he met the Complainant at the beginning of the school year, in July 2024. He stated that though they are good friends, they do not talk or hang out with one another outside of school. He stated that he and the Respondent met in late August 2024 and that they are peers who get along well but have never hung out with one another. He stated that neither the Complainant nor Respondent has ever indicated a romantic interest in one another and that he does not recall seeing them speak or interact with one another, prior to the day of the cocktail party.

2. Mr. ██ **GR** ██ stated that on Saturday, March 29, 2025, he attended a cocktail party at the home of one of his classmates, at 128 E. 48th Street, Savannah, Ga. 31405, and that based on his observations, he could tell that the Complainant was extremely intoxicated. He stated that he did not witness her having trouble walking or standing, but that she was slurring words when communicating.

3. When asked by the Investigator if based on his observations, the Respondent appeared to be intoxicated, Mr. ██ **GR** ██ stated that while the Respondent did not seem sober, he did not seem intoxicated either. He stated that he knows that the Respondent had been drinking because he, like the Respondent was one of the judges for the cocktail competition. He stated that there were approximately 10 cocktails submitted for the competition, but that none of the judges drank them all to completion. He stated that he is unsure as to how many drinks the Complainant had while at the party.

4. Mr. ██ **GR** ██ stated that at one point during the party, he noticed the Complainant, the Respondent and ██ **BE** ██ (Witness F) in the backyard, sitting together and talking, but that he does not know what they were talking about. He stated that later, he, the Complainant and the Respondent were talking with one another about school and that the Complainant, and the Respondent spoke briefly with one another during the conversation, but that he does not recall what they spoke about. He stated that he did not witness any


further interaction between the Complainant and the Respondent at the party, nor did he notice any strange behavior towards the Complainant from the Respondent, at any time.

5. When asked by the Investigator, if at any time during the party, he heard the Complainant ask the Respondent, "Are you sure you want to fuck one person for the rest of your life?", Mr. GR stated that he does recall something similar being said by the Complainant, possibly, while in the backyard. He stated that he was under the impression that the comment was made to the group as a whole, rather than solely to the Respondent, but that he is not completely certain.

6. When asked by the Investigator, if while in the backyard, he witnessed the Complainant making eye contact with the Respondent and/or imitating oral sex using a cigar, Mr. GR stated that he does not recall witnessing that.

7. Mr. GR stated that in the days after the party, he had heard from other students that the Respondent had allegedly sexually assaulted the Complainant. He stated that the Complainant had asked him about speaking with the Title IX Investigator, but that she did not discuss details concerning the alleged sexual assault with him. He stated that during one of the Anatomy Classes, he noticed the Respondent walked over to a table that the Complainant had been sitting at and that she immediately got up and moved to the opposite side of the table. He stated that she seemed upset at the time. Mr. GR stated that while he noticed no unusual behavior from the Respondent, he noticed that he no longer hangs out with his friend group and that he often sits alone.

8. When asked by the Investigator, about his level of intoxication, if any, while at the party, Mr. GR stated that he drank approximately 4-5 drinks total while at the party.


**J. Interview with** LH **on Tuesday, May 6, 2025**

LH is a first-year medical student at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. She is a participant in the OB/GYN Interest Group and is expected to graduate in 2028.

1. Ms. LH stated that she met both the Complainant and the Respondent at the beginning of the school year, in July 2024. She stated while she is friendly with both, she has never hung out with either of them one-on-one outside of school. She stated that neither of them has ever expressed romantic interest in one another to her, and that she is not aware of their friendship status. She stated that everyone in the class is friends with one another.

2. Ms. LH stated that on Saturday, March 29, 2025, she hosted a cocktail party at her home, at 128 E. 48th Street, in Savannah, Ga. 31405, in which all her classmates were invited to. She stated that while she was aware that the Complainant and the Respondent



were at the party, as host she was mingling with everyone and did not take notice of the intoxication level of either of them. She stated that she did not observe their interactions with one another at the party, nor was she made aware of any unusual behavior from either of them.

3. Ms. LH stated towards the end of the night, when she and some of the party guests were making plans to go to a karaoke bar, she was under the impression that the Complainant had left by that time. She stated that she was not aware that the Complainant and the Respondent had left the party when they did, as neither of them said goodbye to her prior to leaving. She stated that she checked her doorbell camera footage, upon learning of the alleged sexual assault from some of her classmates and noticed that the Complainant and the Respondent left her home together, at approximately 10:23pm (Attachment #2).

4. Ms. LH stated that in the days after learning of the alleged sexual assault, she noticed that the Respondent had become a little withdrawn and distant and had stopped hanging out with his friends.

5. Ms. LH stated that she has not discussed the details of the alleged sexual assault with the Complainant, but that sometime in mid-April, she got a text message from her advising that she may be contacted by the Title IX Investigator.

**K. Interview with LTB on Tuesday, May 6, 2025**

LTB is a first-year medical student at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. She is the President of the Student National Medical Association, Vice President of the Family Medicine Interest Group, and Community Outreach Chair of the Teddy Bear Clinic. She is expected to graduate in 2028.

1. Ms. LTB stated that she has known both the Complainant and the Respondent since the beginning of the school year, in July 2024. She stated that while she and the Complainant are cordial with one another, they are not close and have only hung out in group settings. She stated that she previously considered the Respondent to be a close friend but that incidents surrounding the alleged sexual assault has ended their friendship. She stated that neither the Complainant nor the Respondent has ever expressed romantic interest in one another to her, and she has never seen them speak to one another.

2. Ms. LTB stated that on Saturday, March 29, 2025, she attended a cocktail party at the home of one of her classmates, at 128 E. 48th Street, Savannah, Ga. 31405. She stated that during the party, it was obvious that the Complainant was extremely intoxicated, as she was slurring words, stumbling and having a hard time with stability. She stated that at one point, the Complainant's dress lifted, showing her panties, at which time DR


(Witness P) covered her up using her own skirt. Ms. **LTB** stated that she was concerned for the Complainant, because she had never seen her that intoxicated.

3. When asked by the Investigator if, based her observations, the Respondent appeared to be intoxicated, Ms. **LTB** stated that although he had been drinking some, as he was a judge for the cocktail competition, he did not seem as intoxicated as she had seen him at past events, such as the Halloween party that he hosted in October. She stated that she left the party early to attend a family event, but did not witness the Complainant and the Respondent near one another or speaking to one another prior to her leaving.

4. Ms. **LTB** stated that in the days after the party, the Respondent seemed a little off. She stated that on Monday, March 31, 2025, she, the Respondent, **ED** (Witness B) and **RN** (Witness N) went to a café to study and that while at the café, the Respondent told them that he was not sure if he wanted to get married, due to his fiancé not being nice to him and mistreating him. She stated that it was not the first time that the Respondent had expressed those feelings to them. She stated that the following Wednesday, April 2, 2025, during Anatomy Class, she noticed the Respondent walking around the classroom more than usual and even getting close to the Complainant at one point.

5. Ms. **LTB** stated that on Wednesday, April 2, 2025, between 12:30 and 12:45pm, she, **ED** (Witness B) and **RN** Witness N) were together, when Ms. **ED** received a call from the Respondent's fiancé, **AM** Potential Witness #2) stating that she had been told by **VS** (Potential Witness #1) that the Respondent had allegedly sexually assault one of their female classmates and asked if they had any further information about it. She stated they provided her with the details of what they saw while at the party.

6. She stated that on Friday, April 4, 2025, the Complainant told her that the Respondent offered her a ride home even though she had informed him that she was going to take an Uber. She stated that the Complainant told her that she (the Complainant) was really drunk and woke up confused and that she later realized that the Respondent had allegedly raped her.

7. Ms. **LTB** tated that on Friday, April 11, 2025, she and several of her female classmates received a text message from the Complainant, alleging that she had been sexually assaulted by the Respondent, and advising them to use caution around him.

8. Ms. **LTB** stated that on Monday, April 14, 2025, the Respondent, who was emotionally distraught, told her, Ms. **ED** and Ms. **RN** that he had been sexually assaulted by the Complainant on the night of the party and felt alone.

9. Ms. **LTB** stated that the Respondent told them that the Complainant was extremely intoxicated, and that he had offered her a ride home. She stated that he alleged that during the car ride the Complainant leaned over the console, kissed him and invited


him up to her apartment to have sex, which he declined. She stated that he told them that things got hazy and that he was unsure as to how he got into her apartment, but that he recalls her taking down his pants and "doing things" to him.

10. Ms. ███ LTB ███ stated that the Respondent alleged that the Complainant had told him to lay on the bed, which he did, at which time she had sex with him. She stated that the Respondent told them that he thought that if he resisted the Complainant, she would tell people that they had sex.

11. Ms. ███ LTB ███ stated that the Respondent told them that initially he had no intentions of telling his fiancé about the alleged sexual assault, and that he was going to "take it to the grave." He told them that the only thing that was stopping him from reporting the alleged sexual assault was his fiancé's reaction and his fear that she would not believe him. She stated that the Respondent told them, that on April 2, 2025, immediately after, his fiancé was notified of the alleged sexual assault, by Mr. ███ VS ███ (Potential Witness #1), she texted him (the Respondent), and that they two of them met up after his Anatomy Class. She stated that when the Respondent had confirmed to his fiancé that he had cheated on her and slept with someone else, she made him get out of the car. She stated that he told them that it wasn't until he was certain that his relationship was not in jeopardy, that he felt comfortable enough to file a Title IX report against the Complainant.

12. Ms. ███ LTB ███ stated that on Friday, April 18, 2025, Ms. ███ RN ███ told her that she had been approached by the Respondent, who wanted to discuss the Title IX case with her. She stated that at that time, Ms. ███ RN ███ informed the Respondent that she, Ms. ███ LTB ███, and Ms. ███ ED ███ did not feel comfortable speaking with him about the case and had requested that he stopped speaking to them. She stated that Ms. ███ RN ███ told her that when she (Ms. ███ RN ███ had asked the Respondent about a text message that he had sent them on April 15, 2025, stating that the Title IX Coordinator does not believe that men can be raped (Attachment #10), the Respondent told her that the Title IX Coordinator had questioned the possibility of him being raped, if he was behind the Complainant during the alleged sexual encounter. She stated that Ms. ███ RN ███ told her that the Respondent stated that he had planned to hire a lawyer to assist him with filing a Title IX report.

13. Ms. ███ LTB ███ stated that Ms. ███ RN ███ told her that when she reminded the Respondent that he had previously told them that he filed a Title IX report on April 2nd, he told her that he was unable to file a report at that time because he had not yet been assigned an Advisor by the Title IX Coordinator. She stated that Ms. ███ RN ███ told her that the Respondent stated that a report had been filed on April 14, 2025. She stated that the Respondent then told Ms. ███ RN ███ that he had planned to sue Title IX for mishandling his case.

14. Ms. ███ LTB ███ stated that it was at that time that she, Ms. ███ RN ███ and Ms. ███ ED ███ had noticed discrepancies in what the Respondent had told them previously regarding the alleged sexual assault and surrounding circumstances. She stated that during the April 14th



conversation with the Respondent, he told them that the Complainant had forced him to lay down on the bed during the alleged sexual assault but on April 18th, he told them that he was behind the Complainant.

15. Ms. █████ LTB █████ stated that the Respondent had previously told them that he had filed a Title IX report against the Complainant on Wednesday, April 2, 2025, but later stated that he had filed one on April 14th and then told them that he had planned to hire a lawyer to assist him with filing a Title IX report.

16. Ms. █████ LTB █████ stated that during that same conversation, she, Ms. █ RN █ and Ms. █████ RN █████ wondered how the Respondent was able to use a Global Positioning System (GPS) to find his way around, as he had told them he did, if he was as intoxicated as he had claimed to be.

17. When asked by the Investigator, about her level of intoxication, if any, while at the party, Ms. █████ LTB █████ stated that she remained sober while at the party. She stated that she had a couple of sips of some of the alcoholic cocktails, but that she drank non-alcoholic mocktails most of the night, because she had planned on driving herself home.

18. Additional Information: On Tuesday, May 6, 2025, the Investigator was provided a 48-minute recording (Attachment #17) by Ms. █████ LTB █████ titled "Conversation with Will, containing a conversation between herself, the Respondent, █ ED █ (Witness B) and █ RN █ (Witness N). She stated that on April 14, 2025, she, and Ms. █ RN █ were in Conference Room 223, at 13040 Abercorn St., Savannah, Ga. 31419, when the Respondent approached them, wanting to talk. She stated that she, Ms. █ ED █ and Ms. █ RN █ had been previously distancing themselves from the Respondent, upon hearing about the allegations against him from the Complainant.

19. Ms █████ LTB █████ stated that when the Respondent began explaining to them what had happened during the sexual encounter, between him and the Complainant on the night of the party, she began recording the conversation, because she was not comfortable speaking with him about it, especially since she, Ms. █ RN █ and Ms. █ ED █ had been previously warned about discussing the Title IX case, by Dr. █ FP █ (Witness G).

20. Upon reviewing the recording, the Investigator was able to determine that Ms. █ ED █ was not present for a large part of the conversation and rather joined the conversation at the 40:24 mark of the recording. Throughout the recording, the Respondent is heard to be crying, and emotionally distraught. Other pertinent details from the recording, captured by the Investigator are as follows:

- 00:56- The Respondent stated that he had been sexually assaulted by the Complainant
- 3:04- The Respondent advised Ms. █████ LTB █████ and Ms. █ RN █ that a Title IX report had been made on his behalf when he spoke with Dr. █ FP █ prior to Spring Break.


- 4:32- 4:45 Recording silenced for privacy discretion concerning a sensitive and irrelevant topic.
- 5:17- The Respondent stated that ▇▇AM▇▇ (Potential Witness #2) has been harassed
- 5:41- Ms. Nya stated that upon hearing about the allegations, her initial thoughts were that the Complainant was blacked out drunk and the Respondent was sober.
- 20:01- Ms. ▇▇LTB▇▇ and Ms. ▇RN▇ informed the Respondent that the Complainant had advised all of the women in the class that she had filed a complaint against him, to warn them.
- 22:21 thru 22:54- The Respondent stated that despite him getting really drunk at the cocktail party, he decided to drive himself home.
- 23:18 thru 23:39- The Respondent stated that as the party was winding down, he and the Complainant were invited to go downtown with some of the other party guests, to which they both refused. He stated that because he had committed to driving, he offered the Complainant a ride home.
- 23:48- The Respondent stated that upon arriving at the Complainant's apartment complex, she leaned across the truck and kissed him.
- 24:07- The Respondent stated that the Complainant told him that she wanted him to go upstairs and have sex with her, to which he told her that he did not want to.
- 24:24 thru 25:14- The Respondent stated, "it gets a little hazy," but that as he was standing in the hallway of the Complainant's apartment, when she pulled down his pants and started to "go at it."
- 25:21- The Respondent stated that he didn't know what to do and that he just froze up.
- 26:00- The Respondent stated that he didn't know what else to do but to stand there.
- 26:46- The Respondent stated that he doesn't remember the specifics of what "she" (the Complainant) said, but that he recalls being so scared that he just ran out. He stated that he was scared that she (the Complainant) was going to call "▇▇AM▇▇" (Ms. ▇▇AM▇▇ - Potential Witness #2).
- 27:03- The Respondent stated that he "just laid there and let it happen."
- 27:15- The Respondent stated that whenever "she" (the Complainant) told him to do something, he just did it. He stated that he just wanted it over.
- 34:28- Ms. ▇RN▇ stated that she thinks it was more believable in terms of how the "she" (the Complainant) looked, and that if the Respondent did anything, it was because the Complainant was drunk, to which Ms. ▇▇LTB▇▇ can be heard agreeing.



- 34:48- Ms. <span>LTB</span> stated that all the girls and everyone could see how drunk "she" (the Complainant) was, to which Ms. <span>RN</span> can be heard agreeing.
- 44:09 thru 44:45- The Respondent stated that the Title IX Office had promised him a fair chance of having his side of the story told and would conduct interviews with everyone involved. He stated that only the bad version of events had been told at that time. He stated that everyone knows, at which time Ms. <span>ED</span> and Ms. <span>RN</span> stated, "that because everyone knows, the whole investigation is gone and that none of the witnesses could be used."
- 48:02- The Recording ends.

**L. Interview with** <span>RM</span> **on Friday, May 9, 2025**

<span>RM</span> is a first-year medical student at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. She is originally from Atlanta and serves as the liaison between the Medical School Administration and the M1 medical class. She also works with The Living Vine Pregnancy Center. She is expected to graduate in 2028.

1. Ms. <span>RM</span> stated that she met both the Complainant and the Respondent on the first day of orientation, in July 2024 and that she considers the Complainant to be a friend of hers. She stated that she and the Respondent are friendly but have had minimal conversation and have never hung out together outside of school. She stated that neither the Complainant nor the Respondent have ever expressed a romantic interest in one another and that she's never seen them interact. She stated that they have different friend groups.

2. Ms. <span>RM</span> stated that on Saturday, March 29, 2025, she attended a party at the home of one of her classmates, at 128 E. 48th Street, Savannah, Ga. 31405. She stated that upon the Complainant's arrival at the party, she hugged her (Ms. <span>RM</span> and told her that she was already "hammered," indicating that she was already intoxicated. She stated that upon speaking with the Complainant, her eyes appeared glazed over and she was slurring words. She stated that she also noticed the Complainant putting her fingers in her mouth while talking to <span>KL</span> (Witness A).

3. Ms. <span>RM</span> stated that as the party progressed, the Complainant continued to get more intoxicated and began losing motor control. She stated during the cocktail judging, the Complainant sat down and was slouched over, on a nearby couch and that she had a hard time getting up later. She stated that at one point, the Complainant bumped into a table, spilling the drinks that were on it. She stated that she had never seen the Complainant that way, as she is usually well put together.


4.  When asked if based on her observations, the Respondent appeared to be intoxicated, Ms. RM tated that he did not seem incoherent or impaired in any way and that she would've felt comfortable with him driving. She stated that at one point during the party, she noticed the Respondent having trouble opening a jar of cherries and sarcastically teased him about him being too intoxicated to open it.

5.  Ms. RM stated that the only time that she noticed the Complainant and the Respondent interacting at the party, was when they were in the backyard smoking cigars. She stated that toward the end of the night, some of the party guests were making plans to go to karaoke bar and that when the Complainant was asked if she was going, she stated that she was too drunk and needed to go home. She stated that she was unsure of the whereabouts of the Respondent at that time. She stated that she is unsure as to when the Complainant and the Respondent left the party, as neither of them said goodbye prior to leaving.

6.  Ms. RM stated that on Sunday, March 30, 2025, she called the Complainant, and they spoke for approximately, 5-10 minutes. She stated that the Complainant made no mention of the alleged sexual assault during that conversation, but that on the following Friday, April 4, 2025, the Complainant told her to be careful around the Respondent but gave her no further details. She stated that on Friday, April 11, 2025, she along with several of her female classmates, received a text message from the Complainant, alleging that she had been sexual assaulted by the Respondent (Attachment #11), and advised them to use caution around him.

7.  Ms. RM stated that in the days after the party, it seemed as though the Complainant and the Respondent were trying to keep distance between them, especially during lectures. Ms. RM stated that she later heard from another student that while at the party, the Complainant had made a sexually suggestive comment to one of her fellow male students.

8.  When asked by the Investigator about her level of intoxication, if any, while at the party, Ms. RM stated that although she had some drinks while at the party, and was a little intoxicated, her memory of events was not impaired.

**M. Interview with J AM on Friday, May 23, 2025**

AM is the Clerkship Program Coordinator, at the Medical College of Georgia, Savannah Campus, Savannah Ga. He has worked many years in Higher Education and began his career with Augusta University in July 2024.

1.  Mr. AM stated that he has known both the Complainant and the Respondent since July 2024. He stated that although he works closely with the students, by providing them support in various areas, he does not have a close relationship with either of them.



2. Mr. ▮AM▮ stated that on Tuesday, May 6, 2025, the Respondent came to his office, said that he was stressed and anxious. He stated the Respondent was walking around in circles and stated that he had an elevated heart rate. Mr. ▮AM▮ stated that he offered the Respondent a seat and asked if he needed to talk, at which time he sat down, laid his head back, against the wall and took a couple of deep sighs. He stated that after approximately 10-20 minutes, the Respondent stood up and stated that he needed to get to class and left.

3. Mr. ▮AM▮ stated that the next day, Wednesday, May 7, 2025, the Respondent came to his office and asked if he would confirm something for him, but did not tell him what he needed confirmed, to which Mr. ▮AM▮ stated that he would. He stated that same day, at 3:28pm, the Respondent sent him a text message, asking him to confirm that he (the Respondent) was in significant emotional distress the day before while in Mr. ▮AM▮ office (Attachment #12). He stated that he advised the Respondent that he could confirm that he was in his office.

4. Mr. ▮AM▮ stated that later that day, at 5:38pm, the Respondent sent him a second text message, asking if would agree to the Respondent's emotionally distressed state, to which he did not respond. Mr. ▮AM▮ stated that he reported the incident to Dr. ▮EG▮ (Witness) the next day. He stated that on Thursday, May 8, 2025, the Respondent came to his office and apologized for putting him in an uncomfortable position.

5. Mr. ▮AM▮ stated that he (Mr. ▮AM▮) is a non-medical professional, who is incapable of diagnosing distress, but that at no time while in his office, on May 6, 2025, did the Respondent indicate that he was distressed, or show any obvious signs of distress or panic. He stated that what the Respondent was exhibiting seemed to be more like low level frustration than anything, and that when he "sighed," it was comparable to a driver sighing due to frustration with traffic.

6. When asked by the Investigator if in the days after the cocktail party, he noticed any unusual behavior from the Complainant and/or the Respondent, Mr. ▮AM▮ stated he noticed that the Respondent had stopped hanging out with his friend group and seemed to be secluded from the rest of his peers. He stated that the Respondent also began attending Lecture sessions in person, as opposed to exclusively online, as he had previously done.

7. Mr. ▮AM▮ tated that the Complainant, who is usually very reserved seems to be more relaxed and has embraced the support that she has received from her peers.

**N. Interview with ▮RN▮ on Tuesday, June 3, 2025.**

▮RN▮ is a first-year medical student, at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. She is President of the Physical Medicine and Rehabilitation (PM&R) Interest Group, Vice-President of the Residents in Student Government for the M1 Class and Secretary of the Orthopedics Interest Group. She is expected to graduate in 2028.



1. Ms. ▓RN▓ stated that on Saturday, March 29, 2025, she attended a party at the home of one of her classmates, at 128 E. 48th Street, Savannah, Ga. 31405. She stated that while at the party, noticed the Respondent, the Complainant and ▓BE▓ (Witness F) in the backyard, and saw the Respondent give the Complainant a cigar. She stated that she approached the Respondent and told him to take the cigar away from the Complainant, because she did not need it, because she was already extremely intoxicated. She stated that when the Respondent replied, "She's having fun," she (Ms. ▓RN▓) got upset and walked away.

2. Ms. ▓RN▓ stated that on Monday, March 31, 2025, while in Anatomy Class, on more than one occasion, the Respondent came over to the cadaver table that she and the Complainant work at. She stated that even though he was speaking to her (Ms. ▓RN▓), he seemed to be more focused on the Complainant. She stated that he was attempting to engage with the Complainant, but that she was not responsive to him. She stated that on that same day, after the Anatomy Class, the Respondent told her that he believed "something" was in the cigars that he had on Saturday, because he didn't "feel right." She stated that he provided no further details.

3. Ms. ▓RN▓ stated that on Tuesday, April 15, 2025, she, Ms. ▓LTB▓ and Ms. ▓ED▓ received a text message from the Respondent stating that the Title IX Coordinator did not believe that men could be raped (Attachment #10), to which neither of them responded. She stated that on Friday, April 18, 2025, she approached the Respondent at the back of the Lecture Hall, to inform him that she, Ms. ▓LTB▓ and Ms. ▓ED▓ had received his message, but that they did not wish to speak with him and to ask him to stop speaking to them.

4. Ms. ▓RN▓ stated that the Respondent began rambling, telling her that the Title IX Coordinator had questioned his ability to be raped, if he was behind the Complainant, during the alleged sexual encounter. She stated that he told her that he had planned to sue Title IX because he had been assigned the wrong advisor.

5. Ms. ▓RN▓ stated that it was when she was telling Ms. ▓LTB▓ and Ms. ▓ED▓ about her conversation with the Respondent, that they began noticing discrepancies in what the Respondent had previously told them, about the sexual position that he was in during the alleged sexual assault and the timeline of his filing a Title IX report against the Complainant.

6. When asked by the Investigator about her level of intoxication, if any, while at the party, Ms. ▓RN▓ stated that she drank approximately 2-3 cocktails, over the course of 3 hours, but remained sober the entire night.

**O. Interview with Dr. ▓▓▓▓▓▓▓▓ on Wednesday, June 4, 2025**



Dr. <span style="background:black;color:white">JS</span> is the Assistant Program Director and Associate Faculty Member for the Department of Psychiatry. She specializes in addiction medicine and health behavior. She began her career at Augusta University in 2020.

1. When asked by the Investigator for basic information regarding the prescription drug Zoloft, Dr. <span style="background:black;color:white">JS</span> stated that it is commonly prescribed for mood stabilization purposes, in conditions such as Depression, Post Traumatic Stress Disorder (PTSD), Obsessive Compulsive Personality Disorder and other social anxiety disorders. She stated that it is most often prescribed to patients in dosages of 50-100mg.
2. Dr. <span style="background:black;color:white">JS</span> stated that Zoloft bares with it the possible side effects of nausea, drowsiness, insomnia, decreased appetite, heart palpitations, and erectile disfunction, in men.
3. Dr. <span style="background:black;color:white">JS</span> stated that when mixed with alcohol, Zoloft can worsen side effects and in addition cause irritability, shivers, tremors, a racing heart and can cause a person to feel anxious. She stated that a higher alcohol intake with a higher dose of Sertraline (generic for Zoloft) would likely place someone at risk of more severe effects of drug interactions. This could lead to issues with coordination and extreme drowsiness. Incapacitation from something like extreme confusion or syncope would be rare and not something that she has experienced as a prescriber.

**P. Interview with <span style="background:black;color:white">DR</span> on Wednesday, June 4, 2025**

<span style="background:black;color:white">DR</span> is a first-year medical student at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. She is a member of the Honor Council in the Student Government Association. She is expected to graduate in 2028.

1. Ms. <span style="background:black;color:white">DR</span> stated that on March 29, 2025, she attended a party at the home of one of her classmates, at 128 E. 48th Street, Savannah, Ga. 31405. She stated that at the party she recalls having many conversations with many people, as everyone was talking to everyone. When asked by the Investigator, if she recalls having a conversation with the Complainant and the Respondent and if she recalls the Complainant asking the Respondent, "Are you sure you want to fuck one person for the rest of your life?". Ms. <span style="background:black;color:white">DR</span> stated that she does not recall hearing that, nor does she recall having a conversation with the Complainant and the Respondent at the same time. She stated that she recalls having a brief conversation with the Respondent but does not recall what they talked about.
2. Ms. <span style="background:black;color:white">DR</span> stated that she recalls seeing the Complainant sitting on the couch in the living room, with her skirt lifting up, showing her panties. She stated that she sat next to the Complainant and used her (Ms. <span style="background:black;color:white">DR</span>) own skirt to cover up the Complainant's legs. She


stated that during the party, on at least three different occasions, the Complainant complimented her on the red dress that she was wearing. She stated that she believes that it was because the Complainant was intoxicated that she had forgotten that they had previously discussed the dress.

3. When asked by the Investigator about her level of intoxication, if any, while at the party, Ms. DR stated that she remained sober the entire night. She stated that she had a couple of sips of the cocktails that were submitted for the competition, but did not drink any of them to completion.

**Potential Witnesses Not Interviewed:**

1. ██VS██ is a first-year medical student at the Medical College of Georgia, Savannah Campus, in Savannah, Ga. The investigator requested an interview due to his alleged involvement in the following ways: On Wednesday, April 2, 2025, Mr. ██VS██ visited the Respondent's fiancé at her workplace and told her that the Respondent had sexually assaulted one of their female classmates. On the evening of Wednesday, April 2, 2025, Mr. ██VS██ contacted Dr. ██FP██ (Witness G) with concerns for his safety from the Respondent, because he told the Respondent's fiancé about the alleged sexual assault. Dr. ██EG██ (Witness C) stated that on either Wednesday April 3, 2025, or Thursday, April 4, 2025, Mr. ██VS██ placed a complaint with her office, questioning why no action had been taken against the Respondent. An interview request was made to Mr. ██VS██ via email on Tuesday, April 29, 2025, which he declined (Attachment #13).

2. ██AM██ fiancé (now Wife) to the Respondent at the time of the alleged sexual assault. The investigator requested an interview due to her alleged involvement in the following ways: On Wednesday, April 2, 2025, ██VS██ (Potential Witness #1) visited Ms. ██AM██ workplace and alleging to her that the Respondent had sexually assaulted one of his female classmates. On Friday, April 4, 2025, Ms. ██AM██ began receiving calls from unknown phone numbers (Attachment #7), one of which was answered by the Respondent. When the Complainant asked to speak with Ms. ██AM██ she (Ms. ██AM██) instructed the Respondent to end the phone call. That same day, at 5:17pm, Ms. ██AM██ received a second phone call from the Complainant (Attachment #9A & B), in which she left a voicemail alleging that the Respondent had raped her, and that she (Ms. ██AM██ should not stay with him. At 6:16pm, that same day, Ms. ██AM██ received a direct message (DM) via Instagram from the Complainant (Attachment #8), advising her that the Respondent had cheated on her. A verbal request to interview Ms. ██AM██ was made to the Respondent on Thursday, May15, 2025. When asked by the Respondent the necessity for interviewing Ms. ██AM██ the Investigator informed him that because Ms. ██AM██ name had been mentioned previously, by other witnesses, she wanted to capture any first-hand knowledge and/or experiences that Ms. ██AM██ could contribute to the investigation. A

40


second request to interview Ms. ███ was made to the Respondent via email, on Monday, May 21, 2025. A final request to interview Ms. ███ was made verbally to the Respondent on Friday, May 30, 2025. On Wednesday, June 4, 2025, the Respondent declined, via email, the interview request, on behalf of Ms. ███, stating that "she was not a percipient witness to the events in question and has no first- hand knowledge on the subject matter."

## VII. Findings of Facts and Analysis:

In order to determine whether to charge the Respondent with violating the Sexual Misconduct Policy, the information gathered must be evaluated based on a preponderance of the evidence standard. This means it must be determined that it is more likely than not that the Respondent's conduct violated the Sexual Misconduct Policy.

March 29, 2025

1. Regarding the allegation that after driving her home from an off-campus party, the Respondent had sex with her, despite her being heavily intoxicated and unable to consent:

    a. **Both the Complainant and the Respondent agree that a sexual encounter occurred between them.**

    - The Complainant alleged that the only thing that she remembers after getting into the Respondent's truck is her bent over in her bedroom, with the Respondent having sex with her from behind and then ejaculating on her back.
    - The Respondent stated that while in the hallway of the Complainant's apartment, she pulled down his underwear and began performing oral sex on him. He stated that she then either instructed him or took him to her bedroom and asked him to perform sexual acts on her. The Respondent stated that the sexual encounter consisted mostly of the Complainant touching herself and performing sexual acts on him, using her hands and mouth. He stated that the Complainant instructed him to have sex with her from behind and that when he advised her that he was about to "finish," she instructed him to "cum" on either her back or buttocks. In a written statement, the Respondent stated that the alleged sexual contact with the Complainant was consensual (Attachment #14).
    - At the 00:56 mark of the recording titled "Conversation with Will" (Attachment #17), the Respondent stated that he had been sexually assaulted by the Complainant.



**b. The Complainant stated that she was heavily intoxicated and unable to consent**

- The Complainant stated that she began drinking at approximately 4pm and that prior to leaving home, she had consumed at least 2 shots of vodka, as well as some of the cocktail drink that she had prepared for the party, causing her to feel intoxicated. While at the party, she consumed more of the cocktail that she had prepared, along with some of the cocktails prepared by other party guests, some moonshine, a martini, a limoncello shot and a partial beer. She stated that she continued to drink until she left the party. She stated that she believes the effects of the alcohol that she drank at home and during the party was amplified not only by the amount that she drank, but also by the fact that she only weighs 115 pounds and had not eaten for over 2 hours before the party or during the party. She further stated that the dosage of the prescription medication Zoloft that she was on at the time, had been recently increased to 150mg.

- The Respondent stated that during the party, the Complainant showed no signs of being heavily intoxicated and that she was able to clearly communicate throughout the evening. He stated that at no time was the Complainant incapacitated and that her words were clear and direct and consistent with her actions.

- KL (Witness A) stated that upon her arrival at the Complainant's house at approximately 4:30pm, the Complainant told her that she had already started drinking. She stated that the Complainant was more giggly than usual and struggled to carry her cocktails to the Uber. She stated that the Complainant was not sober enough to drive. Ms. KL stated that anytime she saw her during the party, she had a drink in her hand and that she became more intoxicated throughout the party. She stated that at one point, the Complainant looked wobbly when attempting to stand up from a bench and that she was speaking with jumbled words and not making sense when communicating. She stated that she had never seen the Complainant that intoxicated before.

- ED (Witness B) stated that while at the party, she witnessed the Complainant having a hard time standing. She stated that the Complainant was slurring her words and not making much sense when communicating. She stated that it was her first time seeing the Complainant in that condition.

- RM (Witness D) stated that when the Complainant arrived at the party, she told her (Ms. RM) that she was "already hammered," indicating that she was already intoxicated. She stated that while at the party, the Complainant continued to drink and at one point noticed her knock over a drink, as she was attempting to stand up from a couch. She stated that the Complainant was not

42


slurring her words but seemed less reserved than usual. She stated that the Complainant was obviously intoxicated.

- ZC (Witness E) stated that at the party, the Complainant was more intoxicated than she had ever seen her before. She stated that at one point, the Complainant snatched a drink from her (Ms. ZC hand and drank it. She stated that if she had seen the Complainant reach for another drink, she would've stopped her. Ms. ZC stated that she was standing next to the Complainant, during the judging of the cocktail competition and that the Complainant grabbed on to her a few times for stability. She stated that the Complainant was slurring her words, unable to form complete sentences when communicating and unable to follow conversations.

- BE (Witness F) stated that when the Complainant arrived at the party, he could immediately tell that she was heavily intoxicated. He stated that she was giggly, stumbling and cursing a lot, which is unlike her. He stated that she was also slurring her words and rambling about random things. He stated that it was obvious that the Complainant needed to be cut off from having any more alcohol.

- GR (Witness I) stated that based on his observations at the party, he could tell that the Complainant was extremely intoxicated. He stated that though he did not witness her having trouble walking or standing, she was slurring her words when communicating.

- LTB (Witness K) stated that it was obvious that the Complainant was extremely intoxicated at the party. She stated that she was slurring her words, stumbling and having a hard time with stability. She stated that at one point, the Complainant's dress lifted, showing her panties, when DR (Witness P) covered her up. She stated that she was concerned because she had never seen the Complainant that intoxicated before.

- RM (Witness L) stated that when the Complainant arrived at the party and hugged her, she told her (Ms. RM) that she was "hammered," indicating that she was intoxicated. She stated that the Complainant's eyes were glazed over and that she was slurring her words. She stated that she noticed that the Complainant also kept putting her fingers in her mouth while talking to Ms. KL She stated that as the party progressed, the Complainant got more intoxicated and began losing control of her motor skills. She stated that during the cocktail judging, the Complainant sat down on a couch and was slouched over and that she had a hard time getting up later. She stated that at one point, the Complainant bumped into a table, spilling the drinks that were on it. Ms. RM stated that she had never seen the Complainant that way.

43



- **RN** (Witness N) stated that she intervened when she noticed the Respondent give a cigar to the Complainant, because the Complainant was already extremely intoxicated.
- **DR** (Witness P) stated that when she saw the Complainant sitting on a couch, with her dress lifted, showing her panties, she sat next to her and covered up the Complainant's legs, using her own skirt. She stated that throughout the night, the Complainant paid her the same compliment several times, as though she did not remember them previously talking.
- Doorbell camera footage of the party location shows Ms. **KL** (Witness A) and the Complainant's arrival to the party, on Saturday, March 29, 2025, at 6:14pm, (Attachment #1). It shows Ms. **KL** entering the party first, carrying what appears to be a translucent plastic pitcher, containing a red unknown liquid and the Complainant entering second, carrying a box containing what appears to be several mason jars. Upon viewing the footage, the Investigator observed the that the Complainant was able to walk on her own, with no noticeable stumbles.
- Doorbell camera footage of the party location shows the Complainant and the Respondent leaving the party (Attachment #2) on the same day at 10:23pm with the Complainant exiting the house first and then grabbing on to a railing, using her right hand as she walks down 4 stairs. The footage shows the Complainant then reach for a second railing using her right hand again, as she walks down 4 more stairs. The video shows the Respondent exiting the house after the Complainant and slightly touch the first railing using his left hand, while walking down 4 stairs. The Respondent then slightly touches the second railing using his left hand again, while walking down 4 more stairs. Upon viewing the footage, the Investigator observed the Complainant was able to walk down both sets of stairs on her own, without the assistance of the Respondent. The Investigator also observed what appeared to be the Complainant using both railings as support to walk down the stairs. It should be noted that the Complainant was wearing what appeared to be high heel shoes at the time. The Investigator further noticed the Complainant take what appeared to be a "misstep," upon landing on the sidewalk, at the bottom of the stairs, as she turned "left." The investigator would describe the Complainant then walks briskly to catch up with Respondent. Upon catching up with him, the Complainant and the Respondent seem to engage in small talk, as they walk out of the view of the camera. At no point in the footage, did the Investigator notice the Complainant needing support or assistance from the Respondent.



c. **The Respondent engaged in sexual activity with the Complainant when he knew or should have known that the Complainant was incapacitated**

- ▮BE▮ (Witness F) stated that while smoking cigars in the backyard, the Complainant began holding a cigar with her fingers closed to the burning end, at which time he took it away from her and told the Respondent that she'd had enough and was too far gone, referring to her being heavily intoxicated. He stated that the Respondent replied, "She's just having fun. It's ok."

- Ms. ▮LTB▮ (Witness K) stated that on Monday, April 14, 2025, the Respondent told her, ▮ED▮ (Witness B) and ▮RN▮ Witness N) that the Complainant was extremely intoxicated and that he offered her (the Complainant) a ride home.

- ▮RN▮ (Witness N) stated that when she saw the Respondent give the Complainant a cigar, she told him to take it away from her, because she did not need it, because she was already extremely intoxicated. She stated that Respondent replied, "She's having fun," at which time Ms. ▮RN▮ walked away.

- At the 5:41 mark of the recording titled "Conversation with Will" (Attachment #17), Ms. ▮RN▮ stated that upon hearing about the allegations, her initial thoughts were that the Complainant was blacked out drunk and the Respondent was sober.

- At the 34:28 mark of the recording titled "Conversation with Will" (Attachment #171 Ms. ▮RN▮ stated that she thinks it was more believable in terms of how the "she" (the Complainant) looked, and that if the Respondent did anything, it was because the Complainant was drunk, to which Ms. ▮LTB▮ can be heard agreeing.

- At the 34:46 mark of the recording titled "Conversation with Will" (Attachment #17), Ms. ▮LTB▮ (Witness K) stated that all the girls and everyone could see how drunk "she" (the Complainant) was, to which Ms.▮(Witness N) can be heard agreeing.

## VIII. Conclusion

The investigator has examined and considered all the evidence and information gathered during the investigation. Complainant's allegation describes a possible instance of sexual assault prohibited by AU Sexual Misconduct policy. Both parties do not dispute that sexual interactions occurred. Therefore, the decision-maker (Hearing Panel) will need to determine if the sexual interactions were non-consensual based on incapacitation due to alcohol impairment. The decision-maker will also need to determine if the Complainant was incapacitated, did or should the Respondent have reasonably known. The decision-maker should determine whether the


preponderance of the evidence (more likely than not) occurred as described in the allegations. Certain factors, such as corroboration, may bolster the reliability of the evidence as well as the credibility of party and witness statements in the decision-maker's analysis. Consistency and plausibility may also bolster or detract from the decision-maker's assessment.

If the evidence supports the acts occurred as alleged by a preponderance, then the decision-maker should determine whether AU policy was violated for:

***Nonconsensual Sexual Penetration:*** *Any penetration of the vagina, anus or mouth by a penis, object, tongue, finger or other body part; or contact between the mouth of one person and the genitals or anus of another person. This provision also includes "Rape, Incest, and Statutory Rape" as defined by the Clery Act.*

***Consent:*** *Words or actions that show a knowing and voluntary willingness to engage in mutually agreed-upon sexual activity. Consent cannot be gained by force, intimidation or coercion; by ignoring or acting in spite of objections of another; or by taking advantage of the incapacitation of another where the respondent knows or reasonably should have known of such incapacitation.*

## Appendix

| | |
|---|---|
| 4/10/25 | Formal Complaint filed by ▇▇Jane_Doe▇▇ |
| 4/16/25 | Notice of Investigation and Allegation(s) – Complainant |
| 4/16/25 | Notice of Investigation and Allegation(s) – Respondent |
| 4/16/25 | No Contact Directive – Complainant |
| 4/16/25 | No Contact Directive – Respondent |
| 5/28/25 | Complainant Release Regarding Sensitive Health Information |
| 6/25/25 | USG Training Slides - Consent and the Role of Alcohol and Drugs |
| 6/25/25 | Augusta University Sexual Misconduct Policy for Students and Employees https://www.augusta.edu/services/legal/policyinfo/policy/sexual-misconduct-policy-students-employees.pdf |

## Investigation Timeline

| | |
|---|---|
| 4/16/25 | Notice of Investigations and Allegation(s) sent to Complainant and Respondent |
| 4/16/25 | No Contact Directive sent to Complainant and Respondent |



| 4/17/25 | Initial interview request sent to Complainant and Respondent, via email |
|---|---|
| 4/22/25 | Initial interview with Complainant |
| 4/22/25 | Interview requests sent to Witness A- KL , Witness B- ED , Witness D- RM and Witness F- BE |
| 4/24/25 | Interviews with Witness A- KL Witness B- ED and Witness E- ZC |
| 4/24/25 | Interview request sent to Witness C- Dr. EG |
| 4/25/25 | Second interview request sent to Respondent, via email |
| 4/25/25 | Interview requests sent to Witness G- Dr. FP and Witness H- Dr. NP |
| 4/28/25 | Interview requests sent to Witness I- GR , Witness J- LH Witness K- LTB and Witness L- RM |
| 4/29/25 | Interview request sent to Potential Witness #1- VS |
| 4/30/25 | Interview request denied by Potential Witness #1- VS |
| 4/30/25 | Interview with Witness F- BE |
| 5/1/25 | Interviews with Witness G- Dr. FP |
| 5/2/25 | Interview with Witness H- Dr. NP |
| 5/5/25 | Third interview request sent to Respondent, via email |
| 5/5/25 | Interview with Witness I- GR |
| 5/6/25 | Interview with Witness J- LH |
| 5/6/25 | Interview with Witness K- LTB |
| 5/9/25 | Interview with Witness L- RM |
| 5/15/25 | Initial interview with Respondent |
| 5/15/25 | Request to Respondent to interview Potential Witness #2- AM |
| 5/20/25 | Follow-up interview with Complainant |
| 5/21/25 | Access to doorbell camera evidence provided to Complainant and Respondent |
| 5/21/25 | Second request made to Respondent to interview Potential Witness #2- AM |
| 5/21/25 | Interview request sent to Witness M- AM |
| 5/28/25 | Interview request sent to Witness O- Dr JS |
| 5/30/25 | Follow-up interview with Respondent |
| 5/30/25 | Third request made to Respondent to interview Potential Witness #2- AM |
| 6/3/25 | Interview request sent to Witness N- RN |
| 6/3/25 | Interview with Witness N- RN |



| 6/4/25 | Interview with Witness O- Dr. ▮JS▮ |
| 6/4/25 | Phone interview request sent to Witness P- ▮DR▮ |
| 6/4/25 | Phone interview with Witness P- ▮DR▮ |
| 6/9/25 | Title IX Draft Investigative Report sent to Complainant and Respondent |

**List of Attachments**

| Attachment 1 | Electronic Evidence- Doorbell camera footage of the Complainant and ▮KL▮ (Witness A) arriving to the cocktail party, Saturday, March 29, 2025, 6:14pm<br>https://augustauniversity.box.com/s/0es3snchv568bdcq7esmvohg81onp4gf |
| Attachment 2 | Electronic Evidence- Doorbell camera footage of the Complainant and the Respondent leaving the cocktail party, Saturday, March 29, 2025, 10:23pm<br>https://augustauniversity.box.com/s/0es3snchv568bdcq7esmvohg81onp4gf |
| Attachment 3 | Complainant's doorbell notifications |
| Attachment 4 | Photos of bruises on Complainant's left leg and right hip |
| Attachment 5 | Complainant's call log |
| Attachment 6 | Student Success Letter to Complainant |
| Attachment 7 | ▮AM▮ - Potential Witness #2 phone call list |
| Attachment 8 | Instagram Direct Message from Complainant to ▮AM▮ Potential Witness #2) |
| Attachment 9A | Electronic Evidence- Voicemail from Complainant to ▮AM▮ (Potential Witness #2)<br>https://augustauniversity.box.com/s/0es3snchv568bdcq7esmvohg81onp4gf |
| Attachment 9B | Time stamp of Complainant's Voicemail to ▮AM▮ (Potential Witness #2) |
| Attachment 10 | Text message from Respondent to ▮ED▮ (Witness B), ▮LTB▮ ▮(Witness K) and ▮RN▮ (Witness N) |
| Attachment 11 | Text message from Complainant to female classmates |
| Attachment 12 | Text message from Respondent to ▮AM▮ (Witness M) |
| Attachment 13 | Email from ▮VS▮ (Potential Witness #1) to Investigator |
| Attachment 14 | Respondent's Written Statement |



| Attachment 15 | Complainant's Written Statement |
| Attachment 16 | Phone Call from Respondent to Dr. ██FP██ (Witness G) |
| Attachment 17 | Electronic Evidence- Conversation with Will https://augustauniversity.box.com/s/0es3snchv568bdcq7esmvohg81onp4gf |
| Attachment 18 | Complainant's Written Response to Title IX Draft Investigative Report |
| Attachment 19 | Respondent's Written Response to Title IX Draft Investigative Report |

## Reporting Timeline

| 4/2/25 | Approximately 11am: the Complainant reported alleged sexual assault to Dr. ██NP██ Witness H) |
| 4/2/25 | Approximately 11:30 am: Dr. ██NP██ reported alleged sexual assault to Dr. ██EG██ (Witness C) |
| 4/2/25 | 11:39am: Dr. ██EG██ reported alleged sexual assault to Title IX Coordinator, Julie Kneuker, via email |
| 4/2/25 | Early Afternoon: ██AM██ (Potential Witness #2) advised of alleged sexual assault by ██VS██ (Potential Witness #1) |
| 4/2/25 | Approximately 12:30-12:45pm: ██LTB██ advised of alleged sexual assault by ██AM██ (Potential Witness #2) |
| 4/2/25 | Approximately 1:30pm: Drs. ██EG██ and Paletta spoke with Title IX Coordinator, via telephone |
| 4/2/25 | 5:52pm Dr. ██FP██ Witness G): received phone call from Respondent, advising he believes that he was sexually assaulted and requesting contact information for Title IX Coordinator |

**AUGUSTA UNIVERSITY**

**TITLE IX INTAKE FORM** (Updated October 25, 2020)

Today's Date & Time **April 10th, 2025**

**Reporter Name:** ▨ JANE DOE ▨ Reporter info (phone, email) ▨

**Complainant Name** ■ JANE DOE ▨ Gender: Female ■ Male ☐ Other_____ Age: 24

Student ■ Employee ☐ Other_____ Contact (phone, email, address) ▨

**Respondent Name** JOHN DOE ▨ Gender: Female ☐ Male ■ Other_____ Age: 22-24

Student ■ Employee ☐ Other_____ Contact (phone, email, address) ▨

If an employee, list the department: _____

**INCIDENT DETAILS:**

Date & Time **3/29/25, evening**_____ Location **Off campus party/** JANE DOE **apartment**

Incident Type: (check applicable)

☐ Sexual Harassment ☐ Stalking ☐ Dating Violence ☐ Domestic Violence

☐ Sexual Exploitation ☐ Nonconsensual Sexual Contact ■ Non-Consensual Sexual Penetration

Details: There was an off campus party for medical students. I, JANE DOE as heavily intoxicated as witnessed by multiple other students. The Respondent, JOHN DOE took me to my apartment and raped me. I only remember the ending and him telling me to not tell anyone. At the party, I was seen falling down and not making any sense in my communications. At one point at the party, a student told JOHN DOE o back off, and he responded no, she is having fun.

_____

**REPORTING AND RESOLUTION OPTIONS:** Select your request(s):

| YES | NO | |
|---|---|---|
| ☑ | ☐ | I want to report and participate for an investigation related to Title IX |
| ☐ | ☑ | I would like to pursue an Informal Resolution option |
| ☐ | ☑ | I decline to provide information for an incident of sexual misconduct, dating/domestic violence |
| ☐ | ☑ | I want to pursue criminal charges against the accused person. |
| ☐ | ☑ | I already filed a criminal report with Augusta University Police or other Law Enforcement agency. |
| ☐ | ☑ | I want to pursue an order of protection with a law enforcement agency |

**REFERRALS/RESOURCES/SUPPORT SERVICES:** Select your request(s):

| YES | NO | |
|---|---|---|
| ☐ | ☑ | I want to obtain information for a Forensic Medical exam |
| ☐ | ☑ | I want information for student medical services, Student Health Services or an external agency |
| ☐ | ☑ | I want confidential counseling information for Student Counseling and Psychological Services |
| ☐ | ☑ | I want information for services with Rape Crisis and Sexual Assault Services |
| ☐ | ☑ | I want information for Safe Homes of Augusta |
| ☐ | ☑ | I want information for confidential Employee Faculty Assistance Program (EFAP) |

**INTERIM MEASURES:** Check your request(s):

☐ Issue a "No Contact Directive" ☐ Building restriction ☐ Safety Escort Services

■ Faculty Email Notice (out of school) ☐ Change of housing assignment

☐ No Trespass Letter for Non-Student/Employee ☐ Alternate work/class arrangements

*Requests for reporting options/resolution, support services and interim measures may require additional follow up and authorization. In the meantime, I agree to have no contact with the other party as identified or third party affiliates such as; complainant, respondent, reporter, witnesses, mutual friends or outside third party individuals through direct, indirect, verbal and/or written communication, unless authorized by the appropriate personnel such as; Title IX Coordinator, Office for the Dean of Students or Human Resources.*

Print Name: **JANE DOE** Signature **JANE DOE** Date: **April 10th, 2025**

**Confidential Resources :** Reporting to any of the following sources will be confidential. Your personal information will not be shared by any of the following services:

| | |
|---|---|
| 706-737-1471 | Student Counseling and Psychological Services |
| 706-724-5200 | Rape Crisis Services (Crisis Hotline) |
| 706-736-2499 | Safe Home 24/7 Restore (Crisis Hotline) |

**Additional Information:** Augusta University Police department is located at the Annex II Building, 15th Street, HT Building, Augusta, Georgia or by calling 706-721-2911. If you choose to file a report with Augusta University Police, an officer may conduct an investigation based on potential criminal activity related to the incident you report.

If you choose not to pursue nor participate in the Sexual Misconduct Title IX process or action with the University, the University may determine it is necessary to go forward with the complaint process without your involvement. You will be notified if such an action is needed. In addition, the University may be required to document this report for the Clery Act. There will be no personal information shared for the Clery report.

The University may be able to act on your complaint if you decide to pursue it at a later date. You may change your decisions (reporting options), at any time. However, the time of the incident in relation to the time of the investigation may affect whether or not substantial information may be gathered.

The Title IX Sexual Misconduct Policy and procedures protects the rights of the complainant and the respondent. Due process for the complainant and respondent is important, essential and monitored closely at Augusta University. **Retaliation** against the Complainant and Respondent during a Title IX allegation/complaint is strictly prohibited. Inform the Title IX Coordinator if retaliation of any kind occurs. Contact the Title IX Coordinator to discuss your reporting options and questions. Julie Kneuker, Title IX Coordinator 706-721-5144 (office) or email jkneuker@augusta.edu, Office Location: Compliance and Enterprise Risk Management Department, HS Building, Third Floor, Room 2034, 15th Street Augusta, Georgia.

---

| **Augusta University Campus Resources** | | **Community Resources** | |
|---|---|---|---|
| Augusta Public Safety, Emergency | (706-721-2911) | Richmond Sheriff Department | (9-1-1) |
| Title IX Coordinator | (706-721-0901) | Rape Crisis Services | (706-724-5200) |
| Student Counseling & Psych Services | (706)-737-1471) | Augusta University Medical Center | (706) 721-2273 |
| Student Health Services | (706)-721-3448) | University Hospital | (706) 722-9011 |
| Employee Faculty Assistance Program | (706) 721-3418 | Safe Homes | (706-736-2499) |



## AUGUSTA
### UNIVERSITY

**NO CONTACT DIRECTIVE**
*Delivered via Email*

April 16, 2025

JANE DOE

Dear Ms. JANE DOE

Based on concerns reported to the Title IX Office, I am issuing this No Contact Order between you and JOHN DOE as a non-punitive, non-disciplinary individualized supportive measure. This letter serves as official notice that, effective immediately, you are to have no direct or indirect contact with Mr. JOHN DOE or their property.

Direct and Indirect contact includes, but is not limited to:
- Face-to-face contact
- E-mail or other written correspondence
- Contact through social media or apps
- Phone calls, voicemails, and text messages
- Intentionally making contact on your behalf through a third party, including mutual friends

This order recognizes both parties are MCG-Savannah students and there may be occasions when they will be present in class, labs and/or exams together. However, there is to be NO interactions (including non-verbal), and reasonable distance should be maintained. Please work with your Deans if coordination is necessary.

Mr. JOHN DOE has been notified of this directive, and it shall remain in place indefinitely (unless otherwise notified) and I trust that you understand it and adhere to its specifics. While this directive is not a disciplinary measure any violation of it may result in disciplinary action. Thank you for your cooperation in the matter. If you have any questions or concerns, please reach out to me at jkneuker@augusta.edu or 706-721-5144.

Sincerely,
Julie Kneuker
Title IX Coordinator

CC:
Dr. Scott Wallace      AVP, Dean of Students
Dr. Elizabeth Gray    Campus Dean, MCG-GS Savannah Partnership
Dr. Nina Paletta      Campus Ast Dean-Student Affairs, MCG-GS Savannah Partnership



## AUGUSTA
### UNIVERSITY

**NO CONTACT DIRECTIVE**
*Delivered via Email*

April 16, 2025



Dear Mr. ████,

Based on concerns reported to the Title IX Office, I am issuing this No Contact Order between you and ████ as a non-punitive, non-disciplinary individualized supportive measure. This letter serves as official notice that, effective immediately, you are to have no direct or indirect contact with Ms. ████ or their property.

Direct and Indirect contact includes, but is not limited to:
- Face-to-face contact
- E-mail or other written correspondence
- Contact through social media or apps
- Phone calls, voicemails, and text messages
- Intentionally making contact on your behalf through a third party, including mutual friends

This order recognizes both parties are MCG-Savannah students and there may be occasions when they will be present in class, labs and/or exams together. However, there is to be NO interactions (including non-verbal), and reasonable distance should be maintained. Please work with your Deans if coordination is necessary.

Ms. ████ has been notified of this directive, and it shall remain in place indefinitely (unless otherwise notified) and I trust that you understand it and adhere to its specifics. While this directive is not a disciplinary measure any violation of it may result in disciplinary action. Thank you for your cooperation in the matter. If you have any questions or concerns, please reach out to me at jkneuker@augusta.edu or 706-721-5144.

Sincerely,

Julie Kneuker
Title IX Coordinator

CC:
Dr. Scott Wallace      AVP, Dean of Students
Dr. Elizabeth Gray      Campus Dean, MCG-GS Savannah Partnership
Dr. Nina Paletta      Campus Ast Dean-Student Affairs, MCG-GS Savannah Partnership



**AUGUSTA**
UNIVERSITY

## Notice of Title IX Investigation & Allegation(s)

April 16, 2025

JANE DOE

Delivered via Email

Dear Ms. JANE DOE.

Please be advised that a formal complaint in violation of Title IX of the Education Amendments of 1972 ("Title IX") has been filed against JOHN DOE ("Respondent"). The purpose of this notice is to provide all parties with notice of the allegations and to provide certain other information as required by law.

JANE DOE (Complainant) allegations include the following:

o   On March 29, 2025, the Complainant alleges after attending an off-campus party for medical students the Respondent drove her to her apartment and sexually assaulted her. The Complainant states she only remembers "the ending" and the Respondent telling her not to tell anyone. The Complainant alleges she was heavily intoxicated and was observed by multiple students at the party falling down and not able to clearly communicate. The Complainant also alleges at one point at the party, a fellow student told the Respondent to back off, and he responded no, she is having fun.

Should additional allegations emerge over the course of this investigation, this office will provide you with an updated and revised Notice of Investigation and Allegations.

The specific policy violations to be investigated are **Nonconsensual Sexual Penetration.**

**Nonconsensual Sexual Penetration:** Any penetration of the vagina, anus, or mouth by a penis, object, tongue, finger, or other body part; or contact between the mouth of one person and the genitals or anus of another person. This provision also includes "Rape, Incest, and Statutory Rape" as defined by the Clery Act.

> *Consent: Words or actions that show a knowing and voluntary willingness to engage in mutually agreed-upon sexual activity. Consent cannot be gained by force, intimidation or coercion; by ignoring or acting in spite of objections of another; or by taking advantage of the incapacitation of another where the respondent knows or reasonably should have known of such incapacitation. Minors under the age of 16 cannot legally consent under Georgia law. Consent is also absent when the activity in question exceeds the scope of consent previously given. Past consent does not imply present or future consent. Silence or an absence of resistance does not imply consent. Consent can be withdrawn at any time by a party by using clear words or actions.*

This letter serves as formal notice that Augusta University will be conducting a prompt, thorough, and impartial investigation of these allegations pursuant to the procedures detailed in the https://www.usg.edu/policymanual/section6/C2655/. The Respondent is receiving a similar notification. The



investigator assigned to investigate this matter is **Kymyetta Turner (kyturner@augusta.edu).** You will receive an email soon to schedule a meeting.

Once the initial investigation is completed, the investigator will email a copy of the Investigation Findings report to you. The report will outline the facts and information gathered during the investigation. The Complainant and Respondent will be given at least 10 calendar days to respond to the initial report and the investigator may update the report based upon any new information shared within that time frame. The Title IX Coordinator may review the final report with the Respondent and Complainant to answer any questions or concerns. The Investigation Findings report is not a final decision of responsibility and the Respondent is presumed to have not violated any policy until a final decision has been reached through the Hearing process.

An Informal Resolution may be possible (where deemed appropriate by the institution) throughout the Investigation process. Where a case is not resolved through informal resolution or informal resolution is not available, the matter will be formally adjudicated through the Hearing process.

You have the right to an advisor of your choosing to accompany you to all meetings, interviews, and hearings and to assist you in this process. **If you would prefer that the institution appoint an Augusta University trained advisor for you, please let me know within 3 business days of this Notice Letter.**

Although I strongly encourage you to be accompanied by an advisor (who can be an attorney) for all meetings, should you proceed without an advisor, and should this matter proceed to a hearing under the Policy, then an advisor will be provided to you for purposes of conducting questioning during the hearing. This is required by federal regulations.

During the investigation and resolution process, below is a list of additional information to keep in mind:

1. Write a statement or summary of your perspective of the incident, as a starting point for the investigator (not required, encouraged).
2. Gather and submit copies of relevant information, documentation, screenshots, videos, and witness names to the investigator, which provide evidence/facts to your perspective.
3. Review the sexual misconduct policy and procedures, if you need clarification or have questions contact the Title IX Coordinator Julie Kneuker at jkneuker@augusta.edu or 706-721-5144.
4. All communication related to a sexual misconduct allegation and investigation is communicated via augusta.edu email accounts (per the policy).
5. A No Contact Directive has been issued to both parties. Any questions or concerns should be directed to the Title IX Coordinator.
6. If support services and resources were not requested initially through the Title IX Coordinator, you may request them at any point during the Title IX Investigation.
7. The standard of evidence of "preponderance of the evidence" or "a more likely than not" standard will be utilized.
8. You have the right to discuss this matter with your advisor and others in your support system, but the institution will conduct this investigation confidentially, meaning that it will only share information as permitted or required by law.



9. Augusta University asks for your discretion in what you choose to share and hopes that you will respect the private and sensitive nature of these allegations. The Respondent has been provided with the same information.
10. The range in sanctions for a charge following a thorough investigation and hearing could range from a written warning/written reprimand to an expulsion/termination (depending on the charges, evidence/facts, interviews and whether or not there have been previous charges).
11. Individuals are prohibited from knowingly making false statements or knowingly submitting false information to a system or institution official. Any person found to have knowingly submitted false complaints, accusations, or statements, including during a hearing, are in violation of this Policy shall be subject to appropriate disciplinary action (up to and including suspension or expulsion/termination) and adjudicated under the appropriate institutional process.
12. Anyone who has made a report or complaint, provided information, assisted, participated, or refused to participate in any manner in the Sexual Misconduct Process, shall not be subjected to retaliation. Anyone who believes that they have been subjected to retaliation should immediately contact the Title IX Coordinator or their designee. Any person found to have engaged in retaliation in violation of this Policy shall be subject to disciplinary action.

If you have any questions concerning the Title IX process, procedures or need any further clarification, please contact me at 706-721-5144 or email jkneuker@augusta.edu.

Sincerely,

Julie Kneuker
Title IX Coordinator


CC:  Kymyetta Turner            Title IX Investigator
     Scott Wallace              Associate Vice President and Dean of Students
     Dr. Elizabeth Gray         Campus Dean, MCG-GS Savannah Partnership



**AUGUSTA**
UNIVERSITY

**Notice of Title IX Investigation & Allegation(s)**

April 16, 2025

JOHN DOE

Delivered via Email

Dear Mr. JOHN DOE

Please be advised that a formal complaint in violation of Title IX of the Education Amendments of 1972 ("Title IX") has been filed against you, JOHN DOE ("Respondent"). The purpose of this notice is to provide all parties with notice of the allegations and to provide certain other information as required by law.

JANE DOE (Complainant) allegations include the following:

o On March 29, 2025, the Complainant alleges after attending an off-campus party for medical students the Respondent drove her to her apartment and sexually assaulted her. The Complainant states she only remembers "the ending" and the Respondent telling her not to tell anyone. The Complainant alleges she was heavily intoxicated and was observed by multiple students at the party falling down and not able to clearly communicate. The Complainant also alleges at one point at the party, a fellow student told the Respondent to back off, and he responded no, she is having fun.

Should additional allegations emerge over the course of this investigation, this office will provide you with an updated and revised Notice of Investigation and Allegations.

The specific policy violations to be investigated are **Nonconsensual Sexual Penetration.**

**Nonconsensual Sexual Penetration:** Any penetration of the vagina, anus, or mouth by a penis, object, tongue, finger, or other body part; or contact between the mouth of one person and the genitals or anus of another person. This provision also includes "Rape, Incest, and Statutory Rape" as defined by the Clery Act.

*Consent: Words or actions that show a knowing and voluntary willingness to engage in mutually agreed-upon sexual activity. Consent cannot be gained by force, intimidation or coercion; by ignoring or acting in spite of objections of another; or by taking advantage of the incapacitation of another where the respondent knows or reasonably should have known of such incapacitation. Minors under the age of 16 cannot legally consent under Georgia law. Consent is also absent when the activity in question exceeds the scope of consent previously given. Past consent does not imply present or future consent. Silence or an absence of resistance does not imply consent. Consent can be withdrawn at any time by a party by using clear words or actions.*

This letter serves as formal notice that Augusta University will be conducting a prompt, thorough, and impartial investigation of these allegations pursuant to the procedures detailed in the https://www.usg.edu/policymanual/section6/C2655/. The Respondent is receiving a similar notification. The



investigator assigned to investigate this matter is **Kymyetta Turner (kyturner@augusta.edu).** You will receive an email soon to schedule a meeting.

Once the initial investigation is completed, the investigator will email a copy of the Investigation Findings report to you. The report will outline the facts and information gathered during the investigation. The Complainant and Respondent will be given at least 10 calendar days to respond to the initial report and the investigator may update the report based upon any new information shared within that time frame. The Title IX Coordinator may review the final report with the Respondent and Complainant to answer any questions or concerns. The Investigation Findings report is not a final decision of responsibility and the Respondent is presumed to have not violated any policy until a final decision has been reached through the Hearing process.

An Informal Resolution may be possible (where deemed appropriate by the institution) throughout the Investigation process. Where a case is not resolved through informal resolution or informal resolution is not available, the matter will be formally adjudicated through the Hearing process.

You have the right to an advisor of your choosing to accompany you to all meetings, interviews, and hearings and to assist you in this process. **If you would prefer that the institution appoint an Augusta University trained advisor for you, please let me know within 3 business days of this Notice Letter.**

Although I strongly encourage you to be accompanied by an advisor (who can be an attorney) for all meetings, should you proceed without an advisor, and should this matter proceed to a hearing under the Policy, then an advisor will be provided to you for purposes of conducting questioning during the hearing. This is required by federal regulations.

During the investigation and resolution process, below is a list of additional information to keep in mind:

1. Write a statement or summary of your perspective of the incident, as a starting point for the investigator (not required, encouraged).
2. Gather and submit copies of relevant information, documentation, screenshots, videos, and witness names to the investigator, which provide evidence/facts to your perspective.
3. Review the sexual misconduct policy and procedures, if you need clarification or have questions contact the Title IX Coordinator Julie Kneuker at jkneuker@augusta.edu or 706-721-5144.
4. All communication related to a sexual misconduct allegation and investigation is communicated via augusta.edu email accounts (per the policy).
5. A No Contact Directive has been issued to both parties. Any questions or concerns should be directed to the Title IX Coordinator.
6. If support services and resources were not requested initially through the Title IX Coordinator, you may request them at any point during the Title IX Investigation.
7. The standard of evidence of "preponderance of the evidence" or "a more likely than not" standard will be utilized.
8. You have the right to discuss this matter with your advisor and others in your support system, but the institution will conduct this investigation confidentially, meaning that it will only share information as permitted or required by law.



9. Augusta University asks for your discretion in what you choose to share and hopes that you will respect the private and sensitive nature of these allegations. The Respondent has been provided with the same information.

10. The range in sanctions for a charge following a thorough investigation and hearing could range from a written warning/written reprimand to an expulsion/termination (depending on the charges, evidence/facts, interviews and whether or not there have been previous charges).

11. Individuals are prohibited from knowingly making false statements or knowingly submitting false information to a system or institution official. Any person found to have knowingly submitted false complaints, accusations, or statements, including during a hearing, are in violation of this Policy shall be subject to appropriate disciplinary action (up to and including suspension or expulsion/termination) and adjudicated under the appropriate institutional process.

12. Anyone who has made a report or complaint, provided information, assisted, participated, or refused to participate in any manner in the Sexual Misconduct Process, shall not be subjected to retaliation. Anyone who believes that they have been subjected to retaliation should immediately contact the Title IX Coordinator or their designee. Any person found to have engaged in retaliation in violation of this Policy shall be subject to disciplinary action.

If you have any questions concerning the Title IX process, procedures or need any further clarification, please contact me at 706-721-5144 or email jkneuker@augusta.edu.

Sincerely,

Julie Kneuker
Title IX Coordinator


CC:    Kymyetta Turner              Title IX Investigator
        Scott Wallace                Associate Vice President and Dean of Students
        Dr. Elizabeth Gray         Campus Dean, MCG-GS Savannah Partnership



**AUGUSTA**
UNIVERSITY

### TITLE IX NOTICE REGARDING SENSITIVE HEALTH INFORMATION

I, **JANE DOE**, understand that the Augusta University Title IX Coordinator and Title IX Investigator(s) may include as a part of the Title IX investigation report, sensitive health information that you have **voluntarily submitted**, which is relevant and related to an incident reported to the university. I understand the report will be disclosed for the purpose of the Title IX investigation.

The information may be shared with the complainant, respondent, hearing officer and/or hearing panel and appeals officer involved with the complaint. This information may also be disclosed in special circumstances to officials at the University System of Georgia and to other officials for purposes required by law or Board of Regents/Augusta University procedure.

Complainant/Respondent Signature: _____ JANE DOE _____ Date 5-28-25

Title IX Coordinator/Investigator Signature: _____ Date 5-28-25

**OFFICE OF COMPLIANCE, ETHICS AND RISK MANAGEMENT**

Mailing Address:
1120 15th Street, HS Bldg
Augusta, Georgia 30912

T (706) 721-0900

F (706) 721-1910

augustahealth.org

# Consent and the Role of Alcohol and Drugs

 

 

 **UNIVERSITY SYSTEM OF GEORGIA**

# Incapacitation

- Physical and/or mental inability to make informed, rational judgments
  - Could the Complainant make rational, reasonable decisions ?
  - Could the Complainant appreciate the situation and address it consciously?

- More than mere intoxication or drunkenness






# Determining Incapacitation

- Incapacitation is a determination that will be made after the incident in light of all the facts available

- Assessing incapacitation is very fact dependent analysis of the incident in question

- Various forms of incapacity
  - Alcohol or other drugs
  - Mental/cognitive impairment
  - Injury
  - Sleep

 **UNIVERSITY SYSTEM OF GEORGIA**

31

# Two-Part Incapacitation Analysis

### Part One

- Was the Complainant incapacitated?

### Part Two

- Did the Respondent know of the Complainant's incapacity?
  - Or would a Reasonable Person have known?

Subjective analysis based on the facts surrounding the incident

Objective analysis based on the facts surrounding the incident

 **UNIVERSITY SYSTEM OF GEORGIA**

32

# Common Factors that Impact
## the Effect of Alcohol

- Rate of consumption
- Strength of drink
- Food in the stomach
- Body Weight
- Body Type – body fat percentage
- Gender

- Enzymes, hormones, water in body
- Medications
- Illness & dehydration
- Fatigue
- Caffeine
- Genetics



# Possible Signs of Incapacitation

- Lack of control over physical movements
  - Ex. Inability to dress or walk without assistance
- Lack of awareness of circumstances or surroundings
- Inability to communicate coherently
- Vomiting
- Total or intermittent unconsciousness





# Respondent's Awareness

- The Respondent [or a Reasonable Person] must have been aware of the Complainant's incapacity

- The Respondent's own intoxication does not negate their obligation to comply with policy standards

 UNIVERSITY SYSTEM OF GEORGIA



Attachment # 3- Complainant's Doorbell Notifications



Attachment # 4- Photos of Bruises on Complainant's Left Leg and Right Hip

Complainant's Left Leg                    Complainant's Right Hip



KL
mobile                    3/31/25

RM
home                      3/30/25

KL
mobile                    3/30/25

BM
FaceTime Video            3/30/25

KL
FaceTime Video            3/29/25

RY
home                      3/29/25

BM                        3/29/25

FaceTime Video            3/28/25

Attachment # 5- Complainant's Call Log



**MEDICAL COLLEGE**
**OF GEORGIA**
S A V A N N A H
AT GEORGIA SOUTHERN UNIVERSITY

Re: Academic Support and Next Steps for GI/GU/Endo Module

Dear JANE DOE

I hope this message finds you well. First, I want to acknowledge the hard work and dedication you've shown throughout this challenging GI/GU/Endo module. Medical school is a demanding journey, and each step requires immense effort and resilience.

I am reaching out because we have noticed that your performance on the module quizzes so far puts you in the bottom quartile of the class. Our goal is to support you in overcoming any challenges and achieving success.

To help you navigate this situation and develop a plan moving forward, **you are required to schedule and attend a meeting with Dr. Mukhongo, our learning specialist, before May 23, 2025**. She can work with you to identify strategies and resources tailored to your needs, whether that's refining study techniques, enhancing time management skills, or addressing other barriers you may be experiencing.

The medical school curriculum is designed to push you, but you are not expected to navigate this alone. Please know that reaching out for help is a sign of strength, and there is a team here to support you every step of the way.

To schedule your meeting with the learning specialist, please contact Dr. Mukhungo. I also encourage you to connect with me if you have any questions or concerns.

Looking forward to seeing you thrive.

Warm regards,


Nina Paletta, MD, FACP
AD for Student Affairs
Chair – Student Success Committee

Folami Powell, PhD
AD for Preclerkship Curriculum

---

**Physical Address:**
13040 Abercorn St, Suite 217
Savannah, GA 31419

**MEDICAL COLLEGE OF GEORGIA**
———— S A V A N N A H ————
AT GEORGIA SOUTHERN UNIVERSITY

**Mailing Address:**
Attn: Medical College of Georgia
Armstrong Center Room 217
11935 Abercorn St.
Savannah, Georgia 31419



**MEDICAL COLLEGE
OF GEORGIA**
S A V A N N A H
AT GEORGIA SOUTHERN UNIVERSITY

**Module Director, GI/GU/Endo**

**Elizabeth Gray, MD**
**Founding Dean**

**Physical Address:**
13040 Abercorn St, Suite 217
Savannah, GA 31419

**M E D I C A L   C O L L E G E   O F   G E O R G I A**
——————— S A V A N N A H ———————
AT GEORGIA SOUTHERN UNIVERSITY

**Mailing Address:**
Attn: Medical College of Georgia
Armstrong Center Room 217
11935 Abercorn St.
Savannah, Georgia 31419



| | |
|---|---|
| 28 | 4/15/25 00:16 |
| | 4/14/25 00:07 |
| | 4/4/25 00:19 |
| | 3/28/25 01:52 |
| | 3/27/25 00:21 |
| | 12/31/24 00:23 |
| | 12/24/24 00:20 |

Favorites  Recents  Contacts  Keypad  Voicemail

Attachment #7 - ▮▮AM▮▮ Phone Call list





<

**Unknown**
unknown
April 4, 2025 at 5:17 PM

0:00                                    -0:20

Transcription
"Hey, this is JANE DOE I I don I don't think you are
safe with him and I don't think you should
stick with him..."

Was this transcription           or            ?

Attachment #9B – Time Stamp of Complainant's Voicemail to AM



Tue, Apr 15 at 4:41 PM

**JOHN DOE**

The Title IX coordinator just hit me with a very subtle "men can't get raped"

Attachment #10- Text Message from Respondent to ED LTB and RN


  
Good morning loves!

Trigger warning for this text but it's necessary. I'm filing a Title 9 against JOHN DOE After the cocktail party, there was "non-consensual sexual penetration".

1) letting yall know for your own safety around him
2) if you have had any uncomfortable interactions with him, please report them if you feel okay with doing so
3) if you have any information about how drunk I was and are willing to attest to that, please let me know.

I recognize this is not the text you expect to receive but it would come out soon. Our staff has been very supportive, and I'm just collecting witnesses before the investigation is official.

 Stay safe

Attachment # 11- Text Message from Complainant to Female Classmates



Just got here

I got a loaner for you

Wed, May 7 at 3:28 PM

Hey, AM Thanks for helping me find AX149 today! In relation to our previous conversation:

Could you confirm that yesterday, May 6th, just before the start of the PCL lecture, I came to your office in significant emotional distress for a reason that I did not specify to you?

Thanks!

Wed, May 7 at 4:11 PM

No problem showing you the room, you did come to my office before PCL.

Delivered

Wed, May 7 at 5:36 PM

Thanks! Would you agree with that characterization of my emotional state?

Attachment # 12- Text Message from Respondent to AM


 Outlook

**Re: (SECURE) Title IX Interview**

**From** VS

**Date** Tue 4/29/2025 12:02 PM

**To** Turner, Kymyetta <KYTURNER@augusta.edu>

Hi Ms. Turner,

I completely understand and I really appreciate you reaching out. At this point in time, I think I would like to not speak about it. Thank you for your time.

Sincerely,



VS

**From:** Turner, Kymyetta <KYTURNER@augusta.edu>
**Sent:** Tuesday, April 29, 2025 11:53 AM
**To:** VS
**Subject:** Re: (SECURE) Title IX Interview

Mr. VS I completely understand. As I understand, you reached out to Mr. JOHN DOE fiancé with some concerns, as well as to medical school staff. If at all possible, I'd really like to spend a few minutes to discuss those concerns with you. I assure you, I will not take up much of your time.

If you are not willing to speak with me, I completely understand and thank you for your consideration.

KT

**From:** VS
**Sent:** Tuesday, April 29, 2025 11:48 AM
**To:** Turner, Kymyetta <KYTURNER@augusta.edu>
**Subject:** Re: (SECURE) Title IX Interview

Hi Ms. Turner,

Thank you for reaching out. I am familiar with the situation, and I honestly am not sure if I could offer any clarity regarding the events you are talking about, because I have no first-hand knowledge and was not present in the setting around the investigation. Thank you for everything you do.

Sincerely,



VS

**From:** Turner, Kymyetta <KYTURNER@augusta.edu>
**Sent:** Tuesday, April 29, 2025 11:38 AM
**To:** VS
**Subject:** (SECURE) Title IX Interview

Good afternoon Mr. VS

My name is Kym Turner and I have been tasked with conducting a Title IX investigation, involving JANE DOE and JOHN DOE and you have been named as a possible witness. I would like to meet with you to learn about any experiences, observations, or first-hand knowledge that you may have with regards to this case.

If you are willing to speak with me, please provide me with a day and time in the week of May 5th, in which you are available to meet with me virtually. The meeting should take no more than 30 minutes.

In the meantime, I ask that you be discreet in who you speak with about this matter, as it is sensitive and confidential. Should you have any questions or concerns about meeting with me or about the person mentioned in this email, please do not hesitate to reach out, as my contact information is below.

I look forward to hearing from you,


**Kymyetta E. Turner**
*Title IX Investigator/ Clery Act Coordinator*
University Ethics & Compliance
AUGUSTA UNIVERSITY
1499 Walton Way
Augusta, GA 30912

**Friday, March 29, 2025:**

On the evening of 29 March 2025, I attended an off-campus party for medical students of MCG Savannah at 128 E 48th St. The party was centered around a cocktail competition, for which students submitted their own recipes, and I served as a panel judge for the competition.

I arrived late to the party as I had been shopping for wedding supplies with my fiancée (now wife) ▊AM▊ in Pooler, Georgia. I arrived at the party at roughly 7:00 pm, after the scheduled competition at 6:00 pm.

I did drink alcohol at the party. After about an hour, I began to feel unwell.

At some point in the night, I offered a cigar to another student, ▊BE▊ outside in the courtyard. Two other students, Ms. ▊JANE DOE▊ and ▊KL▊, joined us in the courtyard and asked to smoke cigars. The group shared a couple of cigars. I am not a regular cigar smoker.

During the smoking of cigars Ms. ▊JANE DOE▊ began flirting and making lewd gestures towards me, such as imitating performing oral sex with a cigar while making eye contact with me. There was one phrase which she would repeat to me several times over the course of the party, "are you really sure you want to only fuck one person for the rest of your life?", in reference to my upcoming marriage. It is possible these comments were heard by other students, but I cannot recall any specific person who may have heard them.

Finally, with the night winding down, another student, Advaith Sunil, was organizing a group of students to continue the party downtown, and I declined his invitation to join them.

Ms. ▊JANE DOE▊ also declined to join them downtown and said that she wanted to go home instead. The friends she had arrived at the party with were going to Uber downtown, so she didn't have a ride home. She was going to call an Uber. Since I was driving and she would be left taking an Uber alone, I offered to drop her off at her house and she accepted.

Although I was intoxicated, I had control of my senses and actions. Ms. ▊JANE DOE▊ was able to speak plainly with me.

We left the house and went to my truck parked on the street. Ms. ▊JANE DOE▊ walked to my truck and got in under her own power and proceeded to provide me verbal directions to her apartment. After directing me to the apartment complex, she directed me to her apartment and said - "park anywhere." After I put the truck in park, Ms. ▊JANE DOE▊ leaned across the center console and kissed me.

After the kiss, she asked if I was mad at her for kissing me, and I replied that I was not. She then said "I wish you were upstairs railing me right now," to which I replied with words to the effect of - woah, I don't know about that. After some small talk, Ms. ▊JANE DOE▊ again said that she wanted me to come up to the apartment to have sex with her. I said something along the lines of – I don't think I'm comfortable with that.

1

The two instances where she asked to have sex were so sudden and so overt that they have remained with me, especially in light of what would follow.

In every interaction with Ms. JANE DOE set out below, she spoke plainly and explicitly. She had no difficulty walking up to her apartment, walking inside her apartment, entering her bedroom, coming out of her bedroom, or engaging in sexual contact.

We went up to her apartment. I was standing awkwardly in her hallway, as she put sheets on her bed. I was confused about what to do.

Ms. JANE DOE emerged from her bedroom and said – "why are you just fucking standing there," before pulling down my underwear (I had worn a kilt to the party) and performing oral sex on me. There were no other words exchanged before that. At one point she stopped and said "I can't believe you would cheat on your fiancée." I got married the following Sunday, April 6, 2025.

At some point, she stopped performing oral sex and we moved from the hallway to her bedroom where we began to have sexual intercourse. During the sex, I was mostly a passive participant. The sex was dominated by her performing oral or hand-based sex acts on me while she touched herself, interspersed with periods in which she asked me to perform acts from behind. Near the end of the sexual encounter, she said - "you're not leaving here until you cum" as I had become half-flaccid while she continued to perform oral sex. This was followed by one final bout of sex from behind, and I ejaculated on her back which is what she said she wanted me to do.

During the intercourse, she made other statements, like:

"Stop being a little bitch about it"

"You're such a fucking pussy"

(Both referring to my passive participation in the matter.)

"I love that I've got you shaking like that"

"You can't tell anyone about this or they're going to think I'm a horrible person."

When the sex was finally over, I wanted to leave as fast as possible. Ms. JANE DOE had been on her period and my pelvic area was covered in her menstrual blood. I asked to use her shower and she allowed me to, so I took a quick, frigid shower. I dried off, got enough of my clothes back on to be decent, gathered my remaining things and made my way to the front door.

As I was leaving, Ms. JANE DOE was standing naked in her kitchen. When asked why she was still naked, she replied with words to the effect of - it's my house, why shouldn't I be? She then again said, that "we are NEVER telling anyone about this." I agreed to that fact and reassured her that I would not.

I left the apartment and drove home.

2

The allegation that I sexually assaulted Ms. ▓▓▓▓ is false. Our sexual contact was consensual, and, in fact, Ms. ▓▓▓▓ initiated the oral sex she performed on me and willingly engaged in intercourse.

At no time was she incapacitated. She spoke clearly and directly about her wishes. Her actions were consistent with her spoken words.

Although I deeply regret having sexual contact with Ms. ▓▓▓▓ that night, the sexual contact was consensual.

**Subsequent Events:**

On Wednesday, April 2nd, ▓▓▓▓ the MCG Savannah class president, texted ▓▓▓▓ ▓▓▓ my fiancée while she was at work at the Children's Eye Institute and asked to meet her. ▓▓▓ replied that she was at work, and Mr. ▓▓▓ said – I'll come to you. He showed up outside her work place, and claimed that I had sexually assaulted a girl in our class at a party the previous weekend.

As an aside, I disclosed what happened to ▓▓▓ We got married as planned on Sunday, April 6.

That afternoon, I called Dean Powell, to inform her I had been sexually assaulted and was requesting Augusta University's Title IX information. I received the information from her that evening and was told that, based on the information I had provided her, she had already contacted the Title IX office on my behalf.

On Friday, April 4th, Ms. ▓▓▓▓ contacted ▓▓▓ via Instagram direct message and claimed that I had cheated on her. The message can be seen in Exhibit 1. That direct message claimed only that I cheated on ▓▓▓ and said nothing of sexual assault.

That same day, ▓▓▓ began receiving blocked phone calls on her cell phone. She handed the first call to me and asked me to answer while she continued folding laundry. I answered and heard Ms. ▓▓▓▓ tell me to "hand the phone to ▓▓▓ " I told ▓▓▓ who it was and she told me to hang up. I did so. There were more blocked calls that day, but ▓▓▓ deleted the calls from her history. Upon learning about their deletion, I asked ▓▓▓ to preserve any more communication to document the harassment.

One of the calls from Ms. ▓▓▓▓ to ▓▓▓ went to voicemail. The caller, which showed up as "unknown" was Ms. ▓▓▓▓ who claimed that I raped her and that ▓▓▓ shouldn't stick with me. A copy of the call log is attached as Exhibit 2. A copy of the recovered voicemail (found in the deleted voice mails) is provided as Exhibit 3.

**Harassment and Intimidation:**

First, I am deeply troubled by the untruthful rumors being spread by Mr. ▓▓▓ Ms. ▓▓ and Ms. ▓▓▓▓. They are intentionally damaging my reputation, and engaging in a systematic

3

poisoning of the witness pool. Second, they are making public assertions of my guilt to others to influence fellow students to be reluctant to even speak with me for fear of retaliation. Third, Mr. KL and Ms. JANE DOE have over the ensuing weeks continued to sit within 3 rows of me in a large auditorium, which is intended to harass and intimidate me. I should be able to continue my education without that harassment.

In the Notice of Title IX Investigation & Allegation(s) the Title IX Office informed both parties that "Augusta University asks for your discretion in what you choose to share and hopes that you will respect the private and sensitive nature of these allegations. The Respondent has been provided with the same information." Ms. JANE DOE has intentionally failed to abide by that directive and rather than respecting the Title IX investigation and my rights within the context of that investigation, she has launched a campaign of intimidation.

The incident occurred on March 29th, 2025, in the evening. There was a cocktail party organized by a couple of medical school students hosted at a student's house off campus, [LH] The medical students were encouraged to make their own cocktails and bring them to the party. At least 20 students attended.

I made a cocktail with vodka in it. I drank at least two shot equivalents of vodka at my apartment before the party. I was drinking freely from the mixing bowl I had made the drinks in. Coupled with the fact that I am 115 pounds, hadn't eaten for more than 2 hours, don't frequently drink, and recently increased my Zoloft dosage (a medication that interacts with alcohol), my level of intoxication was amplified. Before I left my apartment, I was already intoxicated to the point that I was spilling some of the drinks I had made. [KL] came over to my apartment to get ready before the party and take an Uber to the party with me. She witnessed me spilling the drinks. According to my Uber app, [KL] and I arrived at the party at 6:13 PM.

My alcohol consumption at the party included at least some of the drinks I brought, a strong vodka cocktail made by one of the other students, another cocktail made by a different student, moonshine, limoncello, a martini, and part of a beer. I don't remember consuming any food during the party.

I remember setting my carton of drinks down at the party and tumbling over as I did so. At one point in the night, I remember standing in the kitchen talking to my friends and double fisting cocktails. [ZC] has informed me that at one point in the party, I was speaking to her and not making any sense. She has also informed me that [KL] and she noticed [JOHN DOE] hovering around me throughout the night.

Later in the party, I remember smoking cigars in the backyard with [BE], [JOHN DOE] [JOHN DOE] (respondent), [KL] and [GR] This was the first time I had smoked a cigar, and I don't regularly use nicotine. [BE] has informed me that at one point he felt the need to tell [JOHN DOE] to back off me and did so, to which [JOHN DOE] responded something along the lines of "no, she is having fun." [BE] states that he noticed I was fumbling with the cigar, putting my fingers too close to the burning part.

I briefly remember talking with [RM] another medical student, after smoking the cigars. She later informed me that I had told her at the party that [JOHN DOE] had tried to have sex with me and that I had responded by saying, "you have a fiancé", to which he responded, "I'm a single man for 2 weeks".

The last memories I have of the party were [JOHN DOE] offering to give me a ride to my apartment. Speaking with others at the party, they all thought I was going home in an Uber. My apartment is on the Southside of Savannah. This is notable as the party was North on

48th street, and [ED] can corroborate that she saw [JOHN DOE] cell phone location was not at the party and not at his house, but instead somewhere on the Southside. She also has informed me that she saw [JOHN DOE] and me together when she left the party.

My memory then continues at my apartment; I am bent over in my bedroom with [JOHN DOE] penetrating my vagina with his penis from behind, and he pulls out to ejaculate on my back. Before he left, he told me not to tell anyone about this.

When I woke up the next day, I was completely naked, and blood from my period stained my legs down to my knees. My clothes from the night before were scattered on the floor in my hallway. There were two new bruises on me, one an inch below my knee on the inner aspect of my left leg, the other on my right hip. Looking through my call history, I had made several calls to friends whom I didn't remember calling.

Multiple students have commented to me about how drunk I was at the party since that day.



**3:04**

# John Doe  Edit

message  call  video    pay

April 2, 2025

5:62PM **Incoming Call**
2 minutes

Calls with a checkmark have been verified by the carrier

John Doe

Contact Photo & Poster

phone

FaceTime

Notes

Send Message

Favorites  **Recents**  Contacts  Keypad  Voicemail  433

Attachment #16- Phone Call from Respondent to Dr. Folami Powell

◻ Outlook

**Re: (SECURE) Title IX Draft Investigative Report**

From **Jane Roe**

Date  Wed 6/18/2025 4:16 PM

To  Turner, Kymyetta <KYTURNER@augusta.edu>

Cc  Kneuker, Julie <JKNEUKER@augusta.edu>; josh@zugishlaw.com <josh@zugishlaw.com>

Good afternoon Kymyetta,

Thank you for the opportunity to review the draft report and for your work in capturing and summarizing the information I provided you about my experience. I do have a few subtle but important points of clarification in the draft report to note for the final version:

Line 68 says that I consumed "approximately" two shots of vodka, but my written statement more accurately reflects that I drank "at least" two shot equivalents of vodka at my apartment before the party. Based on this, "approximately" should be replaced with "at least" on Line 68.

Line 70 says that I spilled some of the cocktails I made for the party upon getting into the Uber. The spill occurred while in my apartment prior to leaving and getting into the Uber to go to the party. **KL** was present when the spill occurred in my apartment, and I anticipate she can confirm this if needed.

Line 117 states I do not "believe" the bruises on my body were caused by rough sex. It is not that I don't believe the bruises were caused from rough sex, but rather I acknowledged they could be from rough sex or also other causes. In other words, the bruises may have been from rough sex, but also possibly due to falling and stumbling from intoxication the night before.

Line 151 says I stated **ED** saw me and the Respondent leave the party together. Based on what I knew at the time you and I visited, I said **ED** saw us at the party, but I did not state she also saw us leaving.

Line 234 says I made a call to **AM** "on a later date" after sending her a message. The message and the calls were all on the same day, April 4, so it may be more accurate to note it was "later on April 4" that I made the phone call.

Line 236 says I made the call to **AM** in anger at what the Respondent did to me. While this is true, I was also angry that when I first called **AM** the Respondent answered her phone and hung up on me. It would be most accurate to restate line 236 as "She stated that she made the call in anger at what the Respondent had allegedly done to her, in addition to being angry and frustrated that Respondent answered **AM's** phone and hung up on Complainant the first time Complainant tried to call **AM**"

Line 250 says I was initially hesitant to report the sexual assault because I did not want it to have a negative impact on the class. While this is true, I also noted I was concerned about the impact of reporting on me. This section would be most accurate if amended as "The Complainant stated that she initially hesitated to report the alleged sexual assault because she did not want it to have a negative impact on her, or the medical class, but that she ultimately decided to report it because she is concerned about the Respondent possibly harming future patients in the same way, especially those who would be placed under anesthesia while in his care."

Line 1426 is the same note as line 68 referenced above. It should say I consumed "at least" 2 shots of vodka rather than "approximately" 2 shots.

Lastly, it is my understanding that Lois provided you with a 50-minute recording wherein the Respondent may have acknowledged that I was extremely intoxicated. I do not know if you have listened to that recording, but if it contains any admissions or acknowledgments about my intoxication level or lack of consent, I would ask them to be referenced in the report.

Thank you for your attention to these clarifications based on the information I shared during our interviews and/or any written information I provided. I recognize these are subtle distinctions, but they may be important, and I want to make sure the report accurately reflects the information I was able to provide. I know all of this is a lot of work and information to gather. I really appreciate your efforts.

I also want to make you and Julie aware that I have retained a local attorney, Josh Zugish from Zugish Law Firm LLC, to serve as my counsel and advisor in this matter. Please copy him on all future communications to me. He is copied on this message and can be reached at josh@zugishlaw.com or 970-306-5225.

Best,

Jane Roe
Class of 2028
Medical College of Georgia

**From:** Turner, Kymyetta <KYTURNER@augusta.edu>
**Sent:** Wednesday, June 18, 2025 3:39 PM
**To:** Jane Roe
**Cc:** Burkhalter, Jessica <JBURKHALTER@augusta.edu>
**Subject:** Re: (SECURE) Title IX Draft Investigative Report

Good afternoon, Jane Roe

This is a friendly reminder of the approaching deadline **COB, 6/19/2025,** for your review and written response to the Title IX investigative report draft. You may respond in writing regarding this initial investigation report and any directly related information gathered during the investigation directly to me and copy Julie Kneuker (AU Title IX Coordinator). Please note that any information you submit should relate to discrepancies in your statement(s) or new evidence that you want to bring forward.

As the investigator, I will review your written responses, if any, to determine whether further investigation or changes to the investigation report is necessary. If I do not receive your response by the specified date, it will be assumed that you have no comments, questions, and/or requested changes regarding your statement(s) within this investigative report.

Title IX Investigator
Augusta University
19 June 2025

Ms. Turner,

After a thorough review of the draft investigation report, I respectfully submit the following clarifications and objections to specific content and conclusions found in the report.

### 1. Mischaracterization of Complainant's claims (LINE 21)
The summary inaccurately states that Jane Roe was unconscious during the incident. Nowhere does Jane Roe claim to have been unconscious. Her claims are found at LINE 105 of the report, and is further clarified at LINE 1409 and in Attachment 15. When questioned about specific matters in her follow up interview, rather than denying whether, for instance, she initiated oral sex and performed oral sex on respondent, she uniformly said – she didn't recall. The summary should be revised to accurately reflect her stated claims.

### 2. Incorrect timeline in Complainant statement (LINE 229)
When asked about her use of the word "cheated," Jane Roe made statements that are inconsistent with established facts and electronic evidence. At LINE 234, she claims that phone calls occurred on a later date, while phone records and the voicemail confirm they happened first. The contradiction of fact should be addressed in the report.

### 3. Missing context for Respondent's statement (LINE 412)
The question posed to John Doe concerned whether he had spoken to anyone *in the immediate days following the sexual encounter* should reflect that. I did speak to three MCG students about the incident after being notified of an investigation, as noted in the report, as well as my parents and spouse.

### 4. Inaccurate Timeline of Communication (LINE 423)
The report incorrectly states that the Instagram direct message preceded the phone calls. Electronic evidence shows the call (from a blocked number) occurred at 5:17 PM on April 4th, and the Instagram message was sent an hour later at 6:16 PM. This should be corrected for factual accuracy.

### 5. Conflicting Summary Regarding Intoxication (LINE 1459 vs. LINE 731)
The summary of statements by RM (Witness D) at LINE 1459 inaccurately reflects her testimony at LINE 731. RM states at Line 731 that the complainant *was not* slurring her words *but* was less reserved. Line 1459 changes this statement to *was* slurring her words *and* was less reserved. This factual inaccuracy should be corrected.

1

## 6. Witnesses were not assessed for their intoxication

During their interviews, witnesses were **not** asked about their own level of alcohol consumption. This is a key aspect of their credibility and the accuracy of collected information. This information should be included in the investigation.

## 7. Jane Roe's involvement in VS's harassment of AM was not assessed

The Complainant made her report to a school Dean on the morning of Wednesday, April 2nd. Within hours of that report, VS approached AM at her workplace to inform her of the allegations, beginning a campaign of harassment from VS and Jane Roe How is it that VS became aware of the matter in such a short time span, if not by prompting or communication from Jane Roe? This matter should be addressed with Jane Roe by the investigator.

## 8. Harassment and intimidation against the Respondent omitted

John Doe filed a complaint with the Augusta University Title IX Coordinator on May 7th, 2025, stating that Jane Roe repeatedly positioned herself in close proximity to him during mandatory lectures in violation of the No Contact Directive issued to her. Her behavior necessitated a clarification of the NCD that her behavior was inappropriate, which was addressed with Jane Roe This matter should be included in the investigation report, and is in stark contrast to Jane Roe's claims of trying to avoid John Doe during lecture.

## 9. Improper attempts to influence witnesses

Jane Roe has engaged in an improper attempt to influence the witness testimony, which should be included with the statements of each witness influenced. The text message sent to witnesses by Jane Roe before their interviews specifically requests testimony about "how drunk [she] was." The material fact that these witnesses were prompted by Jane Roe should be made clear in the report.

## 10. Improper analysis of security video footage

The security video footage should be allowed to speak for itself in front of a decision maker. Subjective analysis such as a degree of support from handrails being used by either party or any potential "missteps" should be left to a decision maker. Of extra note, repeated viewings of the video by myself fail to show any such "misstep", highlighting the subjectivity of such a claim. USG training documents require the Investigation Report to contain "an objective evaluation of the information."

If commentary were to remain, the commentary still leaves key details unstated, such as the fact that when on the sidewalk, Jane Roe walks briskly to catch up to John Doe and that she is entirely self-directed in her actions. The commentary also does not note that Jane Roe is wearing high heels.

**11. Supplemental information regarding Incapacitation in USG policy**

Training documents for the University System of Georgia and Augusta University provide additional insight as to the nature of incapacitation. These documents should be included, as they provide key insight to the meaning and application of USG policy.

*Title IX New Investigator Training - 2021*, Slides 34 and 35

Thank you for your attention to these matters. Please let me know if anything further is required.

Sincerely,

