**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **JOHN DOE,** | Civil Action No.:  **4:25-cv-233** |
| **Plaintiff,** | |
| **v.** | **PLAINTIFF'S MEMORANDUM** |
| | **OF LAW IN SUPPORT OF** |
| | **PLAINTIFF'S MOTION FOR** |
| **BOARD OF REGENTS OF THE** | **LEAVE TO PROCEED** |
| **UNIVERSITY SYSTEM OF GEORGIA** | **UNDER A PSEUDONYM** |
| **and MEDICAL COLLEGE OF** | |
| **GEORGIA AT AUGUSTA UNIVERSITY,** | |
| | |
| **Defendants.** | |

## PRELIMINARY STATEMENT

This is an action for violations of Title IX of the Education Amendments of 1972.  For the

reasons set forth below, Plaintiff respectfully requests that this Court issue an Order granting him

leave to proceed in this action under a pseudonym.

## STATEMENT OF FACTS

### The Events Of March 29, 2025

On March 29, 2025, John Doe and Jane Roe, medical students attending the Medical

College of Georgia at Augusta University ("AU") attended a party at the home of a fellow medical

student. VC at ¶ 14.  Prior to the date of the party, John and Jane had been acquaintances, but they

were not particularly close.  VC at ¶ 15.  Jane arrived at the party on the evening at approximately

6:13 PM, and John arrived at the party at approximately 7 PM. VC at ¶¶ 16-17. The party included

a cocktail making contest, for which John served as a judge.  VC at ¶ 18. As a result, John was

sequestered from the other partygoers from approximately 7:20 PM until 8:10 PM while they

sampled the various cocktails. VC at ¶ 19. After the judging concluded, John went outside with

B.E., a fellow classmate, and smoked a cigar. VC at ¶ 20. Shortly thereafter, another fellow

classmate, K.L., and Jane approached John and B.E. and asked to join them. VC at ¶ 21. While they were smoking, Jane made sexually suggestive comments towards John, which included imitating oral sex on a cigar while maintaining eye contact with John. VC at ¶ 22. Jane's sexually suggestive comments also included asking him, "Are you sure you want to fuck one person for the rest of your life?" VC at ¶ 23. Jane asked this question to John repeatedly throughout the evening, hinting at John's upcoming wedding. VC at ¶ 24.

Throughout the course of the evening, John did not witness how much alcohol Jane consumed at the party, and John did not witness whether Jane had consumed any alcoholic beverages prior to her arrival at the party. VC at ¶¶ 25-26. John also did not witness any signs that Jane was incapacitated at the party. VC at ¶ 27-32. John did consume alcohol during the party, however at no point did he become heavily intoxicated or otherwise incapacitated. VC at ¶ 33.

The party concluded at approximately 10:20 PM, at which time several of the partygoers asked Jane if she would like to go to local bars to continue drinking, an offer which Jane declined as she stated that she wanted to return to her residence. VC at ¶¶ 34-35. At this point, John offered Jane a ride home in his car, as he had driven to the party, instead of calling a ride share service, which Jane accepted. VC at ¶¶ 36-37. A doorbell camera captured video footage of Jane and John departing the party, and walking to John's vehicle. VC at ¶ 38. In the video footage, Jane is observed waking unassisted down the front steps of the house and walking, again without any assistance, to John's car, which was parked nearby the house. VC at ¶¶ 39-40. This footage also shows that Jane did not fall down at any point while walking down the steps or on the sidewalk as she walked to John's car. VC at ¶¶ 40-41. This footage clearly shows Jane walking fluidly, showing no outward signs of impairment, on her way to John's vehicle, confirming that Jane was not incapacitated when she left the party. VC at ¶¶ 42-43.

2

John did not know where Jane lived, and therefore in order to get Jane home, John asked Jane to provide him with instructions. VC at ¶ 44. Jane then proceeded to provide him turn-by-turn directions to Jane's home, which was a twenty (20) minute drive from the party. VC at ¶ 45. Jane did not consume any alcohol during the 20-minute drive to her home. VC at ¶ 46. Upon arriving at Jane's home, Jane instructed John to park in any available spot, and, once John parked, Jane proceeded to lean over the center console and kiss John. VC at ¶¶ 47-48. After the kiss, Jane told John the following: "I wish you were upstairs railing me right now," which was a clear indication from Jane to John that she wished to have sex with him. VC at ¶ 49. John declined the offer, and proceeded to continue the conversation in his car with Jane, at which point she eventually reiterated her desire by asking John to come up to her apartment and have sex with her. VC at ¶¶ 50-52. John denied the offer once again, stating that he was uncomfortable with that, but he did accept an invitation from Jane to come up to her apartment. VC at ¶¶ 53-55. From the time they left the party to the time they entered Jane's apartment, neither Jane nor John consumed any alcohol. VC at ¶ 54.

Upon entering her apartment, Jane went into her bedroom, while John remained in the hallway. VC at ¶ 56. Jane returned from her bedroom and asked John "Why are you just fucking standing there?" and proceeded to pull down John's underwear and began performing oral sex on John. VC at ¶¶ 57-59. At no point prior to commencing oral sex on John did Jane obtain consent from John for the sexual acts, and at no point prior to the oral sex did John provide consent to Jane. VC at ¶¶ 60-61. At one point, Jane stopped performing oral sex in order to taunt John by stating, "I can't believe you'd cheat on your fiancée" and then immediately continued performing oral sex on him without consent. VC at ¶¶ 62-63. Jane's actions caused John to feel frozen and unsure of what to do in this situation. VC at ¶ 64. Eventually, Jane took John to her bedroom and continued

to perform sexual acts without John's consent, which now included the use of her hands in addition to her mouth, while John sat passively by, letting the acts occur. VC at ¶¶ 64-66. Eventually, Jane asked John to perform penetrative sex on her from behind, and moved a wall mirror from one side of the room to another and placed it perpendicular to the bed and told John that she wanted him to have sex with her from behind in view of the mirror. VC at ¶¶ 67-68. John, based on Jane's aggressive behavior, feared that should he refuse to engage in sex with her, Jane would retaliate against him. VC at ¶¶ 69-70. Therefore, John proceeded to have sex with Jane in the manner that she directed. VC at ¶¶ 69-70. Throughout their entire sexual encounter, Jane continually made derogatory comments towards John, which included the following: "stop being a little bitch about it"; "You're such a fucking pussy"; "I love that I have you shaking like that" (referring to John's leg, which was trembling); and, "You can't tell anyone about this, or they're going to think I'm a horrible person." VC at ¶¶ 71-75.

Jane even refused to allow John to leave her residence until John ejaculated. Jane instructed John to ejaculate on her buttocks or back, and eventually John complied and ejaculated on her back. VC at ¶¶ 76-77. Upon termination of the sexual encounter, John noticed that there was blood on his gentiles and pelvic area as a result of Jane's menstruation, and asked Jane if he could shower. VC at ¶¶ 78-79. After showering, John proceeded to leave the apartment, before which Jane told him to never tell anyone about the sexual encounter. VC at ¶¶ 80-81. John left Jane's apartment at 11:29 PM. VC at ¶ 83.

From the time Jane and John left the party until the conclusion of the sexual encounter, Jane did not drink any alcohol. VC at ¶ 84. At no point prior to the sexual encounter did John witness any signs that Jane was incapacitated. VC at ¶¶ 85-93. To the contrary, prior to the sexual encounter Jane was capable of appreciating the situation, understanding the situation, and making

rational and reasonable decisions. VC at ¶¶ 94-95. During the sexual encounter itself, Jane did not exhibit any signs of incapacitation. VC at ¶¶ 87-98. Following the conclusion of the sexual encounter, Jane did not exhibit any signs of incapacitation, thereby reinforcing that at all times prior to, during, and after the sexual encounter Jane was capable of appreciating the situation and addressing it consciously and, therefore, not incapacitated. VC at ¶¶ 96-117.

### Jane Makes Inconsistent Statements and False Accusations Following March 29, 2025

On April 4, 2025, Jane Doe called John's fiancée multiples until John answered, and John's fiancée instructed him to hang up the phone. VC at ¶¶ 118-119. Jane then called again and left a voicemail at 5:17 PM for John's fiancée in which she asserted that John raped her and informed John's fiancée that she should end her relationship with him. VC at ¶ 120. Following this call, Jane sent a direct message on Instagram to John's fiancée in which Jane asserted that John had cheated, but did not make any assertion regarding an alleged rape. VC at ¶ 121. In the days following the sexual encounter, in her communications with other classmates, Jane at times refereed to the encounter with John as "sex" and at other times as "rape" and even told one classmate that John had been "unfaithful." VC at ¶ 122. In addition to her inconsistent references to the encounter, and despite showing signs that she had the capacity to consent prior to, during, and after, the sexual encounter with John, Jane informed numerous classmates that she was incapacitated when she had a sexual encounter with John. VC at ¶¶ 123-124.

### Jane Taints the Witness Pool

On April 11, 2025, Jane sent a mass text to all of the female classmates in her and John's cohort in which she accused John of sexually assaulting her and advised them to be cautious, and asked all of her classmates to say that she was very drunk that evening if anyone asked. VC at ¶¶ 125-126.

5

**Jane Files Title IX Complaint Against John**

Jane Doe reported false allegations of sexual assault to Dr. Nina Paletta, an AU employee, on April 2, 2025. VC at ¶ 148. After this false report, Dr. Paletta immediately contacted Dr. Elizabeth Gray, AU's Savannah Campus Dean, to obtain further reporting instructions. VC at ¶ 149. On April 10, 2025, Jane filed a false Title IX report with Julie Kneuker, AU's Title IX Coordinator, in which she alleged that John Doe sexually assaulted her. VC at ¶ 150.

In Jane's Title IX complaint, Jane falsely asserted that John had sex with her when she was heavily intoxicated and unable to consent. VC at ¶ 151. Based on Jane's false claims, John was charged with Nonconsensual Sexual Penetration, and AU formally launched an investigation of Jane's complaint on April 16, 2025. VC at ¶¶ 153-154.

**John Doe's Attempt to File Title IX Complaint Against Jane is Rebuffed by AU**

On April 2, 2025, John informed Dr. Folami Powell, an AU employee, that Jane had sexually assaulted him. VC at ¶ 155. During this conversation, John requested information concerning making a report to the Title IX Coordinator, but Dr. Powell informed John that this report of Jane's misconduct had been forwarded to the Title IX Coordinator, who would affirmatively reach out to John. VC at ¶¶ 156-157. However, Kneuker never reached out to John to discuss his allegations of sexual assault against Jane. VC at ¶ 158. Instead, Kneuker reached out to John on April 14, 2025, in order to inform him that AU would be initiating a formal investigation process based on Jane's false allegations against him. VC at ¶ 159.

On April 14 2025 and April 15, 2025, John asked Kneuker about the status of his complaint against Jane, and repeated the allegations that Jane had forcibly exposed his genitals and performed oral sex on him without his consent, which constituted Nonconsensual Sexual Contact under AU's Sexual Misconduct Policy. VC at ¶¶ 160-162. John also reiterated that Jane had coerced him into

having sexual intercourse, which constituted Nonconsensual Sexual Contact. VC at ¶¶ 163-164. In response Kneuker stated, "If you were having sex from behind, you were in control of the situation." VC at ¶ 165. This statement ignored the fact that John's complaint against Jane was also premised on Jane's nonconsensual removal of John's underpants and non-consensual oral sex that was performed on John. VC at ¶ 166. This statement also clearly indicated that Kneuker believed a penetrative sexual partner, in other words a male, cannot be the victim of sexual assault. VC at ¶ 167. Kneuker's statements to John expressed her belief that men cannot be the victim of sexual assault in the context of a sexual encounter with a woman. VC at ¶ 168.

In response to Kneuker's comments, John reiterated that Jane's conduct was aggressive and coercive, which made John feel pressured into having sex with Jane, and that while they were engaged in sexual intercourse Jane was directing all of John's movements. VC at ¶¶ 169-170. Despite these conversations, and despite John's report and allegations that Jane, without John's consent, exposed his genitals, performed oral sex, and coerced John into engaging in intercourse, Kneuker refused to accept John's Title IX complaint. VC at ¶ 172. Rather, Kneuker informed John that filing a countercomplaint against Jane would be seen as retaliatory. VC at ¶ 171.

During this meeting, John also brought it to Kneuker's attention that Jane tampered with potential witnesses when she sent a mass text to all of the female members of the cohort accusing John of sexual assault and directing all of these potential witnesses to emphasize how drunk Jane was on the night of the incident when they were questioned about it. VC at ¶ 174. Kneuker took no action in response to this, and instead conducted the entire meeting under the assumption that John had sexually assaulted Jane. VC at ¶¶ 173, 175.

**AU Refuses to Enforce the No Contact Order Against Jane**

On April 16, 2025, AU's Title IX office issued a mutual no-contact order ("NCO") to both John and Jane. VC at ¶ 176. The NCO prohibited, among other things, "face-to-face contact," and required that "reasonable distance" be maintained. VC at ¶ 177. On May 6, 2025, Jane violated the terms of the NCO when she approached the area where John was sitting, and sat directly in front, and two chairs to the side, of John, despite the availability of many other available seats. VC at ¶¶ 178-79. On May 7, 2025, John reported this violation of the NCO to Kneuker, however she refused to enforce the clear and unambiguous terms of the NCO. VC at ¶ 180. Kneuker refused to enforce the terms of the NCO, yet she revised the terms of the NCO to specifically prohibit the exact behavior that Jane had engaged in. VC at ¶ 181.

**The Faulty Title IX Investigation**

AU assigned Kymyetta E. Turner to investigate Jane's false claims of sexual assault. VC at ¶ 182. On May 15, 2025, John had his interview with Turner, during which John explained to Turner that Jane was the sexual aggressor and made verbal statements throughout the night expressing desire that John have sex with her. VC at ¶ 183. During this interview, John also informed Turner that: Jane pulled down John's underwear and performed oral sex on him without his consent, and that Jane coerced John into performing various sex acts with her, including intercourse. VC at ¶¶ 184-86. Neither AU or Turner took any action in response to John's additional report that that Jane engaged in conduct that constituted Nonconsensual Sexual Conduct. VC at ¶ 187.

Also during this interview John informed Turner and AU that Jane had contacted his fiancée several times on April 4, 2025, including leaving a voicemail in which Jane claimed that she was raped, and sent John's fiancée a direct message stating that John cheated on her. VC at ¶¶

188-89. John provided documentary evidence of the voicemail and message to Turner. VC at ¶ 190. Despite all of this information, neither Turner, nor AU took any action in response to John's report of Jane's misconduct, which constituted Stalking as defined by AU's Sexual Misconduct Policy. VC at ¶¶ 191-92.

The final Investigative Report was issued on June 30, 2025. VC at ¶ 193. This final report contained a number of evidentiary attachments. VC at ¶ 194. The attachments included an audio recording of a conversation that occurred between John and two non-party witnesses, that occurred on April 14, 2025, and was provided to Turner on May 6, 2025. VC at ¶¶ 195-96. Despite the fact that John had an interview with Turner nine (9) days after Turner received the audio recording, Turner did not inform John about the recording at their initial interview on May 15, 2025, nor did she inform John about it at their follow up interview on May 30, 2025. VC at ¶ 197. John only became aware of the audio recording when the Final Investigative Report was issued on June 30, 2025, almost two (2) months since AU was provided the recording. VC at ¶ 198. This deliberate and improper withholding of the recording until after the Final Investigative Report was issued prevented John from challenging the witness statements offered in support of Jane. VC at ¶¶ 199.

**The Title IX Hearing and Decision**

In connection with the Title IX investigation, a hearing was held before a three-person panel ("Hearing Panel") on July 18, 2025. VC at ¶ 200. The Hearing Panel issued its decision on July 25, 2025, (hereinafter the "Hearing Decision"), in which the Hearing Panel found John responsible for Nonconsensual Sexual Penetration and expelled John from AU. VC at ¶¶ 201-202. In arriving at this determination, the Hearing Panel misread the record evidence and expert testimony in a manner that was only favorable to Jane. VC at ¶ 203. Despite no one on the hearing panel having any medical training or expertise in alcohol metabolism, the Hearing Panel

nonetheless engaging in a "scientific" analysis of Jane's incapacitation based on her uncorroborated and self-reported alcohol consumption prior to John's arrival at the party. VC at ¶¶ 204-205. The Hearing Panel improperly relied on this unsupported analysis to reach its incorrect conclusion that Jane was incapacitated during her sexual encounter with John and that Jane's ingestion of Zoloft on the night in question exacerbated the effects of her alcohol consumption. VC at ¶ 206. The Hearing Panel also ignored testimony from a witness called by AU who testified to the contrary and stated that mixing alcohol and Zoloft would not lead to incapacitation. VC at ¶ 207. Not only did the Hearing Panel chose to selectively ignore this testimony, but the Hearing Panel and Decision relied heavily on testimony provided by three (3) witnesses – LTB, RN, and ZRC – to support its findings that Jane was incapacitated, John knew Jane was incapacitated, and that John was not a credible witness. VC at ¶ 208. All three of the witnesses stated that they had a bias towards believing any woman who made a claim that she was sexually assaulted. VC at ¶ 209. Thus, the testimony provided by LTB, RN, and ZRC was improperly tainted and should have been disregarded pursuant to the Code of Conduct. VC at ¶ 210. The Hearing Panel ignored this clear bias and violated AU's Code of Conduct when it relied upon this tainted testimony. VC at ¶ 211.

The Hearing Panel's error was further compounded when they credited LTB's testimony claiming that John knew Jane was extremely intoxicated even though LTB's testimony was contradicted by an audio recording of a conversation between John and LTB that was part of the evidence record the Hearing Panel was tasked with evaluating. VC at ¶ 212. Notwithstanding the audio recording which clearly contradicted LTB's testimony regarding John's supposed admission of Jane's incapacitation, the Hearing Panel actually stated that the plainly false testimony was "perhaps the most damaging to the Respondent's credibility." VC at ¶ 213.

In determining that John was not a credible witness, the Hearing Panel ignored evidence

10

proving that John relayed a consistent narrative of the night in question to numerous witnesses over a period of time. VC at ¶ 214. Rather, the Hearing Panel determined that John was not credible because of a supposed inconsistency in recounting how many drinks he had on the night in question when, in reality, John was asked to approximate the number of drinks and estimated two drinks on one occasion and three drinks on another. VC at ¶ 215.

While this nonmaterial issue was enough for the Hearing Panel to determine that John was not credible, the Hearing Panel ignored multiple inconsistencies in Jane's story and assumed that Jane's testimony was factual despite her continual changing description of the events giving rise to the Title IX process. VC at ¶¶ 216-19. For example, the Hearing Decision does not address that at times Jane stated that she had "sex" and at other times she stated that she was "raped" while at still other times she said John was "unfaithful." VC at ¶ 217. The Hearing Decision also stated that Jane told a consistent story to numerous outcry witnesses over time, despite the fact that the record shows this to be completely false. VC at ¶ 219. This was part of a one-sided decision-making pattern where the hearing panel went to great lengths to offer patently irrational explanations for Jane's unsupported and inconsistent claims. VC at ¶¶ 220-32. In one particularly glaring example, the Hearing Panel viewed video footage of Jane leaving the party that shows Jane descending two (2) flights of stairs when leaving the party, which she does in high heels and without any assistance. VC at ¶ 222. Once Jane arrives at the bottom of the stairs she increases her speed in order to catch up with John, who was walking ahead of her at this point. VC at ¶ 223. This video, which was taken shortly before the sexual encounter, shows definitive evidence that Jane was not exhibiting any outward, objective signs of incapacitation. VC at ¶ 224. Despite this video evidence, the Hearing Panel inserted their own biased and subjective perspective to reach a determination that completely contradicts the video evidence when they decided that Jane was incapacitated that

evening. VC at ¶¶ 221-225.

The Hearing Panel also determined that Jane was incapacitated despite a dearth of evidence that actually indicated how much alcohol Jane had consumed that evening. VC at ¶ 226-28. There were multiple witnesses at the party who claimed that Jane was incapacitated, but did not actually know how much Jane had to drink that evening. VC at ¶ 227. Some witnesses even testified that Jane was incapacitated even though they had left the party early and could not provide any explanation as to why they believed that Jane was incapacitated. VC at ¶ 228. Further, nine (9) out of the eleven (11) witnesses from the party received the text messages from Jane in which Jane instructed them to testify that she was very drunk at the party. VC at ¶¶ 229.

The Hearing Panel also ignored additional uncontested evidence which established that Jane had decision making capacity immediately prior to the sexual encounter. VC at ¶¶ 230-32. The Hearing Panel ignored the following evidence: that at the end of the party Jane was invited by her friends to continue drinking downtown; that Jane made the decision to go home and stated that she was going to order an Uber; that upon hearing she was going to order an Uber, John offered to drive Jane home, which Jane accepted; and that on the way to her home, Jane provided John with turn by turn directions. VC at ¶ 230. One witness even testified before the Hearing Panel that Jane told her that she did not want to go downtown due to her level of intoxication, a demonstration that Jane was aware of her circumstances and had the ability to make a deliberate and rational decisions, and another witness testified that Jane had no issues communicating with her at the end of the evening. VC at ¶¶ 231-32. While the Hearing Decision explains away Jane's behavior and testimony when it is problematic for her allegations, they created problematic issues for John where none existed. VC at ¶¶ 234-41. For example, the Hearing Panel imputed a higher standard of knowledge with regard to Jane's incapacitation based on a misperception that John possessed

12

military experience, that John had an undergraduate degree in human physiology, and that John had completed one year of medical school. VC at ¶ 235. First, John did not have a degree in human physiology, as the Panel claimed, but instead had a degree in biology. VC at ¶¶ 236. Second, John's association with the military is contractual only, as he was a participant in the Health Professions Scholarship Program, and had never actually received any military training or served in the military in any capacity. VC at ¶¶ 237-38. Third, while it is true John did have a year of medical school experience, Jane had also the same amount of medical school experience as John, yet that did not result applying the same heightened standard to Jane's conduct or testimony. VC at ¶ 239. These fabrications and misleading misrepresentations of John's background and imputation of constructive knowledge resulted in the Hearing Panel holding John to an impermissibly high standard in violation of the preponderance of the evidence standard. VC at ¶ 240. The Hearing Panel also cited the "timing and nature" of John's attempt to report Jane's violations of the Sexual Misconduct Policy as evidence of retaliatory intent and used it to undermine John's credibility VC at ¶ 241.

### John's Appeal of the Hearing Decision

On August 8, 2025, John appealed the Hearing Decision on the grounds of procedural error, and findings inconsistent with the weight of the evidence. VC at ¶ 242. AU denied John's appeal in the August 22, 2025 "Appeal Decision," which ignored substantial portions of John's appeal, improperly overlooked significant procedural defects in the Title IX process, and incorrectly disregarded the Hearing Panel's failure to properly assess the relevant evidence. VC at ¶¶ 243-44. John appealed the decision again in his Presidential Appeal, which was filed on August 28, 2025, and was denied on September 23, 2025. VC at ¶¶ 245-46.

## **LEGAL STANDARD**

Pursuant to Rule 10(a) of the Federal Rules of Civil Procedure, a complaint "must name all the parties." F.R.C.P. 10(a). However, "Courts have nevertheless 'carved out a limited number of exceptions to the general requirement of disclosure [of the names of parties], which permit plaintiffs to proceed anonymously.'" *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008) (quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 685 (11th Cir. 2001)). In determining whether to allow a plaintiff to proceed anonymously, courts in this Circuit employ the following test to determine whether to allow a plaintiff to proceed pseudonymously:

> The ultimate test for permitting a plaintiff to proceed anonymously is whether the plaintiff has a substantial privacy right which outweighs the "customary and constitutionally-embedded presumption of openness in judicial proceedings."

*Doe v. Frank,* 951 F.2d 320, 323 (11th Cir. 1992)(*quoting Doe v. Stegall*, 653 F.2d 180, 188 (5th Cir. 1981). The Eleventh Circuit has stated that a "plaintiff should be permitted to proceed anonymously only in those exceptional cases involving matters of a highly sensitive nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *M.J. v. Jacksonville Hous. Auth.,* 3:11-CV-771-J-37MCR, 2011 WL 4031099 at *2 (M.D. Fla. 2011)(quoting *Frank*, 951 F.2d at 324).

Other Circuits have employed a similar standard and have held that the public interest is served by protecting the identifies of parties when the issues involved include matters of a private, and highly sensitive nature. *See e.g., D.M. v. Cnty. of Berks,* 929 F. Supp 2d 390, 402 (E.D. Pa. 2013) (allowing plaintiffs to proceed anonymously where plaintiffs alleged that they were wrongly accused of child sex abuse); *Doe v. Hartford Life and Acc. Ins. Co.,* 237 F.R.D. 545, 550 (D.N.J. 2006) (allowing plaintiff to proceed under a fictitious name where disclosure of the plaintiff's bipolar disorder would risk stigmatization in his community and career); *Doe v. Evans*, 202 F.R.D.

173, 175-176 (E.D. Pa. 2001) (allowing plaintiff to proceed pseudonymously in case alleging sexual assault by former state trooper); *Roe v. Borup,* 500 F. Supp. 127, 130 (E.D. Wis. 1980) (allowing use of fictitious name in case alleging false allegations of child sex abuse).

　　In determining whether to allow a plaintiff to proceed anonymously, courts in this Circuit have employed a totality of the circumstances approach in order to determine whether a party's right to privacy outweighs the presumption of openness. *Doe v. Neverson,* 820 F. App'x 984, 986 (11th Cir. 2020). The first step in analyzing John Doe's claim of substantial privacy right is to look at the three factors analyzed in *Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe,* 599 F.2 707, 713 (5th Cir. 1979) (hereinafter "*SMU*"):

1.　Is the John Doe seeking anonymity challenging governmental activity?

2.　Will the John Doe be required to disclose information of the utmost intimacy?

3.　Will the John Doe be compelled to admit his intention to engage in illegal conduct and thus risk criminal prosecution?

*Plaintiff B v. Francis,* 631 F.3d 1310, 1316 (11th Cir. 2011). In the trial court's analysis of whether to allow a plaintiff to proceed pseudonymously, the court should "carefully review all circumstances of a given case and then decide whether the customary practice of disclosing the plaintiff's identity should yield to the plaintiff's privacy concerns. *Jacksonville Hous. Auth.,* 2011 WL 4031099 at *2 (*quoting Frank*, 951 F.2d at 323).

## ARGUMENT

### I.　The First Two Factors of the *SMU* Test Apply

　　John asserts that the first two factors enumerated in *SMU* are implicated and weigh in favor of John proceeding anonymously, while the third factor is inapplicable to this matter. John is seeking anonymity challenging government activity, as Defendant AU is a public medical school organized and existing by virtue of the laws of the State of Georgia. When a plaintiff challenges

governments or governmental activities, courts are more likely to permit plaintiffs to proceed under a pseudonym than if an individual had been accused of wrongdoing. *Yacovelli v. Moser*, No. 1:02-cv-596, 2004 U.S. Dist. LEXIS 9152 at *24-25 (M.D.N.C. May 20, 2014).

The disclosure of John's name will reveal information of the utmost intimacy, namely the intimate details of a sexual encounter that John engaged in. As pled in his verified complaint, and again throughout this memorandum, the basis underlying the alleged Title IX violations is a sexual encounter than occurred between John and Jane. Disclosure of the intimate details of the sexual encounter, necessary for this litigation, using the real names of John and Jane would result shame and embarrassment for both individuals. The Eleventh Circuit has stated previously that this Court should consider, among other factors, "whether prosecution of the suit will compel the party to disclose information of the utmost intimacy." *Doe v. Stegall*, 653 F.2d 180, 185–86 (5th Cir.1981). As applied to this case, disclosure of John's name would result in him forever being associated with allegations of sexual misconduct. Even if ultimately cleared, the damage would be done and for the rest of his life John would never be able to clear the stain from his name. Thus, in the instant matter, the injury litigated against would be incurred as a result of the disclosure of the John's identity, which weighs in favor of granting anonymity. *M.J*, WL 4031099 at *2. Keeping John's name confidential in this litigation is also consistent with Federal Policy under the Family Educational Rights and Privacy Act, as this case involves school disciplinary records. The confidentiality of school disciplinary records has already been well established. *See United States v. Miami Univ.*, 294 F.3d 797, 812 (6th Cir. 2002). Even if John ultimately prevails in this action after disclosing his name, the stigma associated with these allegations is so substantial that schools, employers, and John's community would judge John based on Jane's allegations.

## II.       This Litigation Involves Highly Sensitive And Personal Matters

This case undoubtedly involves highly sensitive and personal matters.  Plaintiff has been falsely accused of sexual misconduct, found responsible for Nonconsensual Sexual Penetration, and expelled from AU. VC at ¶ 202.  Numerous courts around the country have permitted college student plaintiffs who assert they were falsely accused and/or found responsible of sexual misconduct to proceed anonymously.  *See e.g. Doe v. Columbia Univ.,* 831 F.3d 46 (2d Cir. 2016); *Doe v. Univ. of Notre Dame*, No. 3:17CV298-PPS/MGG, 2017 U.S. Dist. LEXIS 223299 (N.D. Ind. May 8, 2017); *Doe v. Colgate Univ.*, No. 5:15-cv-1069 (LEK/DEP), 2016 U.S. Dist. LEXIS 48787 (N.D.N.Y. Apr. 12, 2016); *Doe v. Washington & Lee Univ.,* No. 6:14-cv-00052, 2015 U.S. Dist. LEXIS 102426 (W.D. Va. Aug. 5, 2015); *Doe v. Univ. of Montana,* No. CV 12-77-M-DLC, 2012 U.S. Dist. LEXIS 88519 (D. Mont. Jun. 26, 2012) ("With respect to the individual students involved in the Student Conduct Code proceeding, as well as the witnesses and University Court members involved in that proceeding, the Court finds that the interests of those individuals in avoiding undue embarrassment, harassment, and disclosure of sensitive private information outweigh the public's need to know their names."). John Doe should be provided similar protection and be permitted to proceed using a pseudonym.

This Circuit has afforded parties the protection of anonymity in similar situations. In *John Doe v. Rollins College,* the plaintiff, was a former college student who was accused of sexual assault by another college student, which resulted in a Title IX investigation by Rollins College and the plaintiff's ultimate expulsion. *Doe v. Rollins Coll.,* 352 F. Supp. 3d 1205, 1207 (M.D. Fla. 2019). As in *Doe v. Rollins College,* the fact pattern is similar in the case at bar as John Doe is challenging the Title IX investigation conducted by AU and subsequent expulsion. Accordingly, John Doe should be afforded the protection provided by a pseudonym.

### III.   Identification Poses A Risk Of Harm To John Doe

Plaintiff may in fact be deterred from prosecuting this case if the price he must pay is the disclosure of his identity. The chilling effect may also deter other individuals who have been falsely accused of sexual misconduct and wrongly adjudicated by their colleges or universities. Courts have determined that there is a substantial public interest in ensuring that cases involving important issues are adjudicated "without the risk of stigmatization." *Hartford Life and Acc. Ins. Co.,* 237 F.R.D. at 550. Revealing John Doe's identity would result in significant harm, namely, the exact damages he seeks to remedy in this matter – further reputational damages, economic injuries, and the loss of educational and career opportunities.  VC at ¶¶ 206-307; *see Doe v. Colgate Univ.*, 2016 U.S. Dist. LEXIS 48787 at *9 ("Should Plaintiff prevail in providing that the charges against him were unfounded . . . forcing Plaintiff to reveal his identity would further exacerbate the emotional and reputational injuries he alleges.")   Therefore, forcing Plaintiff to reveal his identity would not further any aspect of the litigation and "instead poses a risk that Plaintiff would be subject to unnecessary ridicule and attention."  *Doe v. Colgate Univ.*, 2016 U.S. Dist. LEXIS 48787 at *9.

Further, the Eleventh Circuit has held that in some cases the "social stigma" is sufficient enough to warrant proceeding anonymously as the social stigma attached to the plaintiff's disclosure is enough to overcome the presumption of openness in court proceedings. *Doe v. Neverson*, 820 F. App'x 984, 988 (11th Cir. 2020) (*citing  Frank,* 951 F.2d at 324). As applied, even if John Doe proceeds and prevails in this matter, the disclosure of his name, as a male linked to allegations of rape and sexual assault, would result in such a significant social stigma that would hinder his ability to pursue future career and licensing endeavors, including to obtain internships and to gain admission to residency programs. Moreover, any future potential employer would undoubtedly have access to the records related to this matter and discover that Plaintiff was

accused of sexual misconduct. In the context of Plaintiff's future career as a medical doctor, this would be especially damaging as even a false accusation would leave a stigma on the Plaintiff that would follow Plaintiff throughout his professional career. It is widely recognized that the likelihood of acceptance to a top tier residency program or obtaining employment in the medical profession is significantly reduced in light of the high number of applicants and stiff competition, let alone the social stigma associated with being accused of sexual misconduct, even if the claim is ultimately proven false. Additionally, a male making claims of his own sexual assault, which John made to AU during the Title IX investigation, carries the additional stigma, as men are often belittled when making claims of sexual assault. Based on the foregoing, John Doe should be permitted to proceed anonymously as requiring him to reveal his identity would result in significant harm.

The nature of the Internet today is such that any plaintiff's identity is readily accessible via a simple online search. Thus, courts must be willing to afford additional protective measures to avoid further damage to a plaintiff involved in a matter concerning allegations such as those underlying the instant matter. Further, there is no doubt that "cases stemming from investigations of sexual abuse on college and university campuses have garnered significant media attention, posing the risk of further reputational harm to both the plaintiffs in these cases and their accusers." *See Doe v. Colgate Univ.*, 2016 U.S. Dist. LEXIS 48787 at *6; *see also Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 180 (D.R.I. 2016) ("This case concerns an issue that has been the subject of increasing attention and controversy, particularly in academia, and which has garnered much recent media and scholarly commentary.")

Here, if John Doe were required to reveal his name, the public's access to his identity would result in reputational, academic, professional, and economic harm – the very harms which he seeks

to remedy in this action.  VC at ¶¶ 306-307.  This would be true even if John Doe were to succeed

on his claims against Defendant.  As noted by a court in the 2nd Circuit, "protecting the anonymity

of . . . those accused of committing sexual assault can be an important safeguard to ensure that the

due process rights of all parties are protected."  *Doe v. Colgate Univ.*, 2016 U.S. Dist.  LEXIS

48787 at *6-*7.

For all of the reasons set forth above, identification poses a risk of serious harm to  John

Doe.  As a result, he should be provided the anonymity of a pseudonym.

### IV.    Defendants Will Not Be Prejudiced If Plaintiff Is Permitted To Use A Pseudonym

John should also be permitted to proceed anonymously, as Defendants will not be

prejudiced in any way. Significantly, because Defendant is already aware of John's true identity,

they will not be prejudiced if he is afforded the protection of a pseudonym.  *See Doe v. Bedford*

*Cent. Sch. Dist.*, 2019 U.S. Dist. LEXIS 20625 at *3 (S.D.N.Y. Feb. 8, 2019, Civ. Action No. 18

CV 11797 (VB)).  There is no doubt that Defendant will have an unobstructed opportunity to

conduct discovery, present its defenses, and litigate this matter, regardless of whether Plaintiff

identifies himself or proceeds anonymously.  Accordingly, John Doe must be permitted to proceed

anonymously in this action as revealing his name will cause significant prejudice to him, while

proceeding anonymously will not hinder Defendants in any way.

### V.    There Is Minimal Public Interest in Plaintiff's Identity

There is simply nothing about John Doe that would heighten any public interest beyond

the normal public interest in any judicial proceedings sufficient to outweigh his right to privacy.

There is minimal public interest in disclosing John's name when weighed against his interest in

proceeding anonymously.  John is not a public figure or otherwise noteworthy individual, and there

is no basis for putting his sensitive and private personal matters on public display.   Further,

allowing John to use a pseudonym will not be detrimental to the general public's understanding of this matter (to the extent that there is any public interest in this matter). The public's knowledge will only be restricted as to his identity, but not to the substantive allegations in this matter. Moreover, forcing John Doe to reveal his identity could have a chilling effect on other similarly situated future plaintiffs. The factors at issue here, therefore, favor anonymity for John Doe.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order granting Plaintiff leave to proceed under a pseudonym and granting him such additional relief as the Court may deem just and proper.

Dated: Savannah, Georgia
        October 1, 2025

WITHERS LAW FIRM PC
*Attorneys for Plaintiff*

By: /s/ Thomas A. Withers
Thomas A. Withers
8 East Liberty Street
Savannah, GA 31401
912-447-8400
twithers@witherslawfirmpc.com

             -and-

OFFIT KURMAN, P.A.
*Attorneys for Plaintiff*

By: /s/ Kimberly C. Lau
Kimberly C. Lau (*pro hac vice* pending)
James E. Figliozzi (*pro hac vice* pending)
590 Madison Avenue, 6th Floor
New York, New York 10022
(212) 545-1900
kimberly.lau@offitkurman.com
james.figliozzi@offitkurman.com