# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 4:25-CV-00233-RSB-BWC |
| BOARD OF REGENTS OF THE | ) | |
| UNIVERSITY SYSTEM OF | ) | |
| GEORGIA and MEDICAL | ) | |
| COLLEGE OF GEORGIA AT | ) | |
| AUGUSTA UNIVERSITY | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendant Board of Regents of the University System of Georgia ("BOR")

and Medical College of Georgia at Augusta University ("AU")[1] respond to

Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction

(Doc. 4) as follows:

---

[1] Board of Regents of the University System of Georgia is the proper defendant to this lawsuit as Augusta University exists and operates solely as a unit of the Board of Regents.  *See* O.C.G.A. §§20-3-31 and 20-3-32; *see also McCafferty v. Medical Coll. Of Ga.*, 249 Ga. 62, 65 (1982) (holding that the Medical College of Georgia, as a unit of the Board of Regents of the University System of Georgia, is not a legal entity capable of being sued).

## INTRODUCTION

Plaintiff John Doe, a recently expelled medical student, seeks the extraordinary remedy of a temporary restraining order and preliminary injunction to reverse the AU's disciplinary decision finding him in violation of the university's sexual misconduct policy.  Unfortunately for Plaintiff, his motion fails to meet the high burden required for such relief.  He cannot demonstrate a substantial likelihood of success on the merits, irreparable harm, or that the balance of equities and the public interest supports judicial intervention in this student disciplinary matter.  Defendant requests that the Court deny the motion.

## FACTUAL BACKGROUND[2]

On April 2, 2025, Jane Roe reported an alleged sexual assault to Dr. Nina Paletta at AU.  Lau Decl., Exhibit C.  Thereafter, various members of AU's administration were made aware of Jane Roe's sexual assault complaint.  Gray

---

[2] Notably, in Plaintiff's Memorandum of Law (hereinafter referred to as "Mem."), Plaintiff states that "[i]n the interests of judicial economy [Plaintiff] respectfully refers the Court to the Statement of Facts included in Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Leave to Proceed Under a Pseudonym, as well as the allegations contained in the Verified Complaint ... and the Declaration of John Doe in Support of Request for a Temporary Restraining Order and Preliminary Injunction."  Mem. at 1.  This appears to be an attempt to circumvent L.R. 7.1(a)'s requirement that "[a]bsent prior permission of the Court, no brief shall exceed twenty-six (26) pages in length, inclusive of the certificate of service required by LR 5.1.[,]" as the cumulative nature of the factual allegations contained in the aforementioned documents would clearly exceed the remaining four pages allotted to Plaintiff under L.R. 7.1(a).

2

Decl., ¶4; Kneuker Decl., ¶6.  On April 10, 2025, AU's Title IX Coordinator and

Manager of Title IX and Clery Compliance (also referred to hereinafter

interchangeably as "Title IX Coordinator"), Julie Kneuker, received a signed,

formal complaint from Jane Roe against Plaintiff, alleging that she was sexually

assaulted by Plaintiff on March 29, 2025.  Lau Decl., Exhibit C.  In the complaint,

Jane Roe claimed that after Plaintiff drove her home from an off-campus cocktail

party, he had sex with her, despite her being heavily intoxicated and unable to

consent.  *Id.*  According to Jane Roe's complaint, Jane Roe woke up confused to

find Plaintiff ejaculating on her back.  *Id.*

Subsequent to Jane Roe's initial report to Dr. Paletta, Plaintiff called Dr.

Falomi Powell, requesting information on how to report a sexual assault.  Kneuker

Decl., ¶1.  That evening, Dr. Powell provided Plaintiff with the link to the Title

IX/Sexual Misconduct website on specifically how to report an alleged incident.

*Id.* at 10.  Although John Doe was provided ample opportunity to formally file his

own complaint in writing, he never did so.  Kneuker Decl., ¶9.

Following receipt of Jane Roe's written complaint, the Title IX Coordinator

assigned the complaint to Investigator Kymyetta E. Turner for handling.  Lau

Decl., Exhibit C; Kneuker Decl., ¶3.  An interim "No Contact Directive" was

instituted on April 16, 2025, as "a non-punitive, non-disciplinary individualized

supportive measure."  Lau Decl., Exhibit C.  As part of the investigation,

3

Investigator Turner conducted interviews with Jane Roe, John Doe, and 15 other witnesses, as well as reviewing relevant documentary evidence. *Id.* A Final Investigative Report was issued on June 26, 2025. *Id.*

The matter was adjudicated under the University System of Georgia Board of Regents Sexual Misconduct Policy. Lau Decl., Exhibit D. Under that policy, "nonconsensual sexual penetration" is defined as "[a]ny penetration of the vagina, anus or mouth by a penis, object, tongue, finger, or other body part or contact between the mouth of one person and the genitals or anus of another person." *Id.* "Consent" is defined as "words or actions that show a knowing and voluntary willingness to engage in mutually agreed-upon sexual activity." *Id.* According to the policy, critically, consent cannot be gained by taking advantage of the incapacitation of another where the respondent knows or reasonably should have known of such incapacitation. *Id.* The policy defines "incapacitation" as the "physical and/or mental inability to make informed, rational judgments, which can result from alcohol and/or other drugs." *Id.* The standard of proof to be applied was preponderance of the evidence. *Id.*

On July 18, 2025, a student misconduct hearing panel convened on this matter. Morgan Decl., ¶3. As the parties agreed that they had sex, the focus of the hearing panel concerned whether Jane Roe was incapacitated and therefore unable to consent. *Id.* at ¶5. Both Jane Roe and John Doe were represented at the hearing

4

by counsel. *Id.* at ¶6. At the hearing, both Jane Roe and John Doe gave opening statements, called and questioned witnesses, and concluded with impact statements; the three hearing panel members also questioned the parties and the witnesses directly. *Id.* After the hearing concluded, the hearing panel met and deliberated on the evidence presented for approximately seven hours over multiple days. *Id.* at ¶7.

On July 22, 2025, the hearing panel unanimously found Plaintiff responsible and concluded that the preponderance of the evidence supported that Jane Roe was incapacitated and therefore unable to consent to the sexual activity. Lau Decl., Exhibit D; Morgan Decl., ¶7; Kedigh Decl., ¶9; Myers Decl., ¶7. According to the hearing panel, Jane Roe's extended period of alcohol consumption, volume of alcohol consumed, the physiological factors enhancing Jane Roe's alcohol consumption, and witness testimony on Jane Roe's inability to communicate clearly, lack of control over her physical movements, and lack of awareness of her circumstances and environment all supported her incapacitation. Lau Decl., Exhibit D. Further, the hearing panel found the Plaintiff had both actual and constructive knowledge of Jane Roe's significant impairment from alcohol consumption. *Id.* The hearing panel also found that Plaintiff's testimony lacked credibility due to multiple material contradictions and inconsistencies. *Id.* Specifically, the hearing panel cited to Plaintiff's conflicting statements about his

level of intoxication and capacity during the evening in question, Plaintiff's inconsistent account of Jane Roe's apartment conditions, as compared to two other witness' testimony with first-hand knowledge of the same, Plaintiff's contradictory assessments of Jane Roe's condition, and Plaintiff's inconsistent testimony regarding his involvement and participation in the sexual encounter. *Id.* The hearing panel also concluded that given the timing and conditions leading to Plaintiff's purported counterclaim against Jane Roe, presumably to allege sexual assault against him by Jane Roe, it suggested retaliatory intent, rather than genuine grievance, which would not be consistent with his contention that the sexual activity was consensual. *Id.* According to the hearing panel, "[f]iling a counterclaim only after learning he was being investigated suggests an attempt to deflect blame and create confusion about who was the victim." *Id.* The hearing panel found Jane Roe to have "provided consistent accounts throughout the investigative process" and that "[h]er memory gaps and fragmented recollections [were] consistent with alcohol-induced incapacitation rather than fabrication." *Id.* Critical to the instant motion, the hearing panel made clear that gender had nothing to do with the hearing panel's determination. Morgan Decl., ¶10; Kedigh Decl., ¶9; Myers Decl., ¶9 (emphasis added).

Plaintiff subsequently appealed to Dr. Susan Davies, AU's Executive Vice President for Enrollment and Student Affairs on August 8, 2025. Lau Decl.,

Exhibit E.  A panel reviewed Plaintiff's appeal, and on August 22, 2025, it upheld

the hearing panel's decision.  Lau Decl., Exhibit F.  On August 28, 2025, Plaintiff

submitted an appeal to Dr. Russell Keen, AU's President, who affirmed the

decision on September 23, 2025.  Lau Decl., Exhibits G-H.  The instant lawsuit

followed.

## ARGUMENT AND CITATIONS TO AUTHORITY

A preliminary injunction is an "extraordinary and drastic remedy[.]"  *Keister*

*v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018).  For the court this relief, a plaintiff

must show:

> 1) substantial likelihood of success on the merits; 2) [that]
> irreparable injury will be suffered unless the injunction
> issues; 3) [that] the threatened injury to the movant
> outweighs whatever damage the proposed injunction may
> cause the opposing party; and 4) [that] if issued, the
> injunction would not be adverse to the public interest.

*Callahan v. U.S. Dep't of Health & Human Servs.,* 939 F.3d 1251, 1257 (11th Cir.

2019).  When the government is the opposing party, as here,[3] the third and fourth

factors "merge."  *Swain v. Junior,* 961 F.3d 1276, 1293 (11th Cir. 2020).  "'A

preliminary injunction is … not to be granted unless the [plaintiff] clearly

establishes the burden of persuasion as to the four requisites.'"  *ACLU of Fla., Inc.*

*v. Miami-Dade County Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (quoting *All*

---

[3] *See* O.C.G.A. § 20-3-20, *et seq.* (enacting statutes creating the Board of Regents).

*Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.,* 887 F.2d 1535, 1537 (11th Cir. 1989)). "Failure to show any of the four factors is fatal." *ACLU of Fla., Inc.*, 557 F.3d at 1198. Here, Plaintiff is unable to demonstrate any of the four factors required for a preliminary injunction to issue, and his motion must be denied by this Court.

## I. Plaintiff Has Not Demonstrated a Substantial Likelihood of Succeeding on the Merits of His Claims.

Plaintiff's likelihood of success on the merits is "generally the most important of the four factors." *Gonzales v. Governor of Ga.,* 978 F.3d 1266, 1271 n.12 (11th Cir. 2020). A plaintiff "with questionable claims would not meet the likelihood of success criterion." *Grupo Mexicano De Desarrollo v. Alliance Bond Fund*, 527 U.S. 308, 340 (1999). Importantly, in assessing Plaintiff's likelihood of success on the merits, the Court need not accept the allegations in Plaintiff's complaint as true. *See*, *Moore v. Smith*, No. 5:21-cv-00032-TES-CHW, 2021 U.S. Dist. LEXIS 268058, at *2-3 (M.D. Ga. Apr. 19, 2021) (rejecting Plaintiff's argument that the Court must accept as true the allegations in his complaint in determining substantial likelihood of success on the merits). *See also*, *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791-92 (7th Cir. 2022) ("In assessing the merits, we do not accept John's allegations as true, nor do we give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings"). The court need not address the remaining preliminary injunction

8

requirements if plaintiff fails to demonstrate a substantial likelihood of success on the merits. *Keister*, 879 F.3d at 1287.

Title IX sets forth that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). At the outset, Plaintiff expressly alleges a violation of Title IX and specifically asserts two Title IX claims under 1) erroneous outcome theory and 2) selective enforcement theory, both of which derive from *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994). Mem. at 21. However, Plaintiff incorrectly brings this case under Title IX; due to jurisdictional requirements under Title IX, the underlying student disciplinary matter was considered a Non-Title IX Sexual Misconduct case, as the alleged conduct occurred off-campus. Knueker Decl, ¶13.

Even considering this matter as pled by Plaintiff, in *Doe v. Samford Univ.*, 29 F.4th 675 (11th Cir. 2022), the Eleventh Circuit addressed the legal framework for establishing a violation of Title IX in the context of university disciplinary proceedings. There, the Eleventh Circuit found that *Yusuf* failed to "capture the full range of conduct that could lead to liability under Title IX." *Id.* at 687. According to the court, the *Yusuf* tests "'simply describe [two] ways in which a plaintiff might show that sex was a motivating factor in a university's decision.'"

9

*Id.* (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019). Instead, the Court modified the Seventh Circuit's approach to frame the inquiry more holistically as "whether the alleged facts, if true, permit a reasonable inference that the university discriminated against Doe on the basis of sex." *Id.* Under that framework, Plaintiff is unable to demonstrate a likelihood of success on the merits. Nevertheless, even if the Court were to consider Plaintiff's claims under erroneous outcome and selective enforcement theories, neither claim is likely to succeed.

A. <u>Plaintiff's alleged facts do not support a reasonable inference that BOR discriminated against him on the basis of sex.</u>

Although pleading his case under the incorrect standard, Plaintiff appears to allege various avenues by which BOR and AU discriminated against him on the basis of sex: namely, 1) preferential treatment, 2) procedural irregularities, and 3) actions of the hearing panel. Importantly, "to plausibly allege that sex is a motivating factor in the disciplinary decision, plaintiff's facts must allege 'something more' than just pro-complainant or anti-respondent bias." *See, Holmstrom v. Univ. of Tulsa*, No. 22-CV-0408-CVE-JFJ, 2023 U.S. Dist. LEXIS 79478, at *9 (N.D. Ok. 2023). For example, in *Samford University*, the plaintiff claimed that his "allegations about procedural irregularities at the investigation and hearing stages, 'public pressure[] to comply with Title IX,' public statements by university officials, and 'statistics revealing numerous allegations against male students' raise[d] a reasonable inference of sex discrimination." 29 F.4th at 687.

10

However, according to the Eleventh Circuit, that plaintiff's allegations, which were arguably more robust than the ones Plaintiff makes here, failed to make it plausible that he was suspended on the basis of sex. *Id.*

Here, the facts as presented in Plaintiff's motion and memorandum in support of a preliminary injunction do not mention or discuss the parties' sex or genders in any way, let alone in any way relevant to any purported bias. *See*, *Holmstrom v. Univ. of Tulsa*, No. 22-CV-0408-CVE-JFJ, 2023 U.S. Dist. LEXIS 79478, at *9 (N.D. Ok. 2023). Plaintiff fails to include any allegations regarding AU's investigation of similar claims, apart from his own, to support his claim of anti-male bias. At most – and tenuous, at best – Plaintiff claims bias against him as a respondent in this action, which BOR and AU also deny, and not bias because of his sex. But, as the Eleventh Circuit and courts across the country have made clear, anti-respondent bias does not constitute anti-male bias, as both males and females can be respondents. *See*, *Samford Univ.*, 29 F.4th at 690 ("[D]iscrimination against respondents is not discrimination 'on the basis of sex'"); *Doe v. Univ. of Denver*, 952 F.3d 1182, 1196 (10th Cir. 2020) ("[E]vidence of a school's anti-respondent bias does not permit a reasonable inference of an anti-male bias because both males and females can be respondents"); *see also*, *Holmstrom v. Univ. of Tulsa*, No. 22-CV-0408-CVE-JFJ, 2023 U.S. Dist. LEXIS 79478, at *9 (N.D. Ok. 2023). Thus, as Plaintiff's conclusory allegations fail to

11

link to any purported discrimination based on his sex, Plaintiff is unlikely to succeed on the merits of his case, requiring denial of the preliminary injunction.

Preferential treatment: Plaintiff alleges that BOR failed to accept and investigate his Title IX complaint against Jane Roe; that BOR did not initiate an investigation against Jane Roe for stalking; and that BOR refused to enforce the mutual No Contact Order in effect demonstrate preferential treatment to Jane Roe. Mem. at 6. Plaintiff further claims that Julie Kneuker, AU's Title IX Coordinator, exhibits "anti-male, pro-female bias[,]" as demonstrated through her Facebook picture's message "Believe Survivors" in 2017 and "#Ibelievesurvivors" in 2018, as well as her alleged statement that "a penetrative partner … cannot be a victim of sexual assault." Mem. at 11.

Reasonable explanations refute Plaintiff's claims of preferential treatment. As set forth in Ms. Kneuker's Declaration, Plaintiff "never filed a complaint or inquired further[,]" despite being provided with information on how to submit a complaint to the Title IX Office. Kneuker Decl., ¶7. Additionally, AU appropriately handled the contact between the two parties. Lau Decl., Exhibit C. Further, in response to Plaintiff's conclusory allegations that Kneuker is biased against males, prior to joining the staff at AU, between 2015 to 2019, Ms. Kneuker worked at a local rape crisis resource center as their volunteer coordinator and trainer. Kneuker Decl., ¶12. In 2017 and 2018, during her employment at the rape

crisis resource center, Ms. Kneuker added temporary filters to her Facebook profile during Sexual Assault Awareness month; however, she does not, nor did these filters, associate the word survivor to mean female or male specifically. *Id.* In her position as Title IX Coordinator and Manager of Title IX and Clery Compliance at AU, Kneuker is a neutral party in Title IX and non-Title IX sexual misconduct proceedings. Kneuker Decl., ¶1. Her role is primarily administrative, limited to receiving Title IX and non-Title IX sexual misconduct reports, providing supportive measures and resources to *both* parties, and coordinating the overall process. *Id.* at ¶2. She is not involved in, nor does she weigh in on, the ultimate decision in any given complaint. *Id.* at ¶5. And again, Ms. Kneuker does not believe that only women can be complainants. Kneuker Decl., ¶1. This is exhibited in her training materials, which include a graphic that Title IX is not gender specific ("People of any sex, gender, identity or expression are protected"). *Id.* at 2, Exhibit A. For these reasons, Plaintiff's claim fails.

Procedural irregularities: Plaintiff alleges that BOR withheld an audio recording until after the Final Investigation Report was issued. Mem. at 6-7. However, this purported procedural error is of no moment, as Plaintiff fails to link this alleged error as occurring because of his sex. And, even if he had, *Samford Univ.* makes clear that a "'bare assertion' that the procedural irregularities are attributable to his sex does not make his speculation plausible." 29 F.4th at 688.

Plaintiff also does not claim that only Jane Roe had access to the recording; the recording was included in the final report, and both parties had timely access to the recording in their preparation for, and use at, the hearing.  Kneuker Decl., ¶11; Kedigh Decl., ¶5. *See also*, *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, (7th Cir. 2009) (Seventh Circuit rejected John Doe's argument that "restricting his access to documents relevant to the investigation demonstrated an anti-male bias" because first, he did "not allege that females accused of sexual assault were allowed to review materials or that only female victims were allowed to review them [and] [s]econd, the documents attached to [his] complaint show that he accessed the investigative materials and information submitted by Roe multiple times before his hearing").  As such, Plaintiff's claim fails.

Actions of the hearing panel: Plaintiff makes a litany of unsupported, conclusory, and speculative claims about the hearing panel's actions in this case – primarily, that the hearing panel "misread the record evidence and expert testimony in a manner that only favored Jane[;]" relied on "tainted" evidence from three female witnesses; "improperly assumed that Jane's testimony was factual and did not address multiple inconsistencies in her ever-evolving description of the events giving rise to the Title IX process[;]" "went to great lengths to offer patently irrational explanations for Jane's unsupported and inconsistent claims[;]" "found that Jane was incapacitated despite a dearth of evidence indicating how much

14

alcohol she had actually consumed on the night in question[;]" and "ignored …

uncontested evidence providing that Jane had decision-making capacity – and was

therefore not incapacitated – immediately prior to the sexual encounter[.]"  Mem.

at 7-9.

However, Plaintiff's claims fail because his conclusory allegations wholly

fail to connect the hearing panel's actions as being due to his sex.  And Plaintiff

does not because he cannot.  The United States Supreme Court has made clear that

"[c]ourts should refrain from second guessing the disciplinary decisions made by

school administrators."  *See Davis v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629,

648 (1999).  Hearing panels are tasked with, and exercise discretion in, "weighing

the evidence presented by both sides and the credibility of the parties and

witnesses."  *Doe v. Tex. A&M Univ.*, No. H-20-4332, 2021 U.S. Dist. LEXIS

14114, at *19 (S.D. Tx. Jan. 26, 2021).  At this time, the actions of the hearing

panel here are entitled to deference by this Court.

Based upon the charge and allegations, the hearing panel in the instant

matter essentially sought to answer three questions under the preponderance of

evidence standard of proof: first, whether Jane Roe was incapacitated; second, if

Jane Roe was, whether Plaintiff knew or reasonable should have known that she

was incapacitated, given what he knew and observed; and/or third, whether a

reasonable person would have known Jane Roe was incapacitated.  Lau Decl.,

Exhibit D.  In answering these questions, the hearing panel assessed credibility

through witness testimony and documentary evidence in an all-day hearing.  *Id.*;

Kedigh Decl., ¶5.  Using a thorough process of evidentiary analysis, spanning

seven hours over multiple days, the hearing panel came to a well-reasoned decision

finding Plaintiff responsible.  Lau Decl., Exhibit D; Morgan Decl., ¶7.  Plaintiff's

attempt to substitute his judgment for that of the hearing panel's fails.

B. <u>The record does not support an erroneous outcome claim</u>.

According to Plaintiff, AU erroneously concluded that he violated AU's

sexual misconduct policy, cherry-picking allegations, as set forth above, to support

this assertion.  At the outset, nowhere in Plaintiff's memorandum of law does

Plaintiff set forth the legal standard for erroneous outcome, instead moving straight

into a litany of self-serving assertions as to why AU's decision was allegedly

wrong.  For Plaintiff's benefit, "[t]o state a Title IX erroneous outcome claim, a

plaintiff must plausibly allege 'both that he was innocent and wrongly found to

have committed an offense and that there is a causal connection between the

flawed outcome and [sex] bias.'"  *Doe v. Rollins Coll.*, 77 F.4th 1340, 1351 (11th

Cir. 2023) (quoting *Samford Univ.*, 29 F.4th at 686).

Here, the reasoning of *Samford University* applies.  As the Eleventh Circuit

noted there, "[b]ecause the two *Yusuf* tests are no more than fact-specific

applications of the Seventh Circuit test, … it follows from Doe's failure to satisfy

the latter that Doe has failed to satisfy the former as well." 29 F.4th at 692. The same is true in the instant matter. Plaintiff has not satisfied the erroneous outcome test because he failed to "allege particular circumstances suggesting that [sex] bias was a motivating factor behind the erroneous finding." *See*, *Id.* (quoting *Yusuf*, 35 F.3d at 715). Thus, Plaintiff cannot demonstrate a substantial likelihood of success on his erroneous outcome claim.

    C. <u>The record does not support a selective enforcement claim</u>.

    Importantly, and particularly relevant here, selective-enforcement theory has never been expressly adopted by the Eleventh Circuit. *Whitaker v. Bd. of Regents of the Univ. Sys. of Ga.,* No. 20-13618, 2021 U.S. App. LEXIS 27544, at *7-8 (11th Cir. 2021). However, assuming for purposes of this action that a Title IX violation can be established under a theory of selective enforcement, to state a claim for selective enforcement, "a plaintiff must plausibly allege 'an inconsistency' between his treatment by the university and the university's treatment of a similarly situated member of the other sex." *Doe v. Samford Univ.*, 29 F.4th 675, 693 (11th Cir. 2022); *Whitaker v. Bd. of Regents of the Univ. Sys. of Ga.,* No. 20-13618, 2021 U.S. App. LEXIS 27544, at *7-8 (11th Cir. 2021). In *Austin v. Univ. of Oregon*, 925 F.3d 1133 (9th Cir. 2019), for example, the plaintiffs, three male student athletes, tried to use campus protests and the University president's speech to claim selective enforcement but failed to establish

any plausible link connecting the University's disciplinary actions and these events to the fact that the student athletes were male. *Id.* at 1138. As noted by the *Austin* court, "[j]ust saying so is not enough … [and] [a] recitation of facts without plausible connection to gender is not cured by labels and conclusory statements about sex discrimination." *Id.*

Similar to *Austin*, Plaintiff, here, only "says so," failing to plead any nonconclusory allegations that male students were treated differently than similarly situated female students of sex. As such, Plaintiff's reliance on the selective enforcement theory fails.

## II. Plaintiff Has Not Demonstrated That He Will be Irreparably Injured in the Absence of a Preliminary Injunction.

Plaintiff's claimed harms – delayed graduation, reputational damage, and negative career impacts – are speculative and compensable through monetary damages and subsequent program reinstatement. "A showing of irreparable injury is 'the sine qua non of injunctive relief.'" *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). To be irreparable, the "injury must be neither remote nor speculative, but actual and imminent." *Id.* Indeed, "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

In the instant matter, Plaintiff fails to allege that he will, in fact, suffer an irreparable injury.  Rather, Plaintiff only alleges a speculative possibility of future injury.  Such speculation is woefully insufficient for the Court to grant extraordinary injunctive relief to Plaintiff at this time.  *See*, *Holland America Ins. Co.*, 777 F.2d at 997.  While Plaintiff cites to cases supporting his claim that if he "is forced to delay his medical training while this matter winds its way through the court system, he will forever be stigmatized by, and required to explain, a prolonged gap in his resume" and that "[c]ourts across the country have recognized that this constitutes irreparable harm[,]" courts remain split on this issue.  Indeed, many courts have expressly found the opposite – that a delay in education does not constitute irreparable harm warranting the issuance of a preliminary injunction. See, *Doe v. Tex. A&M Univ.*, No. H-20-4332, 2021 U.S. Dist. LEXIS 14114, at *23-24 (S.D. Tx. Jan. 26, 2021) (where student who was part of university's Corps of Cadets program was expelled for sexual assault and Court denied his request for a preliminary injunction, Court expressly found that "a delay in education is not irreparable harm"); *Doe v. Princeton Univ.*, No. 3:20-cv-4352-BRM-TJB, 2020 U.S. Dist. LEXIS 76827, at *20-24 (D.N.J. Apr. 21, 2020) (Court concluded that a delay in his education is analogous to a suspension and can be remedied through monetary compensation); *Knoch v. Univ. of Pittsburgh*, No. 2:16-CV-00970-CRE, 2016 U.S. Dist. LEXIS 117081, at *26-29 (W.D. Pa. Aug. 31, 2016) (Court found

19

no irreparable injury where plaintiff only offered speculation that he would be

unable to enter the workforce due to his suspension; Court concluded that any

interruption of his education and delay in entering the workforce could adequately

be compensated by monetary damages, should he be successful on the merits of his

claim); *Caiola v. Saddlemire*, No. 3:12-CV-00624, 2013 U.S. Dist. LEXIS 43208,

at *3-5 (D. Ct. Mar. 27, 2013) (Court rejected student plaintiff's claim that the

stigma of his expulsion for sexual assault would cause irreparable harm by

interfering with his academic and teaching career, finding such a claim to be

speculative).

Moreover, in no way is Plaintiff similarly situated to the Plaintiffs in *Jones*

*v. Bd. of Governors of Univ. of N. Carolina*, 557 F. Supp. 263 (W.D. N.C. 1983),

*affd.*, 704 F2d 713 (4th Cir. 1983) and *Doe I v. Bondi*, 785 F. Supp. 3d 1268 (N.D.

Ga. 2025) to which he cites, and both of those cases are completely inapposite to

the matter at hand.  In *Jones*, the nursing student at issue was alleged to have

cheated on an examination – hardly the situation at hand here.  *Id.* at 264.  Further,

the language quoted by Plaintiff was in relation to the Fourth Circuit's "balance of

hardships" test for the issuance of preliminary injunctive relief, which is not used

in this circuit.  *Id.* at 265-266.  Moreover, *Doe v. Bondi*, 785 F. Supp. 3d at 1268, is

inapposite to the case at hand.  That case concerned the termination of SEVIS

records for Plaintiffs, who were either F-1 student visa holders actively enrolled in

colleges and universities throughout the United States or were completing optional practical training under their student status terms. *Id.* at 7. The court noted that "[w]ithout a current SEVIS record, Plaintiffs effectively have no legal status and therefore face uncertainty about being able to attend classes, graduate, obtain and maintain employment, and keep housing and insurance." *Id.* at 8. While the court did find irreparable harm, it did so in the context of Plaintiffs being able to legally stay in the United States – not at all the situation here. *Id.* at 26-28. In sum, neither of these cases are analogous to the instant matter and should not be considered in deciding Plaintiff's entitlement to a preliminary injunction.

In the instant matter, Plaintiff can be made whole in monetary relief and reinstatement to his medical school program, should he prevail at trial. And, indeed, in the Verified Complaint, Plaintiff seeks damages on his two causes of action, as well as any other relief that the Court deems to be just, equitable, and proper. At such time, the Court could order that Plaintiff be reinstated to his class at AU, and any purported harm to him would be extinguished. Further, AU's residency programs, specifically, accept applicants who have gaps and would not necessarily see that as a negative mark on the application, provided that the gap was not for academic performance issues. Savage Decl., ¶4. Thus, as Plaintiff will not suffer irreparable harm if the preliminary injunction is denied, the Court should deny Plaintiff's motion.

21

### III.    Neither the Balance of the Equities Nor the Public Interest Weigh in Favor of Granting the Injunction Sought by Plaintiff.

Finally, the balance of equities and the public interest weigh against granting Plaintiff's motion.  Plaintiff claims that "AU will suffer no harm if the injunction and TRO are granted" and that "[g]ranting [his] motion will not have any adverse effect on the public interest."  Mem. at 20.  That is simply inaccurate and, in fact, constitutes a gross understatement of the circumstances at hand.

Reinstating Plaintiff would place a significant burden on AU, forcing AU to hold Plaintiff out as a qualified, credible medical provider-in-training when its extensive student misconduct proceeding left it concluding the exact opposite – namely, that Plaintiff is not credible and lacks integrity.  Importantly, a physician holds a position of trust.  *See generally*, *U.S. v. Howard*, 28 F.4th 180, 211 (11th Cir. 2022).  Indeed, "[t]here exists between a doctor and a patient a relationship of trust and confidence."  *Spikes v. Heath*, 175 Ga. App. 187, 190 (1985).  *See also*, *Leagan v. Levine*, 158 Ga. App. 293, 293 (1981) (physician and patient have relationship of confidence and trust).

Once Plaintiff moves into the clinical phase of his training in January, he will have the opportunity to directly interact with patients alone in sensitive settings, including the examination room, while unconscious in the operating room, and across other patient care settings.  Gray Decl., ¶5.  As part of this training, AU faculty members accept the risk of supervising trainees, like Plaintiff, with

vulnerable patients, patients for whom the faculty physician is ultimately responsible and liable. *Id.* By not divulging to those volunteer faculty members the conclusions made by the hearing panel, as outlined in its report, AU is putting those volunteer faculty members and their patients at risk. *Id.* AU is also put in the extraordinarily difficult position of jeopardizing its long-standing relationships built on trust with the hospitals and clinical sites who accept its students by not divulging its conclusions regarding Plaintiff to them. Gray Decl., ¶6. Should something occur with Plaintiff and a vulnerable patient, these hospitals and clinical sites may no longer agree to accept AU learners and trainees in the future. *Id.* Thus, requiring AU to hold Plaintiff out to the public as a credible, qualified provider places a significant liability on AU during this interim period while the underlying case plays out and when Plaintiff has not even demonstrated a likelihood of success on the merits of his claim.

Moreover, BOR maintains a compelling interest in maintaining a safe and nondiscriminatory educational environment for all students. Forcing AU to reinstate Plaintiff would undermine that important objective. This is particularly important when considering the small cohort of only 40 medical students at AU's Savannah campus. Gray Decl., ¶ 2.

Finally, reinstating Plaintiff would also undermine the integrity of the student disciplinary process and discourage the reporting of alleged sexual

misconduct.  The public interest favors allowing educational institutions to address sexual misconduct through established procedures.  Indeed, as set forth previously, "[c]ourts should refrain from second guessing the disciplinary decisions made by school administrators."  *See Davis v. Monroe Cnty Bd. of Educ.,* 526 U.S. 629, 648 (1999).  And, the trauma of a sexual assault may continue to resonate with a victim after the event.  *See*, *Doe v. Morehouse Coll.*, 622 F. Supp. 3d 1279, 1290 (N.D. Ga. 2022).  By having that trauma consistently resurfaced on school grounds, a victim can be systematically deprived of educational opportunities.  *Id.*  Regarding Jane Roe, specifically, Dr. Gray expressed significant concerns for her safety and well-being if this Court allows Plaintiff to return to campus, given the visible harm this situation has caused her and the likelihood that it would be administratively impossible to keep Jane Roe and John Doe apart for the remainder of their educations.  Grey Decl., ¶7.

Apart from his own conclusory assertions, Plaintiff has not shown that the alleged threat outweighs the harm to the administration of the medical school or that granting the motion will not be adverse to the public interest or to Jane Roe, specifically.  Plaintiff therefore fails to satisfy the third and fourth elements of his request for preliminary injunctive relief, and his motion should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a temporary restraining order and preliminary injunction should be denied.

Respectfully submitted, this 10th day of October, 2025.

CHRISTOPHER M. CARR          112505
Attorney General

*/s/Bryan K. Webb*
BRYAN K. WEBB                743580
Deputy Attorney General

*/s/Katherine P. Stoff*
KATHERINE P. STOFF           536807
Senior Assistant Attorney General

*/s/Kristen L. Settlemire*             919430
KRISTEN L. SETTLEMIRE
Senior Assistant Attorney General


*Attorneys for Defendant*
Georgia Department of Law
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Telephone: (404) 458-4336
Telephone: (404) 458-3491
kstoff@law.ga.gov
ksettlemire@law.ga.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2025, I have caused to be served the within and foregoing **RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Tom Withers, Esq.
Withers Law Firm, P.C.
8 East Liberty Street
Savannah, GA 31401

Kimberly Lau, Esq.
Offit Kurman, P.A.
590 Madison Avenue, 6th Floor
New York, NY 10022

*s/Katherine P. Stoff*
KATHERINE P. STOFF          536807
Senior Assistant Attorney General

26